COIN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **JANE DOE** | Civil Action No. 1:23-cv-00463 |
| **Plaintiff,** | **COMPLAINT FOR TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL** |
| **vs.** | |
| **MARK A. GIPSON** | |
| **Defendant.** | **PUBLIC COPY** |

**PLAINTIFF JANE DOE ("Plaintiff")**, by and through her attorneys, hereby files this Complaint for damages and injunctive relief against **DEFENDANT MARK A. GIPSON ("Defendant"** or **"Mr. Gipson")**.  Plaintiff alleges, with knowledge concerning her own acts and on information and belief as to all other matters (unless otherwise specifically stated), as follows:

<u>PRELIMINARY STATEMENT</u>

1.     Mr. Gipson is a 48-year-old white male with a history of targeting young minority women for exploitation.  After befriending Plaintiff, ███████████████████████, Mr. Gipson began offering to take Plaintiff on a trip to Europe to celebrate her finishing graduate school.  While Plaintiff was initially hesitant, she eventually agreed to join Mr. Gipson because the two had maintained positive communication on social media for the prior two years without incident.  During the trip, however, Mr. Gipson's demeanor began to change.  Mr. Gipson repeatedly pressured Plaintiff to drink copious amounts of alcohol and take mood-enhancing substances, and then photographed and videotaped Plaintiff while she was intoxicated and incapacitated.  Mr. Gipson also engaged in sexual intercourse with Plaintiff while she was under the influence.  As the trip progressed, Mr. Gipson became more aggressive with his advances, and stated that he wanted to take intimate photographs of Plaintiff in order to form a business promoting her images and content.  While Plaintiff did not agree to forming a business venture with Mr. Gipson to share her images, she allowed Mr. Gipson to take sensitive photos under the presumption that the photos would be for Plaintiff's use only, and not disseminated without approval.

2.     As the trip progressed, Mr. Gipson became more aggressive, ultimately resulting in Mr. Gipson physically assaulting Plaintiff, including punching her in the face and choking her on the floor as she attempted to escape.  After the trip, Plaintiff sought to cease contact with Mr. Gipson and asked for him to destroy the images and videos he had taken.  However, Mr. Gipson

\

refused to delete the content, stating that the images were his and demanding that Plaintiff continue to see him.  After Plaintiff rejected Mr. Gipson's attempts to begin a romantic relationship, Mr. Gipson began sharing the explicit images and videos, without consent, to Plaintiff's friends, acquaintances, and former employers via text messages and various websites, including social media applications.  Mr. Gipson openly bragged about: (i) filming Plaintiff engaged in sexual conduct; (ii) publishing Plaintiff's nude images online; (iii) sharing those videos on the dark web for profit; (iv) hacking Plaintiff's personal iCloud account; and (v) posting fake profiles of Plaintiff claiming she was a prostitute.  Mr. Gipson shared all of these images and information despite Plaintiff's explicit instruction to keep such material private.  Mr. Gipson also threatened Plaintiff with physical violence and continued dissemination of the nude images and videos if she did not agree to pay him money and continue to see him.

3.      Furthermore, Mr. Gipson injured Plaintiff in many other ways, including impersonating her on various social media websites.  For example, Mr. Gipson created a fake Instagram account in Plaintiff's name where he posted explicit images without her consent and "friended" many of Plaintiff's acquaintances and coworkers online to spread the illicit images.  Using this account, Mr. Gipson published and shared explicit images and videos of Plaintiff and falsely accused Plaintiff of multiple crimes, including prostitution, theft, solicitation, and fraud.  At the same time, Mr. Gipson made a false copyright report against Plaintiff's real Instagram account, getting the account removed from Instagram and ultimately limiting Plaintiff's ability to contact her friends on social media to inform them of the fake account Mr. Gipson was using to spread the illicit images and false accusations.  Mr. Gipson also admitted to hacking into Plaintiff's personal iCloud account, accessing her location without her permission, and viewing/downloading Plaintiff's personal images saved on that account.

3

4.      Mr. Gipson also directly sent messages to Plaintiff's friends and coworkers, which included illicit images, called Plaintiff a prostitute, and further bragged about accessing and profiting off of Plaintiff's private images.  Mr. Gipson also sent a barrage of messages, calls, and emails directly to Plaintiff over several months, continuously seeking to pressure Plaintiff into seeing him again.  Mr. Gipson further sent Plaintiff a fake "cease and desist" copyright letter, purporting to be from a law firm and threatening Plaintiff with severe financial liability, in a continued attempt to pressure Plaintiff into seeing Mr. Gipson.

5.      Mr. Gipson's wild accusations and publication of intimate visual material, without Plaintiff's consent, are not only despicable, but unlawful.  On March 15, 2022, President Biden signed into law the Violence Against Women Reauthorization Act of 2022.  Section 1309 of the act is codified as 15 U.S.C. § 6851.  Subsection (b)(1) creates a private right of action for victims of what is commonly referred to as "revenge porn," *viz.*:

> In general. Except as provided in paragraph (4), an individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without the consent of the individual, where such disclosure was made by a person who knows that, or recklessly disregards whether, the individual has not consented to such disclosure, may bring a civil action against that person in an appropriate district court of the United States for relief as set forth in paragraph (3).

15 U.S.C. § 6851(b)(1).

6.      As discussed further below, Mr. Gipson triggered liability under § 6851 on at least twelve (12) separate instances.  The first instance occurred on or about November 21, 2022, seven weeks after § 6851 had gone into effect.  *See Jackson v. Nelson*, No. 2:22-cv-00053-JHC, 2022 U.S. Dist. LEXIS 122994, at *6 (W.D. Wash. July 12, 2022) (holding that the effective date for § 6851 was October 1, 2022).  Therefore, every instance described herein falls squarely within the province of § 6851, thereby giving rise to Plaintiff's claims.

4

7.      For each violation of § 6851, Plaintiff "may recover . . . liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred." § 6851(b)(3)(A)(i). Plaintiff may also obtain a "temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to cease display or disclosure of the visual depiction." § 6851(b)(3)(A)(ii). Plaintiff seeks a temporary restraining order, along with compensatory and injunctive relief for all twelve (12) violations.

8.      In addition, Plaintiff, by way of this Court's supplemental jurisdiction, seeks relief under various Texas state law tort theories, including (i) unlawful disclosure or promotion of intimate visual material; (ii) stalking; (iii) public disclosure of private facts and unlawful publicity; (iv) defamation/libel; (v) intentional infliction of emotional distress; and (iv) negligence *per se*.

## THE PARTIES

9.      **Plaintiff JANE DOE** is, and at all times relevant hereto, an individual citizen and resident of the State of Florida, domiciled in Miami-Dade County, Florida. As set forth in her motion contemporaneously with this Complaint, Plaintiff requests anonymity pursuant to § 6851(b)(3)(B).

10.     **Defendant MARK A. GIPSON** is, and at all times relevant hereto, an individual citizen and resident of the State of Texas, domiciled in Travis County, Texas. On information and belief, Mr. Gipson is the founder and general partner of Austin Private Equity Venture Funds. Mr. Gipson may be served with process at 1005 W. 22nd St., Austin, TX 78705, or wherever he may be found.

## JURISDICTION AND VENUE

11.     This case is brought under 15 U.S.C. § 6851 and under Texas state law. Jurisdiction is conferred on this Court based upon 28 U.S.C. § 1331 (federal question jurisdiction).

Alternatively, jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) (diversity jurisdiction) because Plaintiff is a citizen of Florida, Mr. Gipson is a citizen of Texas, and the amount in controversy exceeds $75,000.  The Court further has jurisdiction over Mr. Gipson under Tex. Civ. Prac. & Rem. Code § 98B.006.

12.     This Court also has supplemental jurisdiction to adjudicate Plaintiff's state law claims over Mr. Gipson pursuant to 42 U.S.C. § 1367 because the state law claims relate to the federal claims.

13.     Venue is proper within the Western District of Texas, Austin Division, under 28 U.S.C. §§ 1391(b)(1)-(2) because Mr. Gipson resides in Austin, Texas; and, on information and belief, the events giving rise to Plaintiff's claims occurred within this District, for example by Mr. Gipson's use of his personal electronic devices to commit many of these offenses within the District.

## **FACTUAL ALLEGATIONS**

14.     Mr. Gipson is a 48-year-old white male with a history of targeting young minority women for exploitation.  Mr. Gipson has previously been charged with online impersonation and credit card fraud, as discussed in a December 12, 2018 news article in the Austin American-Statesman.  Julie Chang, *Man Charged With Online Impersonation of Sisters*, AUSTIN AMERICAN-STATESMAN, Oct. 30, 2013, https://www.statesman.com/story/news/2013/10/30/man-charged-with-online-impersonation/6687551007/ (last visited Mar. 17, 2023).



15.     On information and belief, to counter the narrative of his prior arrest, Mr. Gipson created a fake news website claiming that he was fully exonerated of all charges.  The website includes increasingly viscous character attacks against Mr. Gipson's two prior victims, including calling both victims sex workers and claiming that the two women had been charged with a number of other crimes.  *See UPDATE: Mark Alan Gipson Online Impersonation Charges Dismissed*, TEXAS NEWS ARCHIVE, Jan. 21, 2015, https://texasnewsarchive.com/2015/01/21/update-mark-alan-gipson-online-impersonation-charges-dismissed-by-texas-judge-karen-sage/ (last visited Mar. 14, 2023).  While the website purports to be a news archive, this page is the only article posted and seems to have been created by Mr. Gipson solely to advance his false counter-narrative.

16.     In 2021, Plaintiff met Mr. Gipson while getting dinner with a group of friends. Over the next two years, Mr. Gipson stayed in contact with Plaintiff through social media.  On a number of occasions, Mr. Gipson asked Plaintiff if she would join him on a vacation abroad, offering to pay for all expenses and handle travel logistics, such as paying for her passport and personal bills so she could financially afford to miss work.  Without knowing Mr. Gipson's history of threatening and erratic behavior towards women, Plaintiff eventually agreed to go on a trip to Europe with him to celebrate her recent graduation.

17.     On or about October 18, 2022, Plaintiff traveled to Amsterdam, Netherlands with Mr. Gipson.

18.     On or about October 19, 2022, Mr. Gipson repeatedly asked to take sexually explicit photographs of Plaintiff.  Plaintiff initially did not give Mr. Gipson consent to take any photographs, but Mr. Gipson was undeterred by her refusal.  Mr. Gipson obtained "designer drugs" and pressured Plaintiff into taking them with him, at which point Plaintiff became hazy and could not recall the rest of the night.  Mr. Gipson waited until Plaintiff was sufficiently under the influence of drugs and then proceeded to take sexually explicit photographs of Plaintiff in a bathtub.  Plaintiff had no recollection of this event, and was entirely unaware of what happened until Mr. Gipson showed her the photographs the next morning.  Plaintiff immediately voiced her concern to Mr. Gipson about him taking photographs without her permission, and explicitly stated that she did not consent to this material to be disseminated to anyone else.  Mr. Gipson responded, "[i]f I do post them, sue me! I have millions."

19.     Mr. Gipson's incessant requests to take sexually explicit images of Plaintiff continued throughout the trip.  Because Mr. Gipson had planned and paid for all trip accommodations, Plaintiff became concerned that if she continued to refuse Mr. Gipson's requests

he would retaliate and abandon her in a foreign country.  Plaintiff told Mr. Gipson of her concern that taking sexually explicit images could harm her career.  Mr. Gipson assured her that she would retain sole control over all the pictures, verbally promising that any photographs taken of Plaintiff would be for their personal use only.  With this understanding, Plaintiff allowed Mr. Gipson to take some sexually explicit photographs of her on his cell phone.  Plaintiff both explicitly and implicitly made it known to Mr. Gipson that she did not consent to Mr. Gipson disclosing the sexually explicit material to any other person.

20.   On October 21, 2022, Mr. Gipson sexually assaulted Plaintiff while she was unconscious from the effects of alcohol.  On that date, Plaintiff and Mr. Gipson began drinking. Plaintiff eventually became sick and passed out.  The next morning, Mr. Gipson informed Plaintiff that they had sexual intercourse the prior night, claiming that Plaintiff was "all over him."  Plaintiff has no recollection of anything from that evening after she became sick and, up until that point, had not been physically intimate with Mr. Gipson.  Plaintiff did not consent to having sexual intercourse with Mr. Gipson, and could not consent given her level of intoxication.

21.   On or about October 22, 2022, Plaintiff traveled with Mr. Gipson from Amsterdam to Ibiza, Spain.

22.   On or about October 24, 2022, Mr. Gipson made additional unwanted sexual advances towards Plaintiff, including by placing his hand on her butt while they were in a hotel room together.  When Plaintiff immediately moved his hand away, Mr. Gipson became irate and verbally assaulted her.  Mr. Gipson apologized for his behavior the next morning.  Still fearful that Mr. Gipson would retaliate, Plaintiff felt forced to accept the apology.

23.   On or about October 25, 2022, Plaintiff traveled from Ibiza to Mykonos, Greece with Mr. Gipson.

24.     By October 27, 2022, Plaintiff had become increasingly uncomfortable and concerned with Mr. Gipson's behavior.  Not wanting to be alone with Mr. Gipson any longer, Plaintiff contacted her friend, ███████████████ and asked him to meet her in Amsterdam.  ████████ was scheduled to arrive in Amsterdam on October 29, 2022.

25.     On or about October 28, 2022, Mr. Gipson and Plaintiff went to a local Mykonos bar for dinner and drinks.  After consuming multiple drinks, the two ended up on the beach together, both inebriated.  While they were on the beach, Mr. Gipson misplaced a bag containing his wallet, passport, and phone.  Plaintiff left the beach to search for the bag, but was unable to find Mr. Gipson when she eventually returned with the bag.  Upon going to the local police station for help, Plaintiff discovered that Mr. Gipson had gone to the same police station, given them the address of the Airbnb, and was taken home by the police officers.  The police took Plaintiff to the Airbnb and, when she arrived, Mr. Gipson was already in bed.  Upset and scared that Mr. Gipson had left her alone without a working phone, her passport, or the address of the Airbnb, Plaintiff threatened to throw Mr. Gipson's phone out the window.

26.     In response, Mr. Gipson became enraged and unleashed a brutal physical attack against Plaintiff.  Mr. Gipson got up from the bed and repeatedly punched Plaintiff in the face. Mr. Gipson grabbed Plaintiff by the hair, slammed her face into the ground, and sat on her back. While Plaintiff laid on the floor, defenseless, Mr. Gipson placed his hands around Plaintiff's neck and began to choke her from behind.  Fearing for her life and believing that Mr. Gipson was going to kill her, Plaintiff begged him to stop, shouting, "Mark you're going to kill me!"  Mr. Gipson released his grip on Plaintiff's neck just before she ran out of air, but did not get off of her back. Plaintiff began shouting for help and Mr. Gipson told her, "I'll give you three seconds to get the

fuck out of here before I kill you."  Plaintiff pushed Mr. Gipson off and ran out the door crying for help.

27.     As she was crying for help, someone came outside and gave Plaintiff water to wash the blood off her face.  The local police arrived, helped Plaintiff pack her belongings at the Airbnb, and took her back to the police station.  Local police informed Plaintiff that filing a formal police report would require her to return to Mykonos for the resulting court hearings, and Plaintiff decided not to press any formal charges because she did not have the means to travel back to Mykonos. Plaintiff remained at the police station until her flight to Amsterdam the next day.

28.     Mr. Gipson emailed Plaintiff the next day threatening to abandon her in Mykonos. Mr. Gipson told Plaintiff that he was "tempt[ed] to cancel [Plaintiff's] flights home," but would not do so because she found his bag that evening on the beach in Mykonos.  Mr. Gipson knew that Plaintiff could not afford her own plane ticket or lodging, and this threat confirmed Plaintiff's worst fear—that if she did not placate Mr. Gipson, he would retaliate.

29.     Mr. Gipson also tacitly admitted his culpability and acknowledged the injuries he caused Plaintiff.  Plaintiff responded to Mr. Gipson's email and detailed how his attack had seriously injured her, including leaving her with a swollen tongue, bumps and bruises on her forehead, hands, elbows, knees, and pain on her scalp.  Plaintiff further confronted Mr. Gipson with the details of the attack, specifically how he had hit her in the face, slammed her face on the floor, and choked her to the point where she almost suffocated and believed she would die.  Mr. Gipson did not deny these acts and instead excused his behavior.  Attached hereto as **Exhibit 1** is a true and correct copy of the email message Mr. Gipson sent Plaintiff on October 29, 2022.

30.     On October 29, 2022, Plaintiff traveled back to Amsterdam without Mr. Gipson to meet ██████.  Plaintiff had not secured her own accommodations in Amsterdam and, given the

short notice, was unable to find a place to stay.  During Plaintiff's layover in Munich, Germany,

Mr. Gipson found and approached Plaintiff at the Munich airport.  Mr. Gipson apologized to

Plaintiff and tried to, again, persuade Plaintiff that she was somehow to blame for the assault.

Knowing that Plaintiff had no other place to stay in Amsterdam, Mr. Gipson offered to "forgive"

Plaintiff and let her stay at the hotel originally booked for them.  As an empty gesture of goodwill,

Mr. Gipson also offered to let ███████ stay in the same room so that Plaintiff would feel safe.

Realizing that she would be left without a place to stay in a foreign country if she did not accept

Mr. Gipson's offer, Plaintiff ultimately agreed.

31.     For the remainder of the Amsterdam trip, Plaintiff felt the need to keep Mr. Gipson

content, constantly fearing additional repercussion.  By this point, Mr. Gipson had taken numerous

nude photographs of Plaintiff and, after the physical assault, Plaintiff feared that Mr. Gipson would

exploit those sexually explicit photographs if she suddenly ceased contact.  Plaintiff constantly

feared that Mr. Gipson would physically assault her again or make good on his threat to abandon

her in a foreign country—Plaintiff was, for all intents and purposes, trapped with Mr. Gipson.

32.     On October 30, 2022, while in their hotel room in Amsterdam, Mr. Gipson asked

Plaintiff to join him in the shower.  Plaintiff refused these physical advances, and yet, the next

morning Plaintiff was woken up to Mr. Gipson sexually assaulting her by touching her vagina with

his hand.  Plaintiff screamed, "NO!," pushed him off of her, and wrapped herself tightly in the

blankets to try to shut him out.  Mr. Gipson packed his things and left the room.

33.     Later that day, Plaintiff saw Mr. Gipson downstairs in the hotel lobby as she was

leaving for the airport to catch her return flight.  Mr. Gipson told Plaintiff that he was angry, and

claimed that when "[he] woke up and tried to cuddle [Plaintiff]" earlier that morning Plaintiff had

called him disgusting.  Although angry with him, Mr. Gipson asked Plaintiff to share a car with

him to the airport, and, reluctantly, she agreed.  Fearing what Mr. Gipson would do with the nude

photographs, Plaintiff resolved to complete the return trip peacefully and hoped to let her

relationship with Mr. Gipson naturally grow apart.

34.    Upon landing in Philadelphia, Mr. Gipson asked Plaintiff if he could come stay

with her at her home in Miami, Florida.  Plaintiff said no and told Mr. Gipson that they should

have time apart.  Mr. Gipson then asked Plaintiff to stay with him at a five-star hotel in Miami so

he could take more sexually explicit photographs of her.  Plaintiff refused and again told Mr.

Gipson that he did not have the right to be in possession of the images he already took of Plaintiff

without her consent.  Plaintiff again asked Mr. Gipson for those photographs.  Mr. Gipson refused

to give Plaintiff the photographs because he had "offered Plaintiff another chance" to "make it up

to [him]" by allowing him to stay with her in Miami, and Plaintiff said no.  Plaintiff told Mr.

Gipson that, at the least, she wanted the sexually explicit photographs, but he responded saying

that Plaintiff's sexually explicit photographs belonged to him.

35.    On November 7, 2022,  Mr. Gipson texted Plaintiff that he hoped they could

"overlook [their] past and focus on what's next."  Plaintiff told him that she was upset that he

refused to give her the sexually explicit photographs of her.  Plaintiff again explicitly directed Mr.

Gipson not to post the nude photos anywhere, "not on [his] Instagram or even sending [the]

pictures to someone."  Attached hereto as **Exhibit 2** are true and correct copies of text messages

between Mr. Gipson and Plaintiff on November 7, 2022.

36.    On November 10, 2022, Mr. Gipson sent Plaintiff multiple text messages asking

her to "answer [his calls] and talk."  Mr. Gipson told Plaintiff that he would permanently delete

her sexually explicit photographs only if she sent him $5,000.  Copied below, and attached hereto

as **Exhibit 3** are true and correct copies of text messages from Mr. Gipson on November 10, 2022.



37.     Between November 10, 2022 and November 11, 2022, Mr. Gipson sent Plaintiff over fifteen (15) abusive text messages, emails, and voicemails.  Mr. Gipson repeatedly called Plaintiff a thief, prostitute, "sex industry worker," "dumb █████," and told her to "rot in hell █████." He repeatedly threatened to make public sexually explicit photos of Plaintiff and post harmful, false, and misleading information about her online.

38.     On information and belief, Mr. Gipson began writing fake escort reviews about Plaintiff and posting them on various websites where sex workers often advertise.  On November 10, 2022, Mr. Gipson told Plaintiff that she should Google her name to read a fake escort review he posted about her, and bragged that he was enjoying "warning" people about Plaintiff because

she is an "awful ugly ▮▮▮ of a person." Attached hereto as **Exhibit 4** are true and correct copies

of text messages from Mr. Gipson on November 10, 2022.

39.    On or about November 10, 2022, Plaintiff received a voicemail in which Mr.

Gipson again told her that he would not delete the sexually explicit photos and threatened that she

should "think about [her] safety." Attached hereto as **Exhibit 5** is a true and correct audio file and

transcript of a voicemail from Mr. Gipson on November 10, 2022.

40.    On the same date, Mr. Gipson sent multiple emails repeatedly stating that he would

not delete the sexually explicit photographs of her and that he would post and distribute them

without her consent. Mr. Gipson implied that he intended to make Plaintiff's sexually explicit

photographs public, sarcastically telling Plaintiff that her Mom would be "so proud" about the

information he would post online. Mr. Gipson repeatedly threatened Plaintiff to "act accordingly"

or that he would make her regret disrespecting him. Attached hereto as **Exhibits 6 – 8** are true

and correct copies of the emails Mr. Gipson sent Plaintiff on November 10, 2022.

41.    On November 11, 2022, Mr. Gipson sent Plaintiff another email calling her a

"thief" and told her that she "gave [him] no other options." Mr. Gipson taunted Plaintiff by saying

that even if she was successful in suing him, Plaintiff would get nothing because his crypto assets

are untouchable. Attached hereto as **Exhibit 9** is a true and correct copy of the email Mr. Gipson

sent Plaintiff on November 11, 2022.

42.    Angered that his threats were falling on deaf ears, on information and belief, Mr.

Gipson accessed Plaintiff's iCloud account without her consent and used that information to track

Plaintiff's location. On November 11, 2022, Mr. Gipson began sending ▮▮▮▮▮▮ threatening

messages which ▮▮▮▮▮▮ immediately forwarded to Plaintiff. In those messages, Mr. Gipson

bragged to ▮▮▮▮▮ that Plaintiff did "not realize that [he] can see her iCloud and track her phone

location lol." Plaintiff has never given Mr. Gipson consent to access her personal iCloud and Mr. Gipson therefore knew, or had reason to believe, that all material or information in Plaintiff's iCloud account was obtained without Plaintiff's consent and under circumstances in which Plaintiff has a reasonable expectation of privacy. Copied below, and attached hereto as **Exhibit 10** is a true and correct copy of the text message ███████ shared with Plaintiff on November 12, 2022:



43.      On November 14, 2022, Mr. Gipson sent Plaintiff another barrage of harassing emails and voicemails in which he continued to threaten to post sexually explicit photographs of her online. In the first email, Mr. Gipson stated that "the investment has already been made" and that it is "bad business to flake." Attached hereto as **Exhibit 11** is a true and correct copy of the

email Mr. Gipson sent Plaintiff on November 14, 2022.  A few minutes later, Mr. Gipson left Plaintiff a voicemail saying he would like to speak with her and apologized for saying things he did not mean.  Attached hereto as **Exhibit 12** is a true and correct audio file and transcript of a voicemail from Mr. Gipson on November 14, 2022.  Mr. Gipson sent Plaintiff $1,500 on CashApp for "Mexico Model Fees," and another $1 with the message "Are you sure you don't want to work this out???"  Plaintiff immediately refunded Mr. Gipson's payment of $1,500 because he scared her and she no longer wanted anything to do with him.  Attached hereto as **Exhibit 13** is a true and correct screenshot of the CashApp application showing Plaintiff's transactions on November 14, 2022.

44.     Later that same day, Mr. Gipson sent Plaintiff two more emails containing videos of them on the beach in Mykonos and again alleged that Plaintiff owed him money.  Attached hereto as **Exhibits 14 – 15** are true and correct copies of emails, along with their respective attachments, Mr. Gipson sent Plaintiff on November 14, 2022.

45.     Twenty minutes later, Mr. Gipson emailed Plaintiff several photographs he had taken of her with the message "no hard feelings I already got more than my moneys worth."  Attached hereto as **Exhibit 16** is a true and correct copy of the email Mr. Gipson sent Plaintiff on November 14, 2022.

46.     On November 15, 2022, ███████ received another text message from Mr. Gipson.  ███████ informed Plaintiff of this conversation and forwarded her the messages.  In those text messages, Mr. Gipson asked ███████ if Plaintiff's "plan [was] just to ghost," and said it would be helpful to know because "somethings can't be undone."  Attached hereto as **Exhibit 10** is a true and correct copy of the text message ███████ shared with Plaintiff on or about November 16, 2022.

47.     On November 21, 2022, Mr. Gipson sent Plaintiff another email demanding that she let him visit her in Miami.  Mr. Gipson warned Plaintiff that this was her "last chance to work this out," and that he was "done playing" with her.  Attached hereto as **Exhibit 17** is a true and correct copy of the email Mr. Gipson sent Plaintiff on November 21, 2022.

48.     On information and belief, Mr. Gipson began posting sexually explicit videos of Plaintiff online for his own financial gain.  On November 22, 2022, ▮▮▮▮ again received threatening messages from Mr. Gipson, which ▮▮▮▮ then forwarded to Plaintiff.  In these text messages, Mr. Gipson again admitted to having accessed Plaintiff's iCloud account without consent and threatened to publicly release information and photographs he obtained from her iCloud account.  Mr. Gipson also admitted to making money by posting nude videos of Plaintiff online and told ▮▮▮▮ to "Google [Plaintiff's] full real name" to find "sex vids" of [Plaintiff] "sucking and fucking [Mr. Gipson] poolside in the hot tub."  Mr. Gipson bragged about publishing more false "escort reviews" online depicting Plaintiff as a sex industry worker and sent ▮▮▮▮ several "escort profiles," falsely claiming that Plaintiff was the depicted sex worker.  Copied below and attached hereto as **Exhibit 18** are true and correct copies of the text messages ▮▮▮▮ shared with Plaintiff on November 22, 2022:



49.     On information and belief, Mr. Gipson filmed sexually explicit videos of Plaintiff without her knowledge or consent in order to profit online.  Mr. Gipson reiterated that the video "record[ed] of [Plaintiff] ▮▮▮▮▮▮▮▮ [Mr. Gipson]" was making money on the dark web, and that Plaintiff had "literally ruined her future."  Plaintiff never consented to being filmed while engaged in sexually explicit content and thus Mr. Gipson knew or had reason to believe that the sexually explicit videos were created without her consent and under circumstances in which Plaintiff had a reasonable expectation of privacy.  Copied below and attached hereto as **Exhibit 19** is a true and correct copy of the text message ▮▮▮▮▮ shared with Plaintiff on November 22, 2022:





50.     Angry that Plaintiff had not responded to any of his harassing messages, did not allow him to stay with her in Miami, or pay him the money he demanded, Mr. Gipson began disseminating Plaintiff's sexually explicit photographs directly to her friends.  Calling Plaintiff a ████████ Mr. Gipson sent ████████ four (4) photos of Plaintiff nude in a hot tub engaged in sexual conduct.  The images contain sexually explicit depictions of Plaintiff's uncovered genitalia, including her breasts, and Plaintiff's face is clearly visible and identifiable in each photograph.  In each of the photographs, Plaintiff is kneeling naked in a hot tub with the photographer's hand placed around her throat.  Based upon other information displayed in connection with these visual depictions, including but not limited to, Plaintiff's face and Mr. Gipson's open identification of Plaintiff as the subject of these photos, Plaintiff's identity is readily apparent.  ████████ also told Plaintiff that he immediately recognized her as the subject of the photographs.  Attached hereto as

**Exhibit 20** are true and correct copies of the four (4) sexually explicit images of Plaintiff that Mr. Gipson sent to ▮▮▮▮▮ on November 22, 2022.

51.     On November 21, 2022, Mr. Gipson left Plaintiff two voicemail messages.  In the first voicemail, Mr. Gipson threatened that if Plaintiff's "plan is to ignore [him], we're going to have a war.  Do you understand what that means? I'm not sure you do, but you will soon."  In the second, Mr. Gipson while seemingly speaking to another in the same room, states, "she needs to understand . . . [I] might do it. But then I can't, it can't be deleted. Yeah, she's going to throw a fit. I know."  Attached hereto as **Exhibits 21 – 22** are true and correct audio files and transcripts of the voicemails from Mr. Gipson on November 21, 2022.

52.     On November 22, 2022, Mr. Gipson emailed Plaintiff admitting that he hacked into her iCloud account and had shared additional sexually explicit photos and videos of her without consent.  Mr. Gipson stated in the email that he "recorded everything [in Plaintiff's iCloud] as evidence."  Mr. Gipson again admitted to "selling [Plaintiff's sexually explicit] content and video," and bragged that Plaintiff's videos were "literally making [him] thousands a day on the dark web." Mr. Gipson told Plaintiff that she "will be famous for ▮▮▮▮▮▮," and said that he will never stop "▮▮▮▮ [her] up bc [she] deserve[s] it."  Copied below and attached hereto as **Exhibit 23** is a true and correct copy of the email Mr. Gipson sent to Plaintiff on November 22, 2022:



53.     On the same date, Mr. Gipson emailed Plaintiff again to say "I'm going to enjoy

exposing you [] for the ███ and thief you really are . . . that's a promise."  Attached hereto as **Exhibit**

**24** is a true and correct copy of the email Mr. Gipson sent Plaintiff on November 22, 2022.  Later

that evening, Mr. Gipson left Plaintiff another voicemail claiming that he needed a $70,000 surgery

for the injuries he allegedly sustained in Mykonos.  Despite the fact that Mr. Gipson had brutally

attacked and injured Plaintiff in Mykonos, he again tried to convince Plaintiff that he had been

seriously injured during that night.  Mr. Gipson told Plaintiff that because "all [she] care[s] about

is money," he was going to "add that to what [Plaintiff] owe[s]."  He threatened to "send the

lawyers after [Plaintiff]" and said Plaintiff would "spend the next five to ten years of [her] life

23

paying [him] back." Attached hereto as **Exhibit 25** is a true and correct audio file and transcript of the voicemail from Mr. Gipson on November 22, 2022.

54.     On November 23, 2022, Mr. Gipson sent yet another email to Plaintiff saying, "I'm not gonna give a ▮▮▮ about what happens to you" and promised to return the favor to "everyone you work with bc you are a thief and a ▮▮▮▮ and no one cares about you." Attached hereto as **Exhibit 26** is a true and correct copy of the email Mr. Gipson sent Plaintiff on November 23, 2022.

55.     On November 25, 2022, Mr. Gipson emailed Plaintiff giving her "30 days to think," and implied that at the end of those 30 days Plaintiff had to send him money. In that same email, Mr. Gipson threatened Plaintiff again stating, "you know I keep my promises so I sincerely suggest you consider this situation carefully bc the consequences will [a]ffect you for the rest of your life." Attached hereto as **Exhibit 27** is a true and correct copy of the email Mr. Gipson sent Plaintiff on November 25, 2022.

56.     Later on November 25, 2022, Mr. Gipson sent Plaintiff a long message on WhatsApp. In that message, Mr. Gipson stated, "pain meds have been [a]ffecting [his] judgment and in hindsight [he] realize that many of [his] assumptions maybe incorrect." Mr. Gipson said that he "snapped" because Plaintiff did not respond to his messages, and promised to "honor [his] word and not publish anything without talking with [Plaintiff] first." Plaintiff told Mr. Gipson to "▮▮▮▮ off" and blocked his contact on WhatsApp. Attached hereto as **Exhibit 28** are true and correct copies of the WhatsApp messages from Mr. Gipson on November 25, 2022.

57.     Later that same day, Mr. Gipson sent Plaintiff yet another email immediately after she blocked him on WhatsApp telling her that "[c]ontinuing to fight will just make things worse in the end but that is up to [Plaintiff]." Mr. Gipson claimed, "I'm doing the best I can to resolve this peacefully. Laugh all you want. I gave you a chance at peace if you don't want to take it no

24

problem. We can go to war…"  Plaintiff again responded with a simple "[p]lease stop contacting me."  Attached hereto as **Exhibit 29** is a true and correct copy of the email chain between Mr. Gipson and Plaintiff on November 25, 2022.

58.     On November 26, 2022, Plaintiff received a "cease and desist" letter at her primary residence, which she believed to be genuine at the time it was received.  The letter stated that it was "From The Private Office of Gardener Smith," while, confusingly, also indicating that it was "from" Mark Alan Gipson.  The letter claimed that Plaintiff was "infring[ing] [Mr. Gipson's] DMCA copyright" and demanded that Plaintiff stop using photographs on social media, Onlyfans, or SEEKING.com.  The letter also claimed that Mr. Gipson would be seeking monetary damages of up to $250,000, along with other legal remedies.  Attached hereto as **Exhibit 30** is a true and correct copy of the cease and desist letter Mr. Gipson sent Plaintiff on November 26, 2022.

59.     On information and belief, Mr. Gipson falsified this cease and desist letter in order to scare and harass Plaintiff.  The Texas State Bar does not show any licensed attorney or law firm with the name "Gardener Smith."  However, there are law firms in Fort Worth, Texas, called "Gardner Smith & Hill" and "Gardner Smith & Vaughn."

60.     Since receiving this letter, Plaintiff has become extremely fearful for her safety.  Plaintiff never provided Mr. Gipson with her residential address, and at the time she received the letter, Plaintiff had left her home out of fear that Mr. Gipson would come to Miami to find her, and was living at a friend's house.  Fearing Mr. Gipson's continued harassment and threats, Plaintiff intentionally shared her new address with very few people and had confirmed it was not connected to her on any public record.  Nevertheless, Mr. Gipson located Plaintiff.  Plaintiff immediately moved after receiving the letter because she was uncomfortable and scared that Mr. Gipson somehow discovered her new address.

61.     On information and belief, on or about December 11, 2022, Mr. Gipson created an Instagram account impersonating Plaintiff with the username ███████.  The biography portion of the profile, which can be read by anyone who looks at the account, reads "Fans of Miami Based Korean Sex Worker ██████████████████ Under Investigation for Impersonating a Physician, Solicitation and Theft."  Mr. Gipson's personal Instagram, which operates under the username @mark_alan_west, tags the account ███████.  Plaintiff did not create this account or give Mr. Gipson permission to do so.  Attached hereto as **Exhibit 31** is a December 27, 2022, Page Vault data capture of the Instagram account ███████.

62.     On information and belief, as of December 27, 2022, Mr. Gipson has posted over seventy-three (73) photographs and videos of Plaintiff on this fake Instagram account without her consent.  Mr. Gipson used this account to post the same Mykonos beach videos he previously sent Plaintiff and the same sexually explicit photos of Plaintiff he sent ███████.  In the captions of these posts, Mr. Gipson "offer[s] a $250,000 reward for the arrest and prosecution of ███████ ███████████████ and repeatedly accuses Plaintiff of being "Under Investigation for Online Impersonation of a Physician/Solicitation of Prostitution, Theft and Fraud in Florida."

63.     Despite Mr. Gipson's wild and false accusations, Plaintiff has never worked as a prostitute, has never unlawfully impersonated anyone, and has not engaged in theft or fraud.  Mr. Gipson's statements that he published about Plaintiff are false, and have injured her reputation, emotional well-being, and caused other damage.

64.     The majority of these photographs and videos depict Plaintiff engaged in sexual conduct.  Mr. Gipson took these photographs and videos of Plaintiff during their trip to Europe and has shared them on this profile without Plaintiff's consent or permission.  At least five (5) photographs and one (1) video posted to this profile contain sexually explicit visual depictions of

Plaintiff's uncovered genitalia, including her breasts.  Based upon other information displayed in connection with these visual depictions, including, but not limited to, images of Plaintiff's face and name (in the caption of each photograph and video), Plaintiff's identity is readily apparent. Mr. Gipson was explicitly told and knew that he did not have authorization consent to possess the sexually explicit photographs of Plaintiff.  Further, Mr. Gipson knew he was still and always had been unauthorized to distribute or disclose sexually explicit photographs of Plaintiff to any third party.  Attached hereto as **Exhibit 32** are true and correct copies of the five (5) sexually explicit images and the one (1) sexually explicit  video of Plaintiff that Mr. Gipson uploaded to the Instagram account ███████████ .

65.     Despite Plaintiff's multiple requests that Instagram remove the impersonating account, this account remains active at the time of filing.  The images of Plaintiff are available for the public to view and Mr. Gipson continues to harass Plaintiff by posting defamatory statements under the guise of an account associated with Plaintiff.  Mr. Gipson also befriended Plaintiff's friends and coworkers on Instagram in an effort to share the illicit photos and comments.

66.     On information and belief, Mr. Gipson also posted photographs of Plaintiff on Flickr through accounts with usernames mark_alan_gipson and mark-alan-gipson.  Mr. Gipson also posted hundreds of photographs of other women and marked each photograph with a "Mark Alan Gipson" watermark.  Attached hereto as **Exhibits 33 – 34** are December 30, 2022, Page Vault data captures of the Flickr accounts mark_alan_gipson and mark-alan-gipson, respectively.

67.     On information and belief, Mr. Gipson also posted multiple photographs of Plaintiff on his personal Instagram account under the username @mark_alan_gipson.  This account contains multiple provocative photographs of Plaintiff and captions them with varying iterations of  "she is unattractive on the inside" and "Florida Sex Industry Worker."  Attached hereto as

**Exhibit 35** is a December 27, 2022, Page Vault data capture of the Instagram account mark_alan_gipson.

68.     Through these various social media accounts, Mr. Gipson continues to impersonate Plaintiff and has followed dozens of her friends, acquaintances, and coworkers.  Attached hereto as **Exhibit 36** are true and accurate copies of Instagram screenshots identifying the dozens of people Plaintiff knows Mr. Gipson now follows through the fake account.  Mr. Gipson also "tags" people Plaintiff knows in these posts to draw attention to what he is posting.  Because of Mr. Gipson's tactics, many of Plaintiff's friends have reported being "tagged" in and, ultimately, seeing this account and the compromising pictures of Plaintiff.  Attached hereto as **Exhibit 37** is a true and correct copy of a text message from Anthony Shanayderman ("Doc") on December 20, 2022, telling Plaintiff that he had seen the fake account.  Copied below and attached hereto as **Exhibit 38** is a true and correct copy of an Instagram message from Ni Pham on December 12, 2022, telling Plaintiff that Mr. Gipson had "tagged" her through the fake Instagram account.  Copied below and attached hereto as **Exhibit 39** is a true and correct copy of a text message from Joseph Bonvouloir on December 14, 2022, telling Plaintiff that Mr. Gipson had also "tagged" him through the Instagram fake account.

69.     Mr. Gipson has also contacted Plaintiff's friends on various occasions, shared sexually explicit images of her, and spread the same lies about Plaintiff through his own personal social media accounts.   On November 28, 2022, Plaintiff's former employer, Makism Vladimirskiy ("Mr. Vladimirskiy") told Plaintiff that Mr. Gipson had contacted him through Instagram.  Mr. Vladimirskiy sent Plaintiff screenshots of the Instagram messages he received from Mr. Gipson, but noted that Mr. Gipson had deleted some of the messages before Mr. Vladimirskiy was able to take complete screenshots.  Attached hereto as **Exhibit 40** are true and

correct copies of Instagram messages from Mr. Gipson to Mr. Vladimirskiy on November 22, 2022.  Attached hereto as **Exhibit 41** are true and correct copies of messages Plaintiff received through Instagram from Mr. Vladimirskiy on November 28, 2022.

70.     On information and belief, Mr. Gipson used the Instagram accounts @mark.alan.west and @theonlyjamesman to send Plaintiff's friend, hereafter referred to as " Ms. Irene," an Instagram message containing a photo of Plaintiff nude in a hot tub engaged in sexual conduct.  This visual depiction is the same as one of the sexually explicit photographs Mr. Gipson sent ███████ and depicts Plaintiff kneeling in a hot tub naked, with the photographer's hand around her throat.  The images contain sexually explicit depictions of Plaintiff's uncovered genitalia, including her breasts.  Based upon other information displayed in connection with these visual depictions, including but not limited to, Plaintiff's face and Mr. Gipson's open identification of Plaintiff as the subject of these photos, Plaintiff's identity is readily apparent.  Mr. Gipson also called Plaintiff a "prostitute who owed him $30,000" and directed Ms. Irene to the nude videos of Plaintiff Mr. Gipson posted online.  Attached hereto as **Exhibits 42 – 43** are true and correct copies of Instagram messages from users @mark.alan west and @theonlyjamesman, respectively, to Ms. Irene.

71.     On February 14, 2023, Mr. Gipson emailed Plaintiff to say he is "done fighting," and offered to take Plaintiff on another trip to Tulum, Mexico.  Plaintiff responded demanding that Mr. Gipson immediately take down the fake Instagram profile, desist sharing the sexually explicit photographs, and apologize for publicly accusing her of being a criminal and prostitute.

72.     In response, on February 15, 2023, Mr. Gipson sent Plaintiff two pictures of escort profiles—neither of which depict Plaintiff—along with a long email of inflammatory accusations.  Tauntingly asking Plaintiff if she has "any edits or suggestions," Mr. Gipson brags that "[a]ll nude

and sexually explicit videos of [Plaintiff] are [] available on 18+ websites" and that "in addition to fraud, theft, and solicitation, [Plaintiff] is currently under investigation by the State of Florida for 3rd degree felony charges for impersonating a physician online."  Mr. Gipson implied that his "offering [of] a truce" is contingent on Plaintiff agreeing to "go to Tulum in April" with Mr. Gipson.  Attached hereto as **Exhibit 44** is a true and correct copy of the email chain between Mr. Gipson and Plaintiff from February 14 – 15, 2023.

73.     Having received no response from Plaintiff, on February 17, 2023, Mr. Gipson emailed Plaintiff again saying his "last email was too harsh."  Mr. Gipson admitted that he was responsible for the deletion of Plaintiff's personal Instagram account.  Additionally, Mr. Gipson again implied that his offer to "delete anything [Plaintiff is] upset about" is contingent on her agreeing to "go to Tulum in April."  When Plaintiff, once again, did not respond, Mr. Gipson sent another email on February 20, 2023.  Mr. Gipson said that if he did not "hear back from [Plaintiff] he would "move forward without [her]," which "really means [] that [he] will not share any of the money with [her]."  Mr. Gipson bragged about "how much money [Plaintiff has] already made" him, thanked Plaintiff for being a "good investment," and implied that Plaintiff's sexually explicit images were "popular" online.  Attached hereto as **Exhibit 45** are true and correct copies of emails from Mr. Gipson on February 17, 2023 and February 20, 2023.

74.     On March 17, 2023, Mr. Gipson emailed Plaintiff saying he would "agree to delete the fan account on [Instagram]" if Plaintiff would "talk on the phone for 5-10 mins" with him.  Mr. Gipson said he found it strange that Plaintiff felt unsafe traveling with him again, even though he "could have been a jerk and cancelled [her] flight and abandoned [her]" in Amsterdam.  Despite his shocking conduct, Mr. Gipson said "it surprised [him] that [Plaintiff] said [she] didn't want to

go to [T]ulum and continue working with [him]."  Attached hereto as **Exhibit 46** is a true and correct copy of an email from Mr. Gipson on March 17, 2023.

75.    On March 24, 2023, Mr. Gipson emailed Plaintiff asking if there is anything he "can do that would fix the bad blood," or if he should "just give up."  Plaintiff did not respond.  Attached hereto as **Exhibit 47** is a true and correct copy of an email from Mr. Gipson on March 24, 2023.

76.    In seeking protection from Mr. Gipson's ongoing harassment campaign, which includes unconsented disclosure of her intimate visual material, stalking, and continued threats, Plaintiff has filed police reports with both the Austin, Texas and Coral Gables, Florida Police Departments.

77.    It is likely that Plaintiff is not Mr. Gipson's first victim.  Based on information and belief, Mr. Gipson has engaged in a pattern of targeting and luring women by inviting them on vacations and offering to pay for all of their expenses.  As soon as the women rebuff his romantic advances, Mr. Gipson retaliates by publishing their sexually explicit photos without consent and disparaging them online.

78.    In October 2013, the Austin American-Statesman reported that Mark A. Gipson of Austin, Texas, had been charged with online impersonation after admitting to creating sexually explicit websites and a Facebook profile for two sisters without their consent.[1]  According to the news article, the arrest affidavit stated that Mr. Gipson became angry after the women rebuffed his romantic feelings.  Mr. Gipson openly admitted to posting the women's sexually explicit information on Facebook "out of anger."  The charges were dismissed for unknown reasons in January 2015.

---

[1] *See* AUSTIN AMERICAN-STATESMAN, https://www.statesman.com/story/news/2013/10/30/man-charged-with-online-impersonation/6687551007/ (last visited Mar. 14, 2023).

79.     On information and belief, in January 2015, Mr. Gipson created a separate website, "Texas News Archive," to control the narrative surrounding his arrest and to further disparage the two victims.[2]  The website only contains four (4) news articles, all of which relate to Mr. Gipson's October 2013 online impersonation charge.  These articles state that Mr. Gipson had "invited the women to join him on a vacations [*sic*] to Las Vegas and Aspen, Colorado," unaware that they "worked as strippers and escorts in the sex industry for over a decade."  Using tags such as "Austin Asian Escorts," "Austin Asian Sex Industry Workers," "Asian Escort Reviews," "Sex Workers Arrested," and "TEXAS BUSINESSMAN MARK ALAN GIPSON," the website repeatedly accuses the victims of having been engaged in a wide variety of criminal behavior and describes the victims as "sex workers," "brain damage[ed]," and "obsessed with [Mr. Gipson]."  The website also states that "it appears that racism and/or collaboration with the women who filed the false police report may have been the motive behind the bias and misleading news article published by [] the Austin-American Statesman."

80.     Similarly, here Mr. Gipson retaliated once Plaintiff rebuffed his romantic advances and tried to end the relationship.  Mr. Gipson sent harassing messages and published the sexually explicit material without Plaintiff's consent, intending to cause Plaintiff to suffer extreme humiliation, derision, shame, scorn, contempt, and disrespect in the eyes of her friends, family, and employers.  Each posting and message was sent with malicious intent, thereby invoking outrage.

81.     Mr. Gipson has also bragged about moving on to another target, yet another young Asian female.  On December 25, 2022, Mr. Gipson emailed Plaintiff four (4) nude images of an undisclosed woman.  Mr. Gipson told Plaintiff "I found your costar . . . she's 10 years younger

---

[2] See TEXAS NEWS ARCHIVE, https://texasnewsarchive.com/ (last visited Mar. 14, 2023).

with a lot less miles." On information and belief, Mr. Gipson intends to similarly exploit this young woman.

82.     Given that Mr. Gipson has already physically and sexually assaulted Plaintiff, distributed her sexually explicit material online, and continues to disparage her through multiple social media accounts and direct emails, Plaintiff knows that Mr. Gipson has the apparent ability to carry out his threats.

83.     As a direct and proximate result of Mr. Gipson's actions, Plaintiff has suffered emotionally, experienced injury to her reputation, and has been caused physical pain and suffering. Plaintiff has suffered severe mental anguish, including loss of sleep, loss of appetite, guilt, shame, depression, anxiety, and despair as a result of Mr. Gipson's actions.

84.     Put simply, Mr. Gipson's behavior is not tolerated by a civilized society. Plaintiff seeks the assistance of this Court to put an end to Mr. Gipson's egregious and illegal behavior.

## FEDERAL CLAIMS FOR RELIEF

### Counts I – IV: Disclosure of Intimate Images (15 U.S.C. § 6851)

85.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

86.     On or about November 22, 2022, Mr. Gipson sent ▮▮▮▮▮▮▮ the four (4) intimate visual depictions of Plaintiff identified as **Exhibit 20**. These intimate visual depictions include, but are not limited to, multiple photographs and videos of Plaintiff's breasts where her uncovered nipple is visible.

87.     Each of these four (4) intimate visual depictions of Plaintiff bears at least one visual depiction of Plaintiff's face and breasts. Each visual depiction shows Plaintiff kneeling naked in a hot tub with her breasts uncovered.

33

88.     Mr. Gipson transmitted these communications across state lines (from Texas to Copenhagen) via a means or facility of interstate commerce (i.e., the internet).  He did so without obtaining Plaintiff's consent and without any legal excuse.

89.     Plaintiff is readily identifiable from information displayed in connection with these visual depictions, including the visual depiction of Plaintiff's face and tattoos and the context of Mr. Gipson's messages.

90.     Plaintiff did not give Mr. Gipson consent to distribute these photographs of Plaintiff's breasts—or any other intimate visual depiction of Plaintiff—to anyone, including ███

███.  Specifically, Plaintiff had not given Mr. Gipson an affirmative, conscious, and voluntary authorization free from force, fraud, misrepresentation, or coercion.   In fact, Plaintiff had explicitly, and repeatedly, told Mr. Gipson that he did not have her consent to disseminate any intimate visual depiction of Plaintiff to any third party.  Thus, Mr. Gipson had actual knowledge that Plaintiff had not consented to the distribution of this intimate visual depiction to ███.

91.     The intimate visual depictions of Plaintiff that Mr. Gipson disclosed to ███ were not commercial pornographic content.  Plaintiff has in no way benefitted from Mr. Gipson's wrongful disclosure of such images.  Moreover, Mr. Gipson's disclosures were not made in good faith to law enforcement; as part of a legal proceeding; as part of medical education, diagnosis, or treatment; or in the reporting or investigation of unlawful content or unwelcome content.  Furthermore, the intimate visual depictions of Plaintiff were not a matter of public concern or public interest.  Lastly, the intimate visual depictions were not reasonably intended to assist Plaintiff.  Therefore, Mr. Gipson had no legal excuse pursuant to § 6851 to avoid liability.

92.     Plaintiff seeks liquidated damages in the amount of $150,000 for each of the four (4) intimate visual depictions published to ███, plus attorneys' fees, costs of this action, and

other litigation costs reasonably incurred.  Plaintiff also seeks a temporary restraining order against Mr. Gipson preventing any further contact.   Plaintiff also seeks preliminary and permanent injunctive relief, including: i) requiring Mr. Gipson to immediately take down all sensitive content and false representations on any and all public or private forums in which they have been posted, including Instagram and Flickr; ii) ceasing any future display or disclosure of the visual depictions or false representations; and iii) withdrawing Mr. Gipson's false copyright claims against Plaintiff's personal Instagram account which were levied as a way to silence Plaintiff and further control the narrative against her.

## Count V: Disclosure of Intimate Images (15 U.S.C. § 6851)

93.      Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

94.      On or about November 23, 2022, Mr. Gipson emailed Ms. Irene the one (1) intimate visual depiction of Plaintiff identified as **Exhibit 42**.  This intimate visual depiction includes, but is not limited to, multiple photographs and videos of Plaintiff's breasts where her uncovered nipple is visible.

95.      This intimate visual depiction of Plaintiff bears a visual depiction of Plaintiff's face and breasts.  The visual depiction shows Plaintiff kneeling naked in a hot tub with her breasts uncovered.

96.      Mr. Gipson transmitted these communications across state lines (from Texas to Florida) via a means or facility of interstate commerce (i.e., the internet).  He did so without obtaining Plaintiff's consent and without any legal excuse.

97.     Plaintiff is readily identifiable from information displayed in connection with the visual depiction, including the visual depiction of Plaintiff's face, tattoos, and the context of Mr. Gipson's Instagram messages.

98.     Plaintiff did not give Mr. Gipson consent to distribute this photograph of Plaintiff's breasts—or any other intimate visual depiction of Plaintiff—to anyone, including Ms. Irene. Specifically, Plaintiff had not given Mr. Gipson an affirmative, conscious, and voluntary authorization free from force, fraud, misrepresentation, or coercion.   In fact, Plaintiff had repeatedly, and explicitly, told Mr. Gipson that he did not have her consent to disseminate any intimate visual depiction of Plaintiff to any third party.  Thus, Mr. Gipson had actual knowledge that Plaintiff had not consented to the distribution of this intimate visual depiction to Ms. Irene.

99.     The intimate visual depictions of Plaintiff that Mr. Gipson disclosed to Ms. Irene were not commercial pornographic content.  Plaintiff has in no way benefitted from Mr. Gipson's wrongful disclosure of such images.  Moreover, Mr. Gipson's disclosures were not made in good faith to law enforcement; as part of a legal proceeding; as part of medical education, diagnosis, or treatment; or in the reporting or investigation of unlawful content or unwelcome content. Furthermore, the intimate visual depictions of Plaintiff were not a matter of public concern or public interest.  Lastly, the intimate visual depiction was not reasonably intended to assist Plaintiff. Therefore, Mr. Gipson had no legal excuse pursuant to § 6851 to avoid liability.

100.    Plaintiff seeks liquidated damages in the amount of $150,000 for the image published to Ms. Irene, plus attorneys' fees, costs of this action, and other litigation costs reasonably incurred.   Plaintiff also seeks a temporary restraining order against Mr. Gipson preventing any further contact, along with preliminary and permanent injunctive relief, including relief discussed above in paragraph 92.

## Counts VI – XI: Disclosure of Intimate Images (15 U.S.C. § 6851)

101.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

102.    On or about December 2022, Mr. Gipson published the six (6) intimate visual depictions of Plaintiff on Instagram identified as **Exhibit 32**.  These intimate visual depictions include, but are not limited to, multiple photographs and videos of Plaintiff's breasts and uncovered nipple.

103.    Each of these six (6) intimate visual depictions of Plaintiff bears at least one visual depiction of Plaintiff's face, breasts, and/or buttocks.  Each visual depiction shows Plaintiff engaged in some form of sexual conduct.

104.    Mr. Gipson transmitted these communications across state lines (from Texas to Florida) via a means or facility of interstate commerce (i.e., the internet).  He did so without obtaining Plaintiff's consent and without any legal excuse.

105.    Plaintiff is readily identifiable from information displayed in connection with these visual depictions, including the visual depiction of Plaintiff's face and tattoos, and the context of Mr. Gipson's Instagram captions.

106.    Plaintiff did not give Mr. Gipson consent to distribute these photographs and videos of Plaintiff's breasts—or any other intimate visual depiction of Plaintiff—to anyone, including to Instagram.  Specifically, Plaintiff had not given Mr. Gipson an affirmative, conscious, and voluntary authorization free from force, fraud, misrepresentation, or coercion.  In fact, Plaintiff had explicitly, and repeatedly, told Mr. Gipson that he did not have her consent to disseminate any intimate visual depiction of Plaintiff to any third party.  Thus, Mr. Gipson had actual knowledge that Plaintiff had not consented to the distribution of this intimate visual depiction to Instagram.

107.     The intimate visual depictions of Plaintiff that Mr. Gipson disclosed to Instagram were not commercial pornographic content.  Plaintiff has in no way benefitted from Mr. Gipson's wrongful disclosure of such images.  Moreover, Mr. Gipson's disclosures were not made in good faith to law enforcement; as part of a legal proceeding; as part of medical education, diagnosis, or treatment; or in the reporting or investigation of unlawful content or unwelcome content.  Furthermore, the intimate visual depictions of Plaintiff were not a matter of public concern or public interest.  Lastly, the intimate visual depictions were not reasonably intended to assist Plaintiff.  Therefore, Mr. Gipson had no legal excuse pursuant to § 6851 to avoid liability.

108.     Plaintiff seeks liquidated damages in the amount of $150,000 for each of the six (6) intimate visual depictions published to Instagram, plus attorneys' fees, costs of this action, plus, and other litigation costs reasonably incurred.  Plaintiff also seeks a temporary restraining order against Mr. Gipson preventing any further contact, along with preliminary and permanent injunctive relief, including relief discussed above in paragraph 92.

## Count XII: Disclosure of Intimate Images (15 U.S.C. § 6851)

109.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

110.     On information and belief, Mr. Gipson published an indeterminate number of intimate visual depictions of Plaintiff on the dark web and/or 18+ pornographic websites, including, but not limited to, multiple photographs and videos of Plaintiff engaged in sexual conduct.

111.     On information and belief, each photograph and video bears at least one visual depiction of Plaintiff's face, breasts, and uncovered nipple.

112.    Mr. Gipson transmitted these communications across state lines (from Texas to Florida) via a means or facility of interstate commerce (i.e., the internet).  He did so without obtaining Plaintiff's consent and without any legal excuse.

113.    On information and belief, Plaintiff is readily identifiable from information displayed in connection with these visual depictions, including, but not limited to, visual depictions of Plaintiff's face and tattoos.

114.    Plaintiff did not give Mr. Gipson consent to distribute these photographs and videos of Plaintiff's breasts—or any other intimate visual depiction of Plaintiff—to anyone, including the dark web and/or 18+ pornographic websites.  Specifically, Plaintiff had not given Mr. Gipson an affirmative, conscious, and voluntary authorization free from force, fraud, misrepresentation, or coercion.  In fact, Plaintiff had explicitly, and repeatedly, told Mr. Gipson that he did not have her consent to disseminate any intimate visual depiction of Plaintiff to any third party.  Thus, Mr. Gipson had actual knowledge that Plaintiff had not consented to the distribution of this intimate visual depiction to the dark web or 18+ pornographic websites.

115.    On information and belief, the intimate visual depictions of Plaintiff that Mr. Gipson disclosed to the dark web and/or 18+ pornographic websites were not commercial pornographic content.  Plaintiff has in no way benefitted from Mr. Gipson's wrongful disclosure of such images.  Moreover, Mr. Gipson's disclosures were not made in good faith to law enforcement; as part of a legal proceeding; as part of medical education, diagnosis, or treatment; or in the reporting or investigation of unlawful content or unwelcome content.  Furthermore, the intimate visual depictions of Plaintiff were not a matter of public concern or public interest.  Lastly, the intimate visual depictions were not reasonably intended to assist Plaintiff.  Therefore, Mr. Gipson had no legal excuse pursuant to § 6851 to avoid liability.

116.     Plaintiff seeks liquidated damages in the amount of $150,000 for each intimate visual depiction published to the dark web and/or 18+ pornographic websites, plus attorneys' fees, costs of this action, and other litigation costs reasonably incurred.  Plaintiff also seeks a temporary restraining order against Mr. Gipson preventing any further contact, along with preliminary and permanent injunctive relief, including relief discussed above in paragraph 92.

## TEXAS STATE LAW TORT CLAIMS

### Count XIII: Unlawful Disclosure or Promotion of Intimate Visual Material (Tex. Civ. Prac. & Rem. Code § 98B)

117.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

118.     On multiple occasions, Mr. Gipson disclosed and publicly disseminated intimate visual material, including photos and videos, of the Plaintiff without her effective consent to do so.  Specifically, as discussed in paragraphs 85 – 115, Mr. Gipson:  1) disseminated four (4) pieces of intimate visual material depicting Plaintiff to ███████; 2) disseminated intimate visual material of Plaintiff to a Ms. "Irene";  3) disseminated at least six (6) pieces of intimate visual material of Plaintiff through an Instagram account impersonating Plaintiff; and 4) disseminated intimate visual material of Plaintiff on the dark web and/or 18+ pornographic websites.

119.     Mr. Gipson disclosed this intimate visual material with the clear intent to harm the Plaintiff due to her rejection of his romantic advances.  As discussed in paragraphs 36 – 57 and 71 – 75, Mr. Gipson used the dissemination of illicit photos to intimidate and punish Plaintiff for not maintaining a relationship, and in an attempt to extort Plaintiff into paying Mr. Gipson large sums of money.

120.     At the time of disclosure, Mr. Gipson knew or had reason to know that the images and videos he had taken of Plaintiff were created only under the reasonable expectation that the

material would remain private.  In fact, Plaintiff explicitly told Mr. Gipson on multiple occasions that he did not have consent to share the images with any third party.  There was no reasonable expectation that Mr. Gipson could disclose those images and videos that Plaintiff did not consent to being taken.  Moreover, when Plaintiff did consent to some images, she did so solely based on the promise that the images would only be for her own personal use.

121.   In light of Mr. Gipson's disclosure of intimate visual material, without Plaintiff's consent and which depicted Plaintiff, Plaintiff suffered serious harm, including, but not limited to, mental and emotional distress, and harm to Plaintiff's personal and professional reputation.

122.   The intimate visual material wrongfully disclosed by Mr. Gipson reveals the identity of Plaintiff, the depicted person, because the pictures and videos show her face, identifying features such as tattoos, and the information accompanying Mr. Gipson's disclosures confirms that the Plaintiff is in fact the person in the pictures and videos.  For example, as discussed above in paragraphs 50, 61 – 64, and 70, Mr. Gipson directly named Plaintiff in his online posts with her intimate images on Instagram, and posted additional videos and images where her face is clearly visible.

123.   Plaintiff seeks actual damages, including for mental anguish, court costs, reasonable attorneys' fees, exemplary damages, and requests that the court issue a temporary restraining order, temporary injunction, and permanent injunction to prevent the continued disclosure or promotion of the intimate visual material with respect to any images which depict the Plaintiff, and further requiring Mr. Gipson to take down all currently posted illicit content.  If the Court issues such order, Plaintiff reserves her right to seek additional damages for any further disclosure or violation of such order.

**<u>Count XIV: Stalking (Tex. Civ. Prac. & Rem. Code § 85)</u>**

124.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

125.     Mr. Gipson has engaged in continued harassing behavior towards Plaintiff, beginning with physical and sexual violence while the two traveled through Europe and continues to today via incessant, threatening, and reputationally damaging internet and electronic messages and disclosures of explicit images.

126.     As a result of Mr. Gipson's harassing behavior, Plaintiff reasonably feared for her own safety and fears the damage likely to result to her reputation as a result of Mr. Gipson's actions.  Mr. Gipson has already shown Plaintiff he is willing and capable of inflicting great pain, given that he has physically and sexually assaulted her in the recent past.  Mr. Gipson has also continued to share her intimate photos, levy threats, and demand money and time together.  Mr. Gipson has also bragged about having access to Plaintiff's location due to improperly accessing her iCloud, and has found Plaintiff's address once even after she moved.

127.     Plaintiff has not yet been granted a restraining order to prohibit further harassing behavior, yet seeks one against Mr. Gipson at this time.  *See* Plaintiff's Emergency Application for Temporary Restraining Order and Preliminary Injunction.

128.     Mr. Gipson continues to engage in harassing behavior towards Plaintiff, including by threatening to commit offenses against her such as unlawful disclosure of private intimate material, libel, and blackmail.  Mr. Gipson obviously has the apparent ability to carry out such threats, given that he possesses the intimate visual material depicting Plaintiff, has already disclosed such images without Plaintiff's consent, and maintains control over social media

accounts where such images are posted under the guise of being made public by the Plaintiff herself.

129.    Given that Mr. Gipson has the apparent ability to continue to carry out his threats against Plaintiff, Plaintiff reasonably fears for her own safety and for harm that may come to her reputation.

130.    Plaintiff has on numerous occasions explicitly demanded that Mr. Gipson stop his continued harassment and hand over all control of the intimate visual material in which she is depicted.  Mr. Gipson has failed to do so, and continues to harass, threaten, and control images of the Plaintiff to this day.

131.    Plaintiff has reported this harassing behavior to police in both Texas and Florida.

132.    Plaintiff seeks actual and exemplary damages against Mr. Gipson, in addition to any other remedy available to her as a result of Mr. Gipson's continued harassment and stalking, including a temporary restraining order, protective order, and/or injunctive relief to prevent further harm.

### Count XV: Public Disclosure of Private Facts / Unlawful Publicity

133.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

134.    Mr. Gipson wrongfully and unlawfully gave publicity to matters concerning Plaintiff's personal life, including when he posted intimate visual material where Plaintiff is easily identifiable without her consent and against her clear instruction not to, and when he publicly made allegations that Plaintiff is a sex worker.

43

135.    The publication of highly sensitive intimate visual material, without Plaintiff's consent, and false allegations of illegal sex work and other criminal behavior are highly sensitive to a reasonable person of ordinary sensibilities.

136.    Further, the publicized matter was not of any legitimate public concern and was not publicly known or made available prior to Mr. Gipson's disclosure of such images and alleged facts.

137.    Plaintiff seeks damages for mental anguish, exemplary damages, and any other remedy available to her as a result of Mr. Gipson's public disclosure of private facts concerning Plaintiff, including a temporary restraining order, protective order, and/or injunctive relief to prevent further harm.

## Count XVI: Defamation (Libel)

138.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

139.    Mr. Gipson published, in written and graphic form, multiple statements concerning Plaintiff in messages to Plaintiff; messages to Plaintiff's acquaintances, including ▮▮▮▮▮▮; Instagram and other social media sites; and allegedly, to websites advertising escort services.

140.    Mr. Gipson's published statements clearly concern Plaintiff and are extremely defamatory because they tend to injure Plaintiff's reputation and expose her to public contempt or ridicule, financial injury, and impeach her honesty, integrity, virtue, and reputation.  Mr. Gipson's clearly injurious published statements include, but are not limited to, the following:

- "[Plaintiff] was arrested and charged with Assault and Theft and damage to property after police witnessed her kicking a man in the head until he was unconscious and fracturing his ribs . . . Digitally preserved evidence shows years of prostitution, theft and fraud … she is currently under investigation for felony online impersonation of a physician and solicitation of prostitution. . . ."  *See* **Exhibit 31** (Instagram posts).

- "Fans of Miami Based Korean Sex Worker ███████████████ ████████ Under Investigation for Impersonating a Physician, Solicitation and Theft." **Exhibit 31** (Instagram biography for ███████).

- "She has dozens of escort profiles and more on her iCloud so she's ███ in many ways . . . I had Richard record her sucking and ████ me in the hot tub and gazebo so that's what is making the most money on the dark web [to be honest] not sure why tried to steal from me but prob the dumbest thing she's ever done bc she literally ruined her future over this such a stupid stupid ███ . . . I'm really going to enjoy exposing her for the thief and ██ she really is so no hard feelings it's nothing personal against you just gotta right fire with fire . . ." **Exhibit 19** (text from Mr. Gipson to ███████). *See Bedford v. Spassoff*, 485 S.W.3d 641, 650 (Tex. App. 2016) (stating that libel is a writing published to a third party which injures a person's reputation), *rev'd on other grounds* 520 S.W.3d 901 (Tex. 2017).

141.    At least some of these statements published by Mr. Gipson explicitly accuse Plaintiff of crimes, including prostitution, fraud, solicitation, theft, and online impersonation of a physician.

142.    Mr. Gipson acted at least negligently when he posted these false and defamatory statements.  However, Mr. Gipson's actions also likely arise to actual malice, given that his actions were intentional, willful, wanton, or alternatively, that he acted with such recklessness as to indicate a disregard of consequences.

143.    Plaintiff seeks general damages, including for loss of reputation and mental anguish, special damages, nominal damages, exemplary damages, and any other remedy available to her as a result of Mr. Gipson's libel, including a temporary restraining order, protective order, and/or injunctive relief to prevent further harm.

**Count XVII: Intentional Infliction of Emotional Distress**

144.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

145.     Mr. Gipson acted intentionally and recklessly when he published images and videos which clearly depict the Plaintiff without her consent to the internet and distributed them amongst her friends.  Mr. Gipson also acted intentionally and recklessly when he engaged in a months-long harassment campaign against Plaintiff, making false allegations of sex work and criminal behavior, threatening her unless she agreed to give him money or accompany him on more trips, reaching out directly to Plaintiff's acquaintances and former employer to disparage her and share illicit images, and threatening her with legal action with demands for hundreds of thousands of dollars by sending a fake "cease and desist" letter.

146.     Mr. Gipson's actions were extreme and outrageous, particularly when he publicly disclosed intimate visual material depicting Plaintiff without her consent, when he made unfounded claims about Plaintiff being a sex worker and a criminal, and when he continued to stalk and harass Plaintiff for months following their Europe trip.

147.     As a direct and proximate cause of Mr. Gipson's actions, Plaintiff suffered and continues to suffer emotional distress.  The emotional distress that Plaintiff suffered as a result of Mr. Gipson's actions is severe and persistent.  Plaintiff has been forced to move multiple times in an attempt to escape Mr. Gipson.

148.     Plaintiff seeks damages for past and future mental anguish, past and future loss of earning capacity, loss of society, and any other remedy or damages available to her as a result of Mr. Gipson's intentional infliction of emotional distress, including a temporary restraining order, protective order, and/or injunctive relief to prevent further harm.

## Count XVIII: Negligence *Per Se* (Federal Extortion)

149.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

150.    The relevant federal extortion statute states:

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 875(d).

151.    Mr. Gipson threatened to distribute the sexually explicit photographs and videos to Plaintiff's circle if Plaintiff did not provide something of value to Mr. Gipson (*i.e.*, $5,000).  Mr. Gipson knew that if this threat was brought to fruition, Plaintiff's reputation would suffer in the eyes of her friends, as her entire personal and professional circle would see the sexually explicit photographs and videos.  Mr. Gipson communicated this threat via email, text message, and phone to Plaintiff.  On information and belief, Mr. Gipson made this threat while in Texas, sending the same to Florida.  Therefore, Mr. Gipson communicated this extortion threat via interstate commerce.  Ergo, Mr. Gipson violated the aforementioned federal statute.  Mr. Gipson also sent Plaintiff a fake "cease and desist" letter claiming damages of $250,000.

152.    Section 875(d) prohibits Mr. Gipson from transmitting into interstate commerce any communication containing a threat to injure the reputation of the Plaintiff with the intent to extort from Plaintiff anything of value.  Accordingly, by violating § 875(d) Mr. Gipson's "act or omission is in violation of a statute or ordinance," thereby fulfilling the first element of the tort of negligence *per se* in Texas.  *See Lopez-Juarez v. Kelly*, 348 S.W.3d 10, 27 (Tex. App. 2011).

153.    Plaintiff, having been a victim of Mr. Gipson's extortion attempt, is within the class of persons whom Congress intended to benefit and protect by enacting this statute, thereby fulfilling the second element of the tort of negligence *per se*.  *Id.*

154.    Mr. Gipson's behavior and violation of the federal extortion statute was the proximate cause of the severe emotional distress that Plaintiff complains of herein.  Thus, the third element of the tort of negligence *per se* is fulfilled.  *Id.*

155.    Because the federal extortion statute (i) puts the public on notice by clearly defining the required conduct; (ii) does not impose liability without fault; and (iii) would not result in ruinous damages disproportionate to the seriousness of the regulatory violation, the federal extortion statute is an appropriate standard for negligence *per se*.  *See Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 840 (Tex. App. 2006).

156.    Because Mr. Gipson's actions as described herein have fulfilled the elements of negligence *per se*, Mr. Gipson is liable to Plaintiff for her damages.

157.    Plaintiff seeks compensatory damages and punitive damages in the amount to be determined by this court, plus attorneys' fees, costs of this action, and post-judgment interest, as well as a temporary restraining order, protective order, and/or injunctive relief to prevent further harm.

### Count XIX: Negligence *Per Se* (Federal Cyberstalking)

158.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

159.    The federal cyberstalking statute states:

> Whoever: . . .
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—
>> (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional

support animal, or a horse described in clause (i), (ii), (iii), or (iv) of
paragraph (1)(A); or
(B) causes, attempts to cause, or would be reasonably expected to
cause substantial emotional distress to a person described in clause
(i), (ii), or (iii) of paragraph (1)(A),

shall be punished as provided in section 2261(b) of this title.
18 U.S.C. § 2261A(2).

160.     Section 2261A(2) prohibits Mr. Gipson from using an interactive computer service

or an electronic communication system of interstate commerce (such as Instagram or his email

account) to harass or intimidate Plaintiff (or any other member of the public) by engaging in a

course of conduct that (a) places her in fear of death or serious bodily injury to himself or to her

family members, or (b) causes, attempts to cause, or would be reasonably expected to cause

substantial emotional distress to her.  Accordingly, by violating § 2261A(2), Mr. Gipson's "act or

omission is in violation of a statute or ordinance," thereby fulfilling the first element of the tort of

negligence *per se* in Texas.  *See Lopez-Juarez*, 348 S.W.3d at 27.

161.     When Mr. Gipson emailed his threats, along with his subsequent emails and phone

calls to Plaintiff and Plaintiff's circle, Mr. Gipson transmitted these messages across state lines

and back again, impacting interstate commerce.  Therefore, Mr. Gipson used an interactive

computer service or electronic communication service or electronic communication system of

interstate commerce to transmit these communications across state lines, thereby falling squarely

into the jurisdiction of § 2261A.

162.     Mr. Gipson transmitted these communications on two or more occasions,

evidencing a continuity of purpose, and as such, a course of conduct.  *See* 18 U.S.C. § 2266 (2).

He also used the internet to locate the names and contact information of Plaintiff's friends and

former employer, evidencing an intent to stalk.

163.    Mr. Gipson's communications are "true threats," as understood in the context of First Amendment law.  Therefore, no First Amendment protection exists.

164.    Mr. Gipson engaged in this course of conduct with the intent of harassing Plaintiff. Therefore, this course of conduct placed Plaintiff in reasonable fear of death or serious bodily injury to herself or her family, parties who are covered by § 2261A.  Likewise, this course of conduct caused, attempted to cause, or would have been reasonably expected to cause substantial emotional distress to Plaintiff.

165.    Mr. Gipson has violated the federal cyberstalking statute, § 2261A, as evidenced by his emails, calls, texts, and Instagram messages to Plaintiff described above.

166.    In relation to Mr. Gipson, Plaintiff is "another person."  *See* § 2261A.  Therefore, the plain text of § 2261A contemplates that Plaintiff is within the class of persons whom Congress intended to benefit and protect by the enactment of this statute, thereby fulfilling the second element of the tort of negligence *per se*.  *See Lopez-Juarez*, 348 S.W.3d at 27.

167.    Mr. Gipson's behavior and violation of the federal cyberstalking statute was the proximate cause of the severe emotional distress that Plaintiff complains of herein.  Thus, the third element of the tort of negligence *per se* is fulfilled.  *Id.*

168.    Because the federal cyberstalking statute (i) puts the public on notice by clearly defining the required conduct; (ii) does not impose liability without fault; and (iii) would not result in ruinous damages disproportionate to the seriousness of the regulatory violation, the federal cyberstalking statute is an appropriate standard for negligence *per se*.  *See Omega Contracting, Inc.*, 191 S.W.3d at 840.

169.    Because Mr. Gipson's actions as described herein have fulfilled the elements of negligence *per se*, Mr. Gipson is liable to Plaintiff for her damages.

170.     Plaintiff seeks compensatory damages and punitive damages in the amount to be determined by this court, plus attorneys' fees, the costs of this action, and post-judgment interest, as well as a temporary restraining order, protective order, and/or injunctive relief to prevent further harm.

**Count XX: Negligence *Per Se* (Online Impersonation – Tex. Pen. Code § 33.07)**

171.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

172.     The relevant Texas Penal Code statute declares the following:

> (a) A person commits an offense if the person, without obtaining the other person's consent and with the intent to harm, defraud, intimidate, or threaten any person, uses the name or persona of another person to:
> (1) create a web page on a commercial social networking site or other Internet website; or
> (2) post or send one or more messages on or through a commercial social networking site or other Internet website, other than on or through an electronic mail program or message board program.

Tex. Pen. Code Ann. § 33.07.

173.     Mr. Gipson created an Instagram account purporting to be controlled by or associated with Plaintiff.  On this account, he posted illicit pictures of Plaintiff without her consent.  Mr. Gipson used this account to "friend" Plaintiff's acquaintances, sent messages, and tagged others.  Mr. Gipson undertook these actions as part of his elaborate scheme to harass and harm Plaintiff.  Therefore, Mr. Gipson created a social media account using the name and persona of Plaintiff, without her consent, with the intent to harm her.  Ergo, Mr. Gipson violated the aforementioned Texas state criminal statute.

174.     Additionally, Mr. Gipson admitted that he used Plaintiff's image, name, and persona to create advertisements for prostitution or sex work services on the internet.  Mr. Gipson sent Plaintiff screenshots of images superimposed with words implying she is linked to

prostitution.  These postings to the internet were undertaken without Plaintiff's consent and were clearly intended to harm her.  Thus, Mr. Gipson violated the aforementioned Texas state criminal statute in multiple instances.

175.    Mr. Gipson's violation of the aforementioned statute is the legal and proximate cause of Plaintiff's injuries and damages.  Mr. Gipson's harassment campaign is based on his illegal and unconsented sharing of explicit images of Plaintiff.

176.    Plaintiff, as a user of the internet and as a person who has not consented to use of her images or likeness by Mr. Gipson, belongs to the class of persons the aforementioned statute was designed to protect.

177.    Because the aforementioned statute (i) puts the public on notice by clearly defining the required conduct; (ii) does not impose liability without fault; and (iii) would not result in ruinous damages disproportionate to the seriousness of the regulatory violation, the Texas state penal code statute is an appropriate standard for negligence *per se*.  *See Omega Contracting, Inc.* 191 S.W.3d at 840.

178.    Because Mr. Gipson's actions as described herein have fulfilled the elements of negligence *per se*, Mr. Gipson is liable to Plaintiff for her damages.

179.    Mr. Gipson, without obtaining Plaintiff's consent, used Plaintiff's name and likeness to: (i) create a web page on Instagram, a commercial social networking site; and/or (ii) post or send one or more messages on Instagram, a commercial social networking site.  Mr. Gipson intended for his conduct to harm, defraud, intimidate, and threaten Plaintiff.  Mr. Gipson knew that his actions would cause Plaintiff's reputation to suffer in the eyes of her friends, as her entire personal and professional circle would believe Plaintiff had posted the sexually explicit photographs and videos.  Ergo, Mr. Gipson violated the aforementioned Texas statute.

180.     Plaintiff seeks compensatory damages and punitive damages in the amount to be determined by this court, plus attorneys' fees, costs of this action, and post-judgment interest, as well as a temporary restraining order, protective order, and/or injunctive relief to prevent further harm.

### Count XXI: Negligence *Per Se* (Unlawful Disclosure or Promotion of Intimate Visual Material – Tex. Pen. Code § 21.16)

181.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

182.     The relevant Texas Penal Code statute declares the following:

> (b) A person commits an offense if:
> > (1) without the effective consent of the depicted person and with the intent to harm that person, the person discloses visual material depicting another person with the person's intimate parts exposed or engaged in sexual conduct;
> > (2) at the time of the disclosure, the person knows or has reason to believe that the visual material was obtained by the person or created under circumstances in which the depicted person had a reasonable expectation that the visual material would remain private;
> > (3) the disclosure of the visual material causes harm to the depicted person; and
> > (4) the disclosure of the visual material reveals the identity of the depicted person in any manner, including through:
> > > (A) any accompanying or subsequent information or material related to the visual material; or
> > > (B) information or material provided by a third party in response to the disclosure of the visual material.
> (c) A person commits an offense if the person intentionally threatens to disclose, without the consent of the depicted person, visual material depicting another person with the person's intimate parts exposed or engaged in sexual conduct and the actor makes the threat to obtain a benefit:
> > (1) in return for not making the disclosure; or
> > (2) in connection with the threatened disclosure.
> Tex. Pen. Code Ann. § 21.16.

183.     Mr. Gipson, without Plaintiff's consent and with intent to harm her, disclosed visual material which clearly depicts Plaintiff and where her intimate parts, including her breasts, are

exposed.  At the time of disclosure, Plaintiff had repeatedly ordered that Mr. Gipson not share the images, thus Mr. Gipson knew or had reason to expect that the images should remain private.  Mr. Gipson's disclosure of the images caused Plaintiff harm.  Further, disclosure of the images reveals the identity of Plaintiff given that her face and tattoos are visible, and given that Mr. Gipson included captions and messages which confirmed Plaintiff as the person in the illicit images.  Thus, Mr. Gipson violated Tex. Pen. Code § 21.16(b).

184.    Mr. Gipson also intentionally threatened, and later followed through, to disclose, without Plaintiff's consent, pictures and videos of her where her intimate parts are exposed in order to obtain a benefit in return for not making the disclosure.  Mr. Gipson stated at multiple times that he would delete or send Plaintiff the images if she gave him money.  Plaintiff knew Mr. Gipson was in possession of the images and had the power to follow through on these threats.  Thus, Mr. Gipson violated Tex. Pen. Code § 21.16(c).

185.    Mr. Gipson's violation of the aforementioned statute is the legal and proximate cause of Plaintiff's injuries and damages.  Mr. Gipson's harassment campaign is based on his illegal and unconsented sharing of explicit images of Plaintiff.

186.    Plaintiff, as a person clearly depicted and identifiable in intimate images which were created with the intent of remaining private, belongs to the class of persons the aforementioned statute was designed to protect.

187.    Because the aforementioned statute (i) puts the public on notice by clearly defining the required conduct; (ii) does not impose liability without fault; and (iii) would not result in ruinous damages disproportionate to the seriousness of the regulatory violation, the Texas state penal code statute is an appropriate standard for negligence *per se*.  *See Omega Contracting, Inc.*, 191 S.W.3d at 840.

188.    Because Mr. Gipson's actions as described herein have fulfilled the elements of negligence *per se*, Mr. Gipson is liable to Plaintiff for her damages.

189.    Plaintiff seeks compensatory damages and punitive damages in the amount to be determined by this court, plus attorneys' fees, the costs of this action, and post-judgment interest.

### Count XXII: Negligence *Per Se* (Unlawful Electronic Transmission of Sexually Explicit Visual Material – Tex. Pen. Code § 21.19)

190.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

191.    The relevant Texas Penal Code statute declares the following:

> (b) A person commits an offense if the person knowingly transmits by electronic means visual material that:
> (1) depicts:
> (A) any person engaging in sexual conduct or with the person's intimate parts exposed; or
> (2) is not sent at the request of or with the express consent of the recipient.
>
> Tex. Pen. Code Ann. § 21.19.

192.    Mr. Gipson knowingly, and without express consent, transmitted by electronic means (including via text messages, Instagram, and the internet) visual material that clearly depicts Plaintiff engaging in sexual conduct and with her intimate parts exposed.  Thus, Mr. Gipson has violated Tex. Pen. Code. § 21.19.

193.    Mr. Gipson's violation of the aforementioned statute is the legal and proximate cause of Plaintiff's injuries and damages.  Mr. Gipson's harassment campaign is based on his illegal and unconsented sharing of explicit images of Plaintiff.

194.    Plaintiff, as a person clearly depicted and identifiable in intimate images which were created with the intent of remaining private, belongs to the class of persons the aforementioned statute was designed to protect.

195.     Because the aforementioned statute (i) puts the public on notice by clearly defining the required conduct; (ii) does not impose liability without fault; and (iii) would not result in ruinous damages disproportionate to the seriousness of the regulatory violation, the Texas state penal code statute is an appropriate standard for negligence *per se*.  *See Omega Contracting, Inc.*, 191 S.W.3d at 840.

196.     Because Mr. Gipson's actions as described herein have fulfilled the elements of negligence *per se*, Mr. Gipson is liable to Plaintiff for her damages.

### Count XXIII: Negligence *Per Se* (Breach of Computer Security – Tex. Pen. Code § 33.02)

197.     Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

198.     The relevant Texas breach of computer security statute, Tex. Pen. Code § 33.02(a) states: "A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."  Tex. Pen. Code Ann. § 33.02(a).

199.     On information and belief, Mr. Gipson knowingly accessed Plaintiff's computer, computer network, or computer system without the effective consent of Plaintiff.  Specifically, Mr. Gipson admitted to hacking into Plaintiff's Apple accounts in order to track her location and access private photographs.

200.     A clear and conspicuous prohibition existed by the owner of the computer, computer network, or computer system.

201.     Mr. Gipson had the intent to obtain or use a file, data, or proprietary information stored in the computer, network, or system to harm Plaintiff or alter, damage, or delete property.

202.    Tex. Pen. Code § 33.02(a) prohibits Mr. Gipson from knowingly accessing a computer, computer network, or computer system without the effective consent of the owner. Accordingly, by violating § 33.02(a), Mr. Gipson's "act or omission is in violation of a statute or ordinance," thereby fulfilling the first element of the tort of negligence *per se* in Texas. *See Lopez-Juarez*, 348 S.W.3d at 27.

203.    Plaintiff, having been a victim of Mr. Gipson's breach of computer security, is within the class of persons whom the legislature intended to benefit and protect by enacting this statute.

204.    Mr. Gipson's behavior and violation of the Texas breach of computer security statute was the proximate cause of the severe emotional distress that Plaintiff complains of herein.

205.    Because the Texas breach of computer security statute (i) puts the public on notice by clearly defining the required conduct; (ii) does not impose liability without fault; and (iii) would not result in ruinous damages disproportionate to the seriousness of the regulatory violation, the Texas unlawful disclosure or promotion of intimate visual material statute is an appropriate standard for negligence *per se*. *See Omega Contracting, Inc.*, 191 S.W.3d at 840.

206.    Because Mr. Gipson's actions as described herein have fulfilled the elements of negligence *per se*, Mr. Gipson is liable to Plaintiff for her damages.

207.    Plaintiff seeks compensatory damages and punitive damages in the amount to be determined by this court, plus attorneys' fees, costs of this action, and post-judgment interest.

## **REQUEST FOR INJUNCTIVE RELIEF**

208.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

209.    Plaintiff seeks a preliminary injunction and a permanent injunction to maintain her confidentiality due to the personal nature of the facts of this case pursuant to 15 U.S.C. § 6851(b)(3)(B), which states: " . . . [T]he court may grant injunctive relief maintaining the confidentiality of a plaintiff using a pseudonym."

210.    Plaintiff seeks a temporary restraining order, protective order, preliminary injunction, and a permanent injunction ordering Mr. Gipson to (i) cease display or disclosure of the visual depictions referenced herein pursuant to § 6851(b)(3)(B); (ii) refrain from contacting (directly or indirectly) or coming within 1,000 feet of Plaintiff, any member of Plaintiff's family, or any person known to be associated with Plaintiff; (iii) delete the fake Instagram account ███████ impersonating Plaintiff; (iv) refrain from making defamatory statements about Plaintiff; and (v) refrain from disclosing the true identity of Plaintiff Jane Doe to any other person.

211.    In the alternative, Plaintiff seeks a temporary restraining order, protective order, preliminary injunction, and a permanent injunction ordering Mr. Gipson to (i) cease display or disclosure of the visual depictions referenced herein pursuant to Tex. Civ. Prac. & Rem. Code § 98B.004(a); (ii) refrain from contacting (directly or indirectly) or coming within 1,000 feet of Plaintiff, any member of Plaintiff's family, or any person known to be associated with Plaintiff; (iii) delete the fake Instagram account ███████ impersonating Plaintiff; (iv) refrain from making defamatory statements about Plaintiff; and (v) refrain from disclosing the true identity of Plaintiff Jane Doe to any other person.  If such order is granted and Mr. Gipson violates it in any way, Plaintiff reserves the right to seek further monetary damages under Tex. Civ. Prac. & Rem. Code § 98B.004(b).

212.    In view of Mr. Gipson's persistent threats to continue disclosing Plaintiff's intimate visual material, and given that Mr. Gipson continues to maintain at least one social media account

with intimate visual depictions of Plaintiff against her explicit request to remove all images, Plaintiff asserts that immediate and irreparable injury, loss, and damage may occur to Plaintiff's person and reputation (or to the persons of her family, friends, associates, and coworkers) before Mr. Gipson can be heard in opposition.  Specifically, nothing presently prevents Mr. Gipson from issuing further disclosures of the aforementioned intimate visual depictions and defamatory statements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JANE DOE respectfully requests that the Court enter a judgment as follows:

a.      A temporary restraining order, protective order, and injunctive relief, as requested above and in the accompanying motion;

b.      Statutory liquidated damages in the aggregate amount of $1,800,000 pursuant to 15 U.S.C. § 6851(b)(3)(A)(i) for the twelve (12) unauthorized disclosures of intimate visual depictions of the Plaintiff as complained of herein;

c.      Compensatory damages; damages for mental anguish; nominal damages; and punitive damages in an amount to be determined by this Court for all Texas law claims;

d.      Reasonable attorneys' fees; court costs; reasonable costs of litigation; and pre-and post-judgment interest; and

e.      Any and all other remedies available to Plaintiff and which this Court deems reasonable.

Dated: April 24, 2023

Respectfully Submitted,

/s/  *S. Giri Pathmanaban*

S. Giri Pathmanaban (TSB#: 24074865)
LATHAM & WATKINS LLP
300 Colorado Street
Suite 2400
Austin, TX  78701
Telephone:  (737) 910-7300
Facsimile:  (737) 910-7301
giri.pathmanaban@lw.com

Bradley A. Hyde (*pro hac vice* pending)
S. Sonya Shaikh (*pro hac vice* forthcoming)
Kevin M. Hamilton (*pro hac vice* pending)
Caitlyn L. Brock (*pro hac vice* forthcoming)
LATHAM & WATKINS LLP
650 Town Center Drive
Suite 2000
Costa Mesa, CA  92626-1925
Telephone:  (714) 540-1235
Facsimile:  (714) 755-8290
bradley.hyde@lw.com
sonya.shaikh@lw.com
kevin.hamilton@lw.com
caitlyn.brock@lw.com

ATTORNEYS FOR Plaintiff
JANE DOE