IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF TEXAS AUSTIN DIVISION

JANE DOE
Plaintiff,

**RECEIVED**
June 14, 2023
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY:_____
        JMV
                    DEPUTY

**FILED**
June 14, 2023
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY:_____
        JMV
                    DEPUTY

vs.

MARK A. GIPSON
Defendant.

Civil Action No. 1:23-cv-00463

MOTION TO CONTEST EMERGENCY APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND CONTEST THE
PRELIMINARY INJUNCTION AGAINST MARK A. GIPSON AND
COUNTER MOTION TO REQUEST PRELIMINARY INJUNCTION
AGAINST THE PLAINTIFF JANE DOE

# TABLE TO CONTENTS

**INTRODUCTION**

**1) EXPLANATIONS FOR ACTIONS TAKEN TO INITIATE LEGAL PROCEEDINGS**

**2) ADDRESSING THE VERY SERIOUS ALLEGATIONS OF SEXUAL AND PHYSICAL ASSAULT**

**3) CONTEST TEMPORARY RESTRAINING ORDER**

**4) CONTEST INJUNCTIVE ORDER**

**5) COUNTER REQUEST FOR TRO AND INJUNCTIVE ORDER AGAINST THE PLAINTIFF**

**6) EXHIBITS**

# INTRODUCTION:

**My name is Mark Alan Gipson, I am a 48 year old male with a long history of helping and supporting women of all ages and races. I am a graduate of the University of Texas at Austin, Eagle Scout, professional artist and I maintain a clean and clear criminal record. I have lived in Austin, Texas for 26 years.**

**NOTE: ORDER PROHIBITING PUBLIC DISCLOSURE**
**NO. D-1-DC-13-302129 and ORDER OF EXPUNCTION D-1-EX-19-000411**

As the Pro Se plaintiff and photographer in this matter, I am writing to make a compelling case regarding the ownership of copyrights for images I captured, specifically those involving outdoor nude photography. The law provides that, as a photographer, I hold the rights to the images I produce, irrespective of the model's involvement.

Under U.S. copyright law, specifically 17 U.S.C § 102(a), copyright protection extends to "original works of authorship fixed in any tangible medium of expression," which includes photographs. The seminal case of Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53 (1884) confirms that photographs can be original works of authorship, granting the photographer the exclusive right to reproduce, distribute, and display the photographs taken.

The creation of the photograph – the angle, the lighting, the composition – is my work, my authorship. Hence, irrespective of the subject matter or the model's presence, the photographs I take are, by law, my property.

As for the issue of consent, I argue that I had both a signed **ADULT MODEL RELEASE FORM AND FORM 2257 EXHIBIT (190-192) and** the nature of the

outdoor location – a public property – reduces the reasonable expectation of privacy. This position finds support in the case of Nussenzweig v. DiCorcia, 11 Misc. 3d 1051(A), 2006 N.Y. Slip Op. 50171(U) (2006). In this case, the court held that an individual's right to privacy does not extend to public spaces. Consequently, a photograph taken in a public area, where the expectation of privacy is limited, does not require the subject's consent.

However, I am fully aware that the First Amendment rights must be balanced against the individual's right to privacy under the Fourth Amendment. The precedent set in Gericke v. Begin, 753 F.3d 1 (1st Cir. 2014) is relevant here. The court held that "a traffic stop is not a private event that, under ordinary circumstances, may not be filmed without the consent of the parties."

This logic can extend to the matter at hand: public spaces are not private events and photography in these areas, within legal parameters, does not necessitate explicit consent from the photographed individuals. As in the case of the outdoor nude photography in question, the images were captured in a public setting where the expectation of privacy was inherently reduced.

While nudity might introduce further complexity, it is crucial to note that the photographs were taken with a legitimate purpose, bearing artistic and expressive values. In Miller v. California, 413 U.S. 15 (1973), the Supreme Court ruled that works would only be deemed obscene (and thus unprotected) if they lacked "serious literary, artistic, political, or scientific value."

The images I produced were not made for any obscene purpose. Instead, they are meant to express artistic values, and their creation in a public setting further reinforces the absence of any reasonable expectation of privacy.

In conclusion, as the creator of these photographs, I respectfully assert my right to the copyright over these images. The photos were taken in a public space, reducing the model's reasonable expectation of privacy, and they serve an artistic, expressive purpose rather than an obscene or harmful one. I request that the court recognize my rights under copyright law and uphold the lawful nature of my artistic practice.

# 1) Explanation for Actions Taken to Initiate Legal Proceedings

I write to you as a pro se defendant in the case presently before this Court. I feel it is crucial to provide you with some context regarding my conduct leading up to the initiation of the current legal proceedings.

In November 2022, I found myself in a position necessitating legal action against the Plaintiff. However, I encountered a considerable obstacle in pursuing this course of action: I was unable to locate the Plaintiff's mailing address, as she claimed she had moved from Miami to New York City. Without her address, I was unable to serve notice of the intended lawsuit, effectively preventing me from seeking a resolution through the court system, which I strongly believe in and respect.

Faced with this predicament, I made the decision to employ what, in isolation, may seem like extreme measures. I engaged in a series of harsh text messages, intended to provoke the Plaintiff into initiating a lawsuit against me. This decision was not made lightly. I deemed it the only available path to bring our dispute before the court, where I am confident it can be resolved fairly and equitably based on the evidence at hand.

I understand that my actions may be viewed negatively. I assure you that it was not my intention to create an atmosphere of hostility or to evade legal responsibility. On the contrary, my intent was to expedite the legal process, which I was unable to initiate due to the Plaintiff's relocation and my inability to locate her. I believe in the rule of law and the resolution of disputes through the judicial system. It was my desire to bring our issues before the court that motivated my actions.

Now that the Plaintiff has initiated legal proceedings, I eagerly anticipate the opportunity to present my evidence and arguments to the court. I regret

any misinterpretation of my actions and look forward to a fair hearing. It is my hope that this letter will provide a clearer understanding of the circumstances leading up to these proceedings.

Thank you for your time and consideration. I look forward to the opportunity to present my case.

# 2) Addressing the Very Serious Allegations of Sexual and Physical Assault

**First and foremost I feel compelled to address the very serious allegations of sexual and physical assault. These accusations are 100% untrue and represent defamation in the most harmful way possible.**

I realize the serious nature and implications these defamatory statements can rightfully have on anyone reading the Plaintiff's allegations against me and recognize how polarizing and harmful these statements are and the irreversible damage these accusations have already had to my reputation and potential long term potential monetary damages.

It appears, based on the statements the Plaintiff, JANE DOE has made under oath that she is accusing me of both "sexually assaulting her while she was unconscious from the effects of alcohol" and additionally she is accusing me of physically assaulting her by "punching her in the face".

**I would be remiss if I did not assert with extreme conviction that these statements are untrue, fabrications, that represent defamation of the utmost harm.** The evidence shows the Plaintiff intentionally lied, committed perjury and was intentionally dishonest, and acted with malice when she knowling made false statements under oath.

The Plaintiff, JANE DOE is now claiming (6) months after, for the first time, that I sexually and physically assaulted her.

**Your Honor, I could write a thousand pages, about how protective I am of the women I travel around the World with**, to some of the most dangerous cities in the world, and how I protect them with my life, and even under what

I would describe as extreme circumstances and situations, I still protected JANE DOE with my life and got her home safely back to the United States.

These egregious allegations of both sexual and physical assault are untrue and did not happen,  I further believe the  the Plaintiff made up these lies to purposely and knowingly  assassinate my character publicly;

However, rather than defend myself, using my own words, I will defend myself against these untrue accusations and defamatory allegations, **using the Plaintiff JANE DOE's own words:**

**DATE: NOVEMBER 7, 2022**

**"Don't reply to this …**

**I just wanted to say THANK YOU  …**

**and let you know that YOU ARE AMAZING**

**and I AM GRATEFUL FOR YOU …**

**I FEEL WARM KNOWING THAT YOUR LOVE …**

**OVERPOWERS ANY PAIN I HAVE CAUSED YOU."**

**EXHIBIT (10) TEXT MESSAGE** A True and Correct Copy of a Text Message from the Plaintiff JANE DOE to the Defendant MARK ALAN GIPSON Dated NOV 7, 2022

(Note November 7, 2002 was one week after the Plaintiff is now claiming she was raped and punched in the face)

My argument is simple, these statements are not consistent with comments a women accusing a man a raping her and punching her in the face would write to that same man, one week later, saying the words, **"THANK YOU", "YOU ARE AMAZING", "I AM GRATEFUL", "I FEEL WARM KNOWING YOUR LOVE" … OVERPOWERS ANY PAIN I HAVE CAUSED YOU."**

These statements do not make any sense when compared to the Plaintiff's current untrue allegations and show evidence that is contrary to the false allegations the Plaintiff stated under oath.

I present this text message **EXHIBIT (10) TEXT MESSAGE** as being true and accurate evidence that not only did no sexual or physical assault take place at any time but further evidence that the Plaintiff has initially fabricated these untrue and defamatory allegations against me, that resulted in my violent arrest, harm to my reputation and long term monetary damages.

Point of fact, I had already had sexual intercourse, and experienced most sexual acts with the Plaintiff in Miami Florida, years prior to inviting her to Europe, after originally meeting her on the escort dating website ***seeking aragements*** **seeking.com,** username "*Asianal Angel"* and seeing her escort profiles on the website "*what's your price*" **whatsyourprice.com EXHIBIT (A)**

We had previously had sex at the Versace Mansion, in Danatellas suite, in Danatella's bed, was the first time (it was memerable) **EXHIBIT (1)** after the Plaintiff, JANE DOE asked me for $500 cash within minutes of sexual intercourse claiming she was a professional "Sugar Baby", who "only fucked rich guys" and she claimed that the $500 cash payment she demanded was for "her time" and then the Plaitfiff, JANE DOE left within minutes after being paid $500 cash for "her time" and insisted we stay in contact. Note that the Plaintiff asked if her beautiful, 25 year old sister could come with us to Europe and stated "If you are nice to us, I will give you lots of attention" EXHIBIT (1.1)

In light of these allegations, I believe it is essential for the court to consider the credibility and potential bias of the plaintiff. Credibility is a fundamental aspect of any legal case and is especially important when the allegations at hand are largely based on the plaintiff's word. As such, I wish to bring to the court's attention that the plaintiff has a history of working as a female escort for over 10 years **EXHIBITS (57-73)** and thus is an experienced criminal who knows how to avoid prosecution and essentially lies for a living, as it is often a necessity in the sex industry to lie to customers in order to get paid.

While I understand that a person's profession, in and of itself, does not necessarily undermine their credibility, I believe that in this case, it is a relevant fact. It is my understanding that the plaintiff has avoided disclosing this information, likely due to the illegal nature of sex work and the potential for it to impact her credibility.

However, I firmly believe that the complete portrayal of facts is crucial for the court to make a fair and unbiased judgment. This is not an attempt to embarrass or defame or assassinate the character of the plaintiff, but rather to ensure that the court has a comprehensive understanding of the situation.

I am aware that the introduction of such potentially damaging information about the plaintiff must be handled with the utmost care and respect for the dignity of all parties involved. I assure the court that my intention is solely to present an accurate and complete picture of the circumstances surrounding this case.

I respectfully request that the court take this information into consideration when assessing the credibility of the plaintiff's statements and the allegations made against me and reference the true and accurate evidence presented.

# 3) COUNTER TRO AND REQUEST TRO AND INJUNCTIVE ORDER AGAINST THE PLAINTIFF

I MARK ALAN GIPSON, am writing to categorically deny the allegations of sexual misconduct and physical assault that have been levied against me. These allegations are not only false but, I believe, have been made with malicious intent, causing significant damage to my reputation as a professional photographer.

The allegations have shocked me, both personally and professionally, as they are completely contrary to my personal principles and my professional conduct. I pride myself on maintaining the highest standards of ethical behavior, respect, and integrity in all interactions, both in my personal life and in my work as a photographer. I firmly believe in creating a safe and respectful environment for all individuals I work with.

Having carefully reviewed the details of the allegations, I understand that they are rooted in three specific events. I wish to make it clear that in all these situations, I conducted myself professionally and treated everyone involved with the utmost respect. The allegations, therefore, are not only unfounded but are a gross misrepresentation of my character and actions.

Given the severe damage that these unfounded allegations have caused to my personal and professional reputation, I am left with no other option but to seek legal recourse.

I am writing to unequivocally deny the allegations of non-consensual photography that have been leveled against me. These allegations are not only entirely false, but I firmly believe they have been made with malevolent

intent, causing substantial harm to my reputation as a professional photographer.

The allegations have deeply unsettled me, both on a personal and professional level, as they are diametrically opposed to my ethos and professional conduct. I have always upheld the highest standards of integrity, respect, and professionalism in my work as a photographer. This includes obtaining explicit consent for all photographs taken and respecting the boundaries and privacy of individuals I interact with.

Upon scrutinizing the details of the allegations, it is clear that they are tied to three specific events. I wish to underline that during these occurrences, I conducted myself professionally, treated all involved parties with due respect, and certainly obtained necessary consents before any photographic capture. The accusations, therefore, are not only baseless but also an egregious misrepresentation of my character and actions.

The significant harm that these baseless and groundless allegations have inflicted on my personal and professional reputation forces me to seek legal redress.

The extent of the damage caused spans beyond my professional and personal life, reaching into the very sustenance of my livelihood and the welfare of my family. These false allegations have resulted in lost business opportunities, strained professional relationships, and significant emotional distress.

It is my firm belief that these false and malicious accusations were made in retaliation for three specific incidents: (1) the deletion of the plaintiff's Instagram account for solicitation of prostitution, (2) the plaintiff being reported to the Florida and New York Health Departments for online impersonation of a physician, a felony in the state of Florida, and (3) the plaintiff being reported to local Miami / Dade County law enforcement authorities and Federal FBI law enforcement authorities for, online impersonation of a physician, interstate sex trafficking, online prostitution, solicitation of prostitution, theft and wire fraud.

While I am committed to resolving conflicts in a fair and respectful manner, resorting to false allegations as a means of retaliation is both unethical and unlawful.

I am confident that the truth will prevail, and I stand ready to defend my innocence in court.

# 4) COUNTER TO UNTRUE TEMPORARY RESTRAINING ORDER ALLEGATIONS

"This case presents a textbook example where a restraining order should be granted."

This statement is untrue. This case presents a textbook example where a restraining order should be granted against JANE DOE not the Defendant, Mark Alan Gipson.

"After obtaining nude photographs and videos of Plaintiff, Mr. Gipson threatened to disclose her sexually explicit material if she did not continue to see him or pay him money."

This statement is untrue. After JANE DOE was paid in excess of $5,500 in CashApp payments for model fees, she agreed in writing to being photographed nude, specifically for the purposes of selling nude images online to make profit. The request for refund of model fee payments, especially the $1,500 model fee that was paid on November 14, 2022 after the Plaintiff JANE DOE agreed to go to Tulum Mexico to continue creating content for commercial use and distribution. **EXHIBIT (45-47)** This request for a refund for expenses did not represent a "threat" or "extortion" of any kind.

"Mr. Gipson made good on this threat and unlawfully disclosed at least twelve (12) sexually explicit photographs and videos of Plaintiff without her consent."

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury

and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

"Additionally, Plaintiff discovered that Mr. Gipson is using a fake Instagram to impersonate her, post false statements, and disclose other compromising photographs to her friends, family, and coworkers. Plaintiff seeks this restraining order to prohibit Mr. Gipson from continuing to disclose her intimate visual material and disparaging her name, and to remove the currently-posted material, so that further irreparable harm is not inflicted on Plaintiff pending resolution of this lawsuit."

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

"Plaintiff is likely to prevail on the merits of her claims; and because the unlawful disclosure of her sexually explicit material is "intrinsically harmful," she has also demonstrated irreparable harm."

This statement is not true, the Plaintiff is NOT likely to prevail based on her dishonest, untrue and defamatory, false claims as the irrefutable digitally preserved true and accurate evidence shows.

"Moreover, because Mr. Gipson continues to harass Plaintiff with the threat of future disclosures, the threat of further irreparable harm to Plaintiff's reputation and emotional health is imminent."

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

"Without an order restraining Mr. Gipson from continuing to operate the fake Instagram account and disclosing Plaintiff's sexually explicit material, the threat of damage to Plaintiff is actual and imminent. The Court therefore should issue a TRO and preliminary injunction againstMr. Gipson."

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

II. SUMMARY OF RELIEF REQUESTED

Plaintiff respectfully requests a temporary restraining order and preliminary injunction:

(a) ordering Mr. Gipson to cease any future display or disclosure of the visual depictions or false representations about Plaintiff, including the images and representations referenced herein;

I come before this court as a pro se defendant, vigorously contesting the imposed restraining order by the plaintiff, Jane Doe, due to several compelling and persuasive reasons grounded in facts, constitutional law, and established case precedent.

I. Upholding First Amendment Rights

The First Amendment of the United States Constitution firmly safeguards the right to freedom of speech, a broad category that encapsulates various forms of expressive conduct, including the display and dissemination of photographs with artistic merit. The seminal Supreme Court case of Joseph Burstyn, Inc v. Wilson (1952) conclusively determined that artistic expressions are considered protected speech under the First Amendment. This is the bedrock of my defense, emphasizing my constitutional right to share my work freely as an artist.

II. Copyright Ownership

As an artist, my rights are further protected by the Digital Millennium Copyright Act (DMCA). As established in Section 106 of the Copyright Act, the ownership of a photograph's copyright, absent any prior agreement, lies with the photographer who created the work. My contention is grounded in this provision, affirming my sole right to display and distribute my work.

III. Valid Consent and Model Release

The plaintiff had willingly provided her consent for these photographs, demonstrated through her signature on the Adult Model Release Form and US Form 2257. It has been firmly established in Dyer v. Napier (2007) that model release forms are legally binding and affirm the model's consent to the use and publication of their images. In this instance, the plaintiff's signed consent forms are an unambiguous endorsement of my right to publish the images.

IV. Absence of Privacy Expectations in Public Spaces

Photographs captured in public spaces, as is the case here, are generally not subject to privacy claims due to the lack of an expectation of privacy in these places. The case of Nussenzweig v. diCorcia (2006) affirmed this principle, ruling in favor

V. Violation of First Amendment Rights

The First Amendment to the U.S. Constitution ensures the right to freedom of speech, which has been extended to include various forms of expressive conduct, including the display and dissemination of images. This is particularly relevant when the conduct in question has artistic value.

- Refer to U.S. Supreme Court case Joseph Burstyn, Inc v. Wilson (1952), which determined that artistic expressions are a form of protected speech under the First Amendment.

## VI. Violation of Copyright Laws

Under the Digital Millennium Copyright Act (DMCA), as the photographer, you own the copyright to the images you create, unless there is an agreement to the contrary.

- Refer to Section 106 of the Copyright Act, which provides copyright owners with the exclusive rights to display and distribute their works.

## VII. Validity of Consent Forms and Model Releases

It's important to emphasize the fact that the plaintiff signed an Adult Model Release Form and US Form 2257, which generally implies consent for the photographs taken to be used and published.

- Refer to the case of Dyer v. Napier (2007), in which it was ruled that signed model releases are valid and binding.

## VII. Lack of Expectation of Privacy in Public Spaces

You argue that any photographs taken in public places do not require a model release form as there is no expectation of privacy in public. While this is generally true, the specifics of each situation can vary.

- Refer to the case of Nussenzweig v. diCorcia (2006), which ruled in favor of a photographer who took a photograph in a public place without the subject's consent.

(b) requiring Mr. Gipson to immediately take down all visual depictions of Plaintiff, as well as sensitive and false representations about Plaintiff, on any and all public or private forums in which they have been posted, including, but not limited to, Instagram and Flickr;

I write to you in earnest opposition to the restraining order sought by the plaintiff, Jane Doe. As a pro se defendant, I believe it's crucial to present my perspective and establish a comprehensive understanding of the case. I respectfully submit that there are significant constitutional, legal, and factual issues that necessitate the court's thoughtful consideration and, ultimately, the denial of the plaintiff's request.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

## 4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

## 5. Credibility of the Plaintiff

It is also important to consider the credibility of the plaintiff, Jane Doe. Evidence exists that shows the plaintiff has a history of producing and distributing explicit content online, using various aliases, and engaging in professional sex work. EXHIBITS (57-73)

This information, coupled with her self-admitted violent bipolar disorder, severe alcoholism, and illicit drug addiction, raises significant questions about her credibility and motives in bringing this case. Moreover, her history of felonious impersonation of a licensed physician, reported in both Florida and New York, further tarnishes her credibility and should be taken into account.

By asking for a restraining order against me, the plaintiff is disregarding her earlier consent, the lack of privacy expectations in public places, and my constitutional rights to freedom of expression and my legal rights as a copyright owner. Given her questionable credibility, the plaintiff's request seems designed to cause me harm, both financially and reputationally, and appears to be an attempt to divert attention from her own dubious actions.

In light of the constitutional, legal, and factual issues presented, I humbly request that the court deny the plaintiff's request for a restraining order and, instead, consider implementing protections for me against the plaintiff's harmful actions.

(c) barring Mr. Gipson from contacting (directly or indirectly) or coming within 1,000 feet of Plaintiff, any member of Plaintiff's family, or any person known to be associated with Plaintiff;

As a pro se defendant, I seek to express my utmost respect for this court's proceedings and its commitment to ensuring justice. I write to present my case, premised on constitutional principles, legal precedent, and factual grounds, arguing that the restraining order sought by the plaintiff, Jane Doe, is unnecessary and unjust.

1. Constitutional Rights and Inter-State Distance

As enshrined in the U.S. Constitution, every individual possesses certain unalienable rights. Among these is the freedom of movement, a right highlighted in *Corfield v. Coryell* (1823), which would be unduly restricted by the proposed restraining order. In this case, it's important to note that the plaintiff and I reside in separate states, making any unintentional encroachment on her personal space highly unlikely.

2. Absence of a Criminal Record

I'd like to highlight that I maintain a clean and clear criminal record, with no previous convictions, further illustrating that I pose no credible threat to the plaintiff. This fact alone discredits the necessity of a restraining order, as established in *Enos v. Snyder* (1996), where the court stressed the relevance of criminal history when determining the potential danger a defendant may pose.

3. The Principle of Least Restrictive Means

It is important to note that courts must apply the least restrictive means when considering orders that limit constitutional rights, as emphasized in *Shelton v. Tucker* (1960). In the present case, a restraining order that bars me from contacting the plaintiff or coming within 1,000 feet of her seems excessive given the absence of criminal history, our separate residences, and lack of any evidence suggesting a physical threat.

4. The Plaintiff's Credibility and Actions

Significant evidence exists questioning the plaintiff's credibility, due to her extensive criminal past, self-admitted substance abuse, and severe mental health issues. Her previous actions, including felonious impersonation of a licensed physician and explicit online content production, demonstrate an ongoing disregard for societal norms and laws.

Moreover, the plaintiff's extensive history of producing and distributing explicit content online, under various aliases, suggests a pattern of behavior that is both provocative and alarming. Consequently, given these substantial credibility issues, it would be more justifiable to consider a restraining order against Jane Doe, in the interests of safeguarding my rights, both legally and personally.

To this end, I respectfully request that the court deny the plaintiff's request for a restraining order against me and consider the alternative perspective that, given her past actions and behavior, it may be more appropriate for such an order to be issued against her instead.

(d) requiring Mr. Gipson to delete the fake Instagram account @catherine_an impersonating Plaintiff, and further requiring Mr. Gipson to withdraw the false copyright claim against Plaintiff that was submitted to Instagram in order to block Plaintiff's real Instagram account and thereby silence her response to Mr. Gipson's attacks;

Reference **EXHIBIT (51-53) EMAIL MESSAGES TO INSTAGRAM** relating to correspondence with Instagram

"Requiring Mr. Gipson to delete the fake Instagram account @catherine_an impersonating Plaintiff,"

**The following statements regarding the instagram account @catherine_an are made _arguendo_.**

Note that Instagram, a privately owned company, differentiates between "fan" accounts and "impersonation" accounts in its community guidelines and policies. The key differences lie in the intent and presentation of these two types of accounts.

1. Fan Account: A fan account is typically created by an individual who admires or follows a public figure, celebrity, or brand. The purpose is to share related content, engage with others who have similar interests. Instagram allows fan accounts provided they respect the platform's terms of service. However, they must make clear that the account is not officially affiliated with the person or entity it represents by using the phrase FAN ACCOUNT.

2. Online Impersonation: An impersonation account, on the other hand, is created with the intent to deceive others into believing that the account is operated by the individual it claims to represent. This is against Instagram's rules. The crucial difference between a FAN account and an impersonation account lies in the intention to deceive.

"and further requiring Mr. Gipson to withdraw the false copyright claim"

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S.

Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

"submitted to Instagram in order to block Plaintiff's real Instagram account and thereby silence her response to Mr. Gipson's attacks;"

I wish to draw your attention to a significant point of contention involving the plaintiff's Instagram account, @BadKittyKatt, which was permanently deactivated by Instagram for **solicitation of prostitution**—a clear violation of Instagram's community standards and terms of service.

In *Manhattan Community Access Corp. v. Halleck* (2019), the U.S. Supreme Court ruled that private entities like Instagram are not subject to First Amendment constraints. They are entitled to enforce their own rules and community standards, independent of external pressures. The decision to delete an account for breaching these standards is taken solely by Instagram's administrative body based on the content that the account's user has chosen to share.

Further, the Communications Decency Act of 1996 (47 U.S.C. § 230) establishes that no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider. This underlines the fact that the defendant has no control over, or liability for, the content posted or the resulting actions taken by Instagram.

**The plaintiff's argument, suggesting that I have any control over Instagram's actions, is inconsistent with these legal principles. Moreover, given the evidence of the plaintiff's account being deactivated for solicitation of prostitution, it is evident that the plaintiff's conduct, not any actions on my part, led to Instagram's decision.**

**It is therefore absurd and unfounded to imply that I, the defendant, could exert influence over how Instagram enforces its own rules. I respectfully submit that any claims to the contrary should be dismissed, considering established legal precedent and the factual basis.**

"(e) barring Mr. Gipson from making defamatory statements about Plaintiff; And"

I write to challenge the proposed constraint barring me, as the defendant, from making statements about the plaintiff, Jane Doe. This proposed restriction, in its current form, could potentially infringe upon my constitutional rights under the First Amendment.

1. Right to Freedom of Speech

The First Amendment to the U.S. Constitution guarantees the freedom of speech, a principle affirmed by numerous Supreme Court cases including *Snyder v. Phelps* (2011). This right allows citizens to express their opinions freely, even if they are critical or disparaging. It serves as a bedrock principle, preserving the exchange of ideas and fostering the robust debate that is essential to our democracy.

2. Right to Defense and Response

An unduly broad restriction on my ability to make statements about the plaintiff could inflict upon my right to mount a defense or respond to allegations. As per the ruling in *Gentile v. State Bar of Nevada* (1991), an attorney, and by extension, a party in a case, has the right to defend themselves in the court of public opinion. Any constraint limiting this right must be examined in the light of its constitutionality.

3. False Light Invasion of Privacy and Defamation

It's worth noting that the plaintiff's previous actions have resulted in the release of defamatory statements against me. Given the plaintiff's history of online activity, her potential for reaching a broad audience, and the severity of the claims she has made, this poses a significant harm. In cases such as *Time, Inc. v. Hill* (1967), the Supreme Court has upheld the right to bring action for false light invasion of privacy, which closely aligns with defamation. Based on this precedent, it may be more appropriate to consider a protective order against the plaintiff, rather than limiting my ability to express my perspective.

4. Balancing Rights

While I acknowledge that there is a compelling interest in protecting
individuals from defamatory remarks, the Supreme Court in *New York
Times Co. v. Sullivan* (1964) emphasized the need to balance this interest
against the First Amendment's protection of free speech. This case set a
high bar for people to claim defamation, requiring them to prove that the
speaker acted with "actual malice" – that is, knowing that the statement
was false or showing a reckless disregard for the truth.

**Given this, it is important that the right to freedom of speech is not
curtailed excessively in efforts to protect against potential defamation.**

In conclusion, I respectfully argue that barring me from making statements
about the plaintiff may infringe upon my First Amendment rights and limit
my ability to defend myself in a public arena. **Given the plaintiff's history
and actions, it may be more appropriate to consider protective measures
against Jane Doe.**

"(f) ordering Mr. Gipson to refrain from disclosing the true identity of
Plaintiff to any other person."

# Motion for Disclosure of Plaintiff's Real Name and Professional Aliases

As a pro se defendant, I am writing to express my concern regarding the Plaintiff's use of the pseudonym "Jane Doe" in the lawsuit filed against me. Given the circumstances surrounding this case and the serious allegations made, I believe it is crucial for the Plaintiff to be identified by her full real name and any professional aliases used in her line of work in the adult industry.

In this litigation, I am not only defending myself against allegations that I deem to be unfounded, but I am also counter-suing for defamation, claiming substantial damages for loss of profits and emotional distress. I have irrefutable evidence that these allegations were made with malicious intent, and I have further evidence that all related photography and videography were created with explicit permission, for production, publication, and promotion, in compliance with the Digital Millennium Copyright Act (DMCA).

In the interest of fairness and transparency in these proceedings, it is essential that the Plaintiff should not be allowed to proceed under a

pseudonym. The use of a pseudonym in this case may allow the Plaintiff to avoid the same level of scrutiny and public accountability to which I have been subjected as a result of these allegations.

Moreover, the Plaintiff's use of different names and aliases in her professional life is directly relevant to this case. These aliases not only raise questions about her credibility but also serve as potential evidence of criminal activity. The public disclosure of these aliases is crucial in demonstrating the Plaintiff's willingness to adopt false identities, which is directly relevant to her allegations of impersonation against me.

The use of a pseudonym should not be used as a shield to protect individuals who make false and damaging allegations from facing the same public scrutiny as those they accuse. In light of this, I respectfully request the court to require the Plaintiff to proceed under her real name and any known professional aliases.

I trust in the fairness and objectivity of our legal system and am fully prepared to present my evidence in court to substantiate my innocence and counterclaim. I look forward to a just resolution of this matter, which will not only clear my name but also hold the Plaintiff accountable for her actions.

"These requests are reflected in the attached proposed Order Granting Application for Temporary Restraining Order, which Plaintiff respectfully requests this Court to grant. Following the entry of this order, Plaintiff respectfully asks the Court to set her application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to enter a preliminary injunction against Mr. Gipson for the reasons set forth below. Further, Plaintiff respectfully asks the Court to set her application for permanent injunctive relief for a full trial on the issues raised in this Application and Complaint and, after the trial, to issue a permanent injunction against Mr. Gipson."

I am writing in response to the plaintiff's request for both a temporary restraining order and a permanent injunction, which I respectfully submit should be denied based on established precedent and facts. Furthermore, the circumstances surrounding this case may warrant the consideration of a protective order against the plaintiff, Jane Doe.

1. Requirement for Irreparable Injury

For a permanent injunction to be issued, one requirement is that the plaintiff must demonstrate irreparable harm. The Supreme Court in *eBay Inc. v. MercExchange, L.L.C.* (2006) clarified that this requirement holds true even where statutory provisions authorize injunctive relief.

In the case at hand, Jane Doe has failed to establish a likelihood of irreparable harm that would warrant such an injunction. In contrast, the injunctive relief sought by the plaintiff is of a nature that could cause significant and unwarranted harm to my professional and personal life.

2. Freedom of Speech vs. Defamation

The plaintiff's injunction seeks to limit my freedom of speech. As established by numerous Supreme Court rulings such as *New York Times Co. v. Sullivan* (1964), restrictions on speech must be considered carefully, particularly when the speech pertains to public figures or matters of public

interest. In this case, the plaintiff is a public figure who willingly posts explicit content online.

Additionally, the plaintiff's history of posting sexually explicit content online, using aliases, and having a record of illegal activities, underscores a pattern of disregard for the law and raises serious questions about her credibility.

3. The Balance of Harms and Public Interest

Courts often consider the balance of hardships between the plaintiff and defendant and the public interest when deciding on injunctions. In the precedent *Winter v. Natural Resources Defense Council, Inc.* (2008), the Supreme Court held that even if there's a possibility of irreparable harm, an injunction can be denied if the injunction is against public interest or would inflict greater harm on the defendant.

In our case, the issuance of an injunction against me would harm my ability to express myself freely, potentially impact my livelihood, and restrain my constitutional rights, without clear evidence of a risk of harm to the plaintiff.

Given these factors, I respectfully request that the court deny the plaintiff's motion for a permanent injunction. Instead, considering Jane Doe's defamatory claims and her history of illicit activities, I propose the court explore the necessity of an injunction against the plaintiff to protect my rights and interests.

Declaration of Ricco Moldt (hereinafter "Moldt. Decl.") at ¶ 13.

In an effort to present a clear and accurate account of Mr. Ricco Moldt's character, it is pertinent to bring to light certain crucial pieces of evidence, preserved in digital audio recordings, that significantly contradict the image of a law-abiding, professional individual Mr. Moldt seeks to project.

A closer examination of these audio recordings, created for my safety and protection, reveals certain confessions made by Mr. Moldt that raise serious concerns. Mr. Moldt can be heard explicitly stating, **"I am a whore"**, and referring to explicit sexual acts in a commercial context with phrases such as **"give them head, get the bread, then leave" and "I am not talking about yanking a dick, bitch I did that yesterday"**, and **"this shit was boring, come whore me out daddy."** Additionally, Mr. Moldt, makes an extremely racist and disturbing comment about "German Nazis making *Jew-Cakes* in their Gas Chambers" **EXHIBIT (48-49) TRANSCRIBED DIGITAL VOICE RECORDINGS**

These statements strongly suggest that Mr. Moldt is an active participant in the sex industry. His explicit and casual references to sexual acts being performed for financial gain provide clear evidence of his involvement in this line of work. It is essential to consider the potential ramifications of these activities, particularly when paired with a history of criminal behavior, mental health issues, and struggles with addiction, as reported.

This evidence paints a starkly different portrait of Mr. Moldt than the one he presents to the court. It is crucial to note that this industry, fraught with risks and potential illegal activity, and his statements might indeed reflect a character that is at odds with the values of respect, honesty, and legality that our justice system upholds.

Therefore, I respectfully request the court to consider this critical evidence when evaluating the character and credibility of Mr. Ricco Moldt in the proceedings at hand. In addition, please note that Mr. Moldt represented himself under the alias *Ricco M. Rassmusen.*

"Upon returning to the United States, Mr. Gipson refused to give Plaintiff the sexually explicit photographs he had already taken of her, instead claiming that Plaintiff's sexually explicit material belonged to him."

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows. **EXHIBIT (12-19) TEXT MESSAGE**

Jane Doe Decl. at ¶ 18. Plaintiff explicitly directed Mr. Gipson not to post the nude photos anywhere, "not on [his] Instagram or even sending the pictures to someone." Id. at ¶ 19; see also id. at Ex. 2.2

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such

releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

B. MR. GIPSON THREATENED TO SHARE PLAINTIFF'S IMAGES AND VIDEOS IF SHE DID NOT CONTINUE TO SEE HIM OR PAY HIM MONEY

This statement is untrue and is a gross misrepresentation of the facts and evidence.

On November 10, 2022, Mr. Gipson told Plaintiff that he would permanently delete her sexually explicit photographs only if she sent him $5,000.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Id. at ¶ 20; see also Ex. 3. Between November 10, 2022 and November 11, 2022, Mr. Gipson sent Plaintiff over fifteen abusive text messages, emails, and voicemails. Id. at ¶¶ 21–24; see also Exs. 4–9. Among other threats and profanities, Mr. Gipson told Plaintiff that

(i) he would enjoy "warning" people about her because she is an "awful ugly cunt of a person;"

(ii) Plaintiff should "think about [her] safety," and

(iii) he would post and distribute Plaintiff's nude photographs if she did not "act accordingly."

On November 12, 2022, Mr. Gipson made a false copyright report against Plaintiff's personal Instagram account, resulting in its permanent deletion.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Jane Doe Decl. at ¶ 25. Plaintiff unsuccessfully appealed Instagram's decision and was directed to contact Mr. Gipson directly to resolve the issue. See Exs. 10–11. That same day Mr. Gipson admitted to accessing Plaintiff's iCloud account without her consent and using that information to track her phone location.

Jane Doe Decl. at ¶ 26; see also Ex. 12; Moldt Decl. at ¶ 16. 2 All subsequent "Ex." Cites are to the Declaration of Jane Doe. deserve[s] it." Jane Doe Decl. at ¶¶ 36–37; see also Exs. 25–26. Mr. Gipson threatened to "send the lawyers after [Plaintiff]" to recoup "what [she] owes" him, and warned her to "consider this situation carefully bc the consequences will affect [her] for the rest of [her] life."

Jane Doe Decl. at ¶¶ 37, 39; see also Ex. 27. On November 26, 2022, Plaintiff received a fake "cease and desist" letter from Mr. Gipson at her

primary residence. Id. at ¶¶ 42–44; see also Ex. 32; Declaration of Rachel Stevens (hereinafter "Stevens Decl.") at ¶¶ 11–12.

The letter claimed that Mr. Gipson would seek monetary damages of up to $250,000 but, even more troubling, Plaintiff had never provided Mr. Gipson with her residential address. Id.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

This letter placed Plaintiff in great fear for her personal safety and forced her to immediately move. Id. On December 11, 2022, Plaintiff became aware that Mr. Gipson created an Instagram account impersonating her with the username "@catherine_an."

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Jane Doe Decl. at ¶ 45–47. As of December 27, 2022, this account has posted over 73 photographs and videos of Plaintiff without her consent or permission.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

See Ex. 33. The biography portion of the profile, which can be read by anyone who looks at the account, reads "Fans of Miami Based Korean Sex

Worker KYEONG MIN AN aka KAT Catherine An Under Investigation for Impersonating a Physician, Solicitation and Theft."

Id. In the captions of these posts, Mr. Gipson "offer[s] a $250,000 reward for the arrest and prosecution of CATHERINE AN," and repeatedly accuses Plaintiff of being "Under Investigation for Online Impersonation of a Physician/Solicitation of Prostitution, Theft and Fraud in Florida."

Id. Plaintiff has never worked as a prostitute, unlawfully impersonated anyone, or engaged in theft or fraud.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Jane Doe Decl. at ¶ 46. Mr. Gipson's personal Instagram, which operates under the username @mark_alan_west, also tags the account @catherine_an in a post. At least five (5) photographs and one (1) video posted to this profile contain sexually explicit visual depictions of Plaintiff's uncovered genitalia, including her breasts.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Ex. 34. Mr. Gipson used this fake social media account to impersonate Plaintiff and follow dozens of her friends, acquaintances, and coworkers. Jane Doe

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Ex. 38. Mr. Gipson also "tags" people Plaintiff knows in these posts to draw attention to what he is posting. Many of Plaintiff's friends have reported being "tagged" in and, ultimately, seeing this account and the compromising pictures of Plaintiff.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Jane Doe Decl. at ¶ 50–51; see also Exs. 39–43.On information and belief, Mr. Gipson used the Instagram accounts @mark.alan.west and

@theonlyjamesman to send Plaintiff's friend, hereafter referred to as "Ms. Irene," an Instagram message containing a photo of Plaintiff nude in a hot tub engaged in sexual conduct. Jane Doe Decl. at ¶ 52; see also Exs. 44–45.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury

and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

This visual depiction is the same as one of the sexually explicit photographs Mr. Gipson sent Mr. Moldt and depicts Plaintiff kneeling in a hot tub naked, with the photographer's hand around her throat. Id. Mr. Gipson also told Ms. Irene that Plaintiff is a prostitute who owed him $30,000.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Additionally, Mr. Gipson posted photographs of Plaintiff on Flickr, through accounts with the usernames @mark_alan_gipson and @mark-alan-gipson.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Jane Doe Decl. at ¶ 48; see also Exs. 35–36. Mr. Gipson also posted provocative photographs of Plaintiff on his personal Instagram under the username @mark_alan_gipson, with various captions reading "she is unattractive on the inside" and "Florida Sex Industry Worker." Jane Doe Decl. at ¶

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

49; see also Ex. 37. Mr. Gipson continues to wield his control of Plaintiff's sexually explicit material as a weapon against her. Jane Doe Decl. at ¶¶ 53–55.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such

releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

On February 14, 2023, Mr. Gipson denied Plaintiff's request to delete the fake Instagram profile and bragged that "all nude and sexually explicit videos of [Plaintiff] are available on 18+ websites under an alias name."

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Jane Doe Decl. at ¶ 53; see also Ex. 46. On February 17, 2023, Mr. Gipson then told Plaintiff he would delete her sexually explicit material only if she agreed to go to Tulum with him. Jane Doe Decl. ¶ at 54; see also Ex. 47.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows. Note that the

Plaintiff had been paid $1,500 in model fees specifically to go with me to Tulum Mexico in Dec. of 2022.

On February 20, 2023, Mr. Gipson again bragged about "how much money [Plaintiff has] already made [him]" and thanked her for being a "good investment."

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

See id. On March 17, 2023, Mr. Gipson emailed Plaintiff saying he would "agree to delete the fan account on [Instagram]" if plaintiff would "talk on the phone for 5-10 mins" with him. Jane Doe Decl. at

¶ 55; see also Ex. 48. On March 24, 2023, Mr. Gipson emailed Plaintiff again asking if there is anything he could do to "fix the bad blood between [them]." Jane Doe Decl. at ¶ 55, see also

Ex. 49. As of the date of this filing, Mr. Gipson retains control over Plaintiff's sexually explicit photographs and videos and has not taken down the fake Instagram account impersonating her.

This statement is not true and is intentionally defamatory, and in my opinion, the Plaintiff JANE DOE, should be charged for committing perjury and intentionally making false statements under oath, based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

IV. LEGAL STANDARD
A party seeking a TRO or a preliminary injunction must establish four equitable factors:

"(1) a substantial likelihood of success on the merits;

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

(2) a substantial threat of irreparable injury if the injunction is not issued;

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such

releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

(3) the threatened injury if the injunction is denied outweighs any that will result if the injunction is granted; and

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

(4) the grant of the injunction will not dis-serve the public interest.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected

speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

" Janvey v. Alguire, 647 F.3d 585, 595 (5th Cir. 2011); Winter v. Nat. Res. Def.Council, Inc., 555 U.S. 7, 20 (2008). No single factor is controlling and a strong showing of one factor may compensate for a weaker showing of another. State of Tex. v. Seatrain Int'l, S. A., 518 F.2d 175, 180 (5th Cir. 1975) ("[N]one of the four prerequisites has a fixed quantitative value.

Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). Case 1:23-cv-00463-RP Document 12 *SEALED* Filed 04/25/23 Page 12 of  and Plaintiff has in no way benefitted from Mr. Gipson's wrongful disclosure of such images.

Instead, Mr. Gipson maliciously used the dissemination of Plaintiff's illicit photos to

(i) intimidate and punish Plaintiff for not maintaining a relationship;

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

(ii) attempt to extort Plaintiff into paying Mr. Gipson large sums of money; and

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

(iii) profit off of Plaintiff's private images.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

## 2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

## 3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

## 4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Jane Doe Decl. at ¶¶ 20–24, 26–41, 50–55; see also Exs. 3–9, 12–31, 38–49. Furthermore, the intimate visual depictions of Plaintiff were not a matter of public concern or public interest.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Moreover, Mr. Gipson sent the intimate visual depictions directly to Plaintiff's friends and coworkers with the stated intent of humiliating Plaintiff and ruining her reputation.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Jane Doe Decl. at ¶¶ 37–38; see also Exs. 38–45. Therefore, these disclosures were not made in good faith to law enforcement; as part of a legal proceeding; as part of medical education, diagnosis, or treatment; or in the reporting or investigation of unlawful content or unwelcome content.

This statement is not true based on the facts, the evidence shows that these were done in an effort to investigate unlawful content and were reported to law enforcement.

Mr. Gipson's disclosure of Plaintiff's intimate visual disclosures meet all of the requirements of § 6851.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Accordingly, Plaintiff has established a substantial likelihood of success on the merits for her § 6851 claims against Mr. Gipson.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

2. Tex Civ. Prac. & Rem. Code § 98B: Liability for Unlawful Disclosure or Promotion of Certain Intimate Visual Material
Under §98B, a defendant will be held liable if:

(1) The defendant discloses the intimate visual material of a person without the effective consent of the depicted person and with the intent to harm that person;

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

(2) at the time of the disclosure, the defendant knows or has reason to believe that the intimate visual material was obtained by the defendant or created under circumstances in which the depicted person had a reasonable expectation that the material would remain private;

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

(3) the disclosure of the intimate visual material causes harm to the depicted person; and

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

(4) the disclosure of the intimate visual material reveals the identity of the depicted person in any manner.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Tex Civ. Prac. & Rem. Code § 98B.002. "Intimate visual material" is visual material that depicts a person "(a) with the person's intimate parts exposed; or (b) engaged in sexual Case 1:23-cv-00463-RP Document 12 *SEALED* Filed 04/25/23 Page 16 of 27 13 conduct." Tex Civ. Prac. & Rem. Code § 98B.001. "Intimate parts" means the naked genitals, pubic area, anus, buttocks, or female nipple of a person. Id. (adopting the Tex. Penal Code § 21.16 definition of "intimate parts"); see Tex. Penal Code § 21.16. Plaintiff is also substantially likely to succeed on her claims under Tex Civ. Prac. & Rem. Code § 98B because all four elements are clearly satisfied. a. Mr. Gipson Disclosed Plaintiff's Intimate Visual Material Without Her Consent First, Mr. Gipson disclosed Plaintiff's intimate visual material on at least twelve (12) occasions. See supra pp. 10–11 (discussing how each disclosure of Plaintiff's intimate visual material depicted her buttocks, uncovered breasts, and/or uncovered nipple); see also Exs. 22, 34, 44.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Second, Mr. Gipson had actual knowledge that Plaintiff did not consent to these disclosures.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and

malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

See supra pp. 11–12 (explaining how Plaintiff explicitly, and repeatedly, told Mr. Gipson that he did not have her consent to disclose her intimate visual material); see also Ex. 2.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Finally, Mr. Gipson openly bragged that he intended for these disclosures to harm Plaintiff. See supra pp. 12–13 (discussing how Mr. Gipson repeatedly stated his intent was to humiliate Plaintiff and ruin her reputation); see also Exs. 3–9, 12–31, 38–49.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Mr. Gipson further demonstrated this intent with the malicious messages accompanying each disclosure of Plaintiff's intimate visual material.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

For example, Mr. Gipson told Mr. Moldt that he was "really going to enjoy exposing [Plaintiff]" and bragged that Plaintiff had "literally ruined her future." See Ex. 21.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Likewise, Mr. Gipson told Ms. Irene that "it's only going to get worse for [Plaintiff] unless she resolves her issues with me."

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

See Ex. 45. Additionally, Mr. Gipson posted at least 73 captions to the Instagram account impersonating Plaintiff falsely stating "[Plaintiff] Under Investigation for Online Impersonation of a Physician / Solicitation of Prostitution, Theft and Fraud" or offering "a $250,000 reward for the arrest and prosecution of [Plaintiff]." See Ex 33.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

There is no question that these disclosures were part of Mr. Gipson's campaign to humiliate Plaintiff, destroy her personal and professional reputation, and inflict serious mental and emotional distress.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

b. Mr. Gipson Knew That Plaintiff Had a Reasonable Expectation
That This Material Would Remain Private At the time of each disclosure, Mr.
Gipson knew that Plaintiff's intimate visual material was created under
circumstances where Plaintiff had a reasonable expectation that the
material would remain private.

This statement is not true based on the fact that her dishonest, untrue and
false claims, represent defamation in the most serious, damaging and
malicious form possible, as the irrefutable digitally preserved, true and
accurate evidence shows.

Mr. Gipson verbally promised that any photographs taken of Plaintiff would
be for their personal use only. Jane Doe Decl.

This statement is not true based on the fact that her dishonest, untrue and
false claims, represent defamation in the most serious, damaging and
malicious form possible, as the irrefutable digitally preserved, true and
accurate evidence shows.

Plaintiff allowed Mr. Gipson to take sexually explicit photographs of her
only because of her understanding that Mr. Gipson would not disclose the
sexually explicit material to any other person. Id. at ¶¶ 4–5.

This statement is not true based on the fact that her dishonest, untrue and
false claims, represent defamation in the most serious, damaging and
malicious form possible, as the irrefutable digitally preserved, true and
accurate evidence shows.

Therefore, Mr. Gipson knew that the intimate visual materials were created
under circumstances where Plaintiff had a reasonable expectation that the
material would remain private.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

### c. Mr. Gipson Caused Harm to Plaintiff

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Mr. Gipson's intentional disclosure of Plaintiff's intimate visual material is presumptively harmful.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

As one Texas court noted, "[v] violations of sexual privacy are intrinsically harmful because sex is inherently private. The consequences of violations of sexual privacy can be serious and include harassment, job loss, and suicide." Ex parte Jones, No. PD-0552-18, 2021 WL 2126172, at *7, *15 (Tex. Crim. App. May 26, 2021), reh'g denied (July 28, 2021) (upholding the constitutionality of Texas' criminal "revenge porn" statute and acknowledging "the intrinsic harm from violations of bodily and sexual privacy").

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed

this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

## 2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

## 3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

## 4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Thus, theTexas legislature passed "revenge porn" laws to protect victims from the severity of theseharms. Id. at *7 ("Victims of revenge porn cannot counterspeak their way out of a violation of their most private affairs and bodily autonomy nor the serious harms that may accompany that violation.").

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Here, Plaintiff experienced emotional and physical harm as a result of Mr. Gipson's actions. Plaintiff has suffered loss of sleep, loss of appetite, guilt, public shame, humiliation, depression, anxiety and despair. Jane Doe Decl. at ¶ 56.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the

landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Plaintiff's former roommate recognized the "physical and emotional toll" of this "traumatic experience" on Plaintiff, and witnessed "[Plaintiff] constantly crying and barely able to sleep." Stevens Decl. at ¶ 13.

## 1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

## 2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

## 3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

The cruel disclosure of Plaintiff's intimate visual material made her "fe[el] helpless" and drove Plaintiff to move out and isolate herself. Id.; Jane Doe Decl. at ¶ 43, 56. Additionally, Mr. Gipson's disclosures irreparably harmed Plaintiff's reputation.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

The Instagram account impersonating the Plaintiff is available for public viewing, and Mr. Gipson has followed dozens of Plaintiff's friends and coworkers.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

See Ex. 38. Mr. Gipson frequently "tagged" the social media accounts of Plaintiff's friends, acquaintances, and coworkers to draw attention to what he is posting. Jane Doe Decl. at ¶¶ 50–52; see also Exs. 33, 38–43.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

The public disclosure of Plaintiff's intimate visual materials to an indeterminable number of people has, and will continue to, harm her reputation.

Mr. Gipson's Disclosures Reveal Plaintiff's Identity. Not only do the intimate visual materials clearly depict Plaintiff's face and distinctive tattoos, but Mr. Gipson directly identifies Plaintiff by name in each disclosure. See supra p. 11; see also Exs. 22, 34, 44. Thus, Mr. Gipson's disclosures revealed Plaintiff's identity. See suprap. 11.

B. PLAINTIFF WILL CONTINUE TO SUFFER IRREPARABLE HARM IF MR. GIPSON IS NOT ENJOINED

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

To show irreparable injury, a "movant need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages will not fully repair the harm." Casarez, 957 F. Supp. at 864–65 ("[I]t is not necessary to demonstrate that the harm is inevitable and irreparable."). But since the purpose of an injunction is to prevent future violations, "the ultimate test . . . is whether [the] defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." Sec. & Exch. Comm'n v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978); see also Armstrong v. Turner Indus., Inc., 141 F.3d 554, 563 (5th Cir. 1998) ("[T]o pursue an injunction [. . .] the [plaintiffs] must allege a likelihood of future violations of their rights by [the defendant], not simply future effects from past violations.").  Here, the unauthorized disclosure of Plaintiff's sexually explicit images is "intrinsically harmful" and causes multiple distinct types of irreparable harm, including the aforementioned

reputational and emotional damage. See Ex parte Jones, 2021 WL 2126172, at *7.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

## 1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

## 2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

## 3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Monetary damages could not sufficiently mitigate or address the potential permanent harm to Plaintiff's reputation and emotional health.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Additionally, Plaintiff has no adequate remedy at law because, despite Plaintiff's continued requests that such actions cease, Mr. Gipson continues to post Plaintiff's sexually explicit content on a regular basis. Jane Doe Decl. at ¶¶ 45–47, 53–54; see also Exs. 33, 46.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a

contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Since Mr. Gipson retains control of Plaintiff's sexually explicit material and successfully deactivated Plaintiff's personal Instagram account, Plaintiff has no means of even attempting to stop future disclosures. Jane Doe Decl. at ¶ 25; see also Exs. 10–11, 47.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

And as Mr. Gipson acknowledged, Plaintiff's sexually explicit images "can't be deleted" from the internet—making the harm of future disclosures

<span style="color:red">irreparable. See Ex. 24. Mr. Gipson's unlawful disclosure of Plaintiff's sexually explicit photographs has and, absent an injunction, will continue to cause Plaintiff to suffer extreme emotional distress and permanent damage to her reputation.</span>

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

## 4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Finally, Mr. Gipson's unlawful disclosure of Plaintiff's intimate visual material is part of his aggressive, false, and malicious online campaign designed to permanently tarnish Plaintiff's reputation and emotional well-being. Jane Doe Decl. at ¶¶ 20–24, 26–41, 50–55; see also Exs. 3–9, 12–31, 38–49.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

## 1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

## 2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and

distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Importantly, Mr. Gipson has repeatedly indicated that he will not stop and intends to continue this offensive behavior until Plaintiff gives in to his demands.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed

this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

After disclosing Plaintiff's intimate visual materials to Mr. Moldt on November 22, 2022, Mr. Gipson emailed Plaintiff saying "I'm going to enjoy fucking you [] up bc you [] deserve it and I'm never gonna stop so cry all you want, it won't help." See Ex. 25.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Later that same day, he told Plaintiff "I'm going to enjoy exposing you for [] the ho and thief you really are . . . that's a promise." See Ex. 26. And on February 15, 2023, Mr. Gipson told Plaintiff that "all nude and sexually explicit videos of [you] are [] available on 18+ websites under an alias name."

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

See Ex. 46. Therefore, Mr. Gipson's past conduct indicates that "further violations in the future" are not just reasonably likely, but a near certainty. Armstrong, 141 F.3d at 563.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

C. THE BALANCE OF HARDSHIPS FAVOR GRANTING A TRO AND/OR PRELIMINARY INJUNCTION

Balancing the hardships requires a court to consider "the competing claims of injury and . . . the effect on each party of the granting or withholding of the requested relief." Heil Trailer Int'l Co. v. Kula, 542 F. App'x 329, 336 (5th Cir. 2013). Here, the balance of hardships tilts strongly in favor of granting Plaintiff a TRO and/or preliminary injunction.

The threatened harm to Plaintiff clearly outweighs any damage that the injunction may cause Mr. Gipson because, as discussed above, the threatened harm to Plaintiff is irreparable.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Conversely, Mr. Gipson's inability to continue exploiting, misusing, and disclosing Plaintiff's intimate visual depictions will cause him no harm.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Thus, Plaintiff's irreparable harm outweighs Mr. Gipson's potential reparable injury.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

D. A TRO AND PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Granting Plaintiff's request for a TRO and preliminary injunction serves the public interest because "revenge porn" claims are particularly well-suited for injunctive remedies. §6851 permits a court to "order equitable relief, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to cease display or disclosure of the visual depiction." § 6851(b)(3)(A)(ii).

## 1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

## 2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

## 3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

## 4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Likewise, Tex. Civ. Prac. & Rem. Code § 98B provides that "[a] court in which a suit is brought under this chapter, on the motion of a party, may issue a temporary restraining order or a temporary or permanent injunction to restrain and prevent the disclosure or promotion of intimate visual material with respect to the person depicted in the material." § 98B.004(a). § 98B also requires that a court "liberally construe[] and appl[y]" this provision "to promote its underlying purpose to protect persons from, and provide adequate remedies to victims of, the disclosure or promotion of intimate visual material." § 98B.007(a).

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Because the "interest in sexual privacy is substantial" and Plaintiff has established a substantial likelihood of success on the merits of her "revenge porn" claims, a TRO and preliminary injunction serves the public interest. See Ex parte Jones, 2021 WL 2126172, at *7 (finding that the Texas statute criminalizing "revenge porn" serves a compelling government interest).

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Likewise, here there is no evidence that Mr. Gipson would suffer any damages from an injunction.

This statement is untrue. There is substantial evidence that I will suffer damages from an injunction.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed

this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

## 2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

## 3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

## 4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

Id. In light of the clear evidence of Mr. Gipson's "revenge porn" violations and the lack of any legitimate interest in continuing his actions, the Court should set the bond amount in this case at zero.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

## VI. CONCLUSION

Plaintiff has established a substantial likelihood of success on the merits of her claim.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Plaintiff has suffered and will continue to suffer irreparable harm if a TRO and injunctive relief are not granted.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

Due to the egregious nature of Mr. Gipson's ongoing conduct, Plaintiff is entitled to emergency relief to prevent the ongoing harm being caused by Mr. Gipson's actions.

This statement is not true based on the fact that her dishonest, untrue and false claims, represent defamation in the most serious, damaging and malicious form possible, as the irrefutable digitally preserved, true and accurate evidence shows.

1. Respect for First Amendment Rights

As a photographer, I understand the profound importance of free speech and expression, a tenet safeguarded by the First Amendment. The U.S. Supreme Court's decision in *Joseph Burstyn, Inc v. Wilson* (1952) reaffirmed this principle by including artistic expression within the ambit of protected speech. Consequently, limiting my ability to display or disclose my photography impinges on my constitutional rights.

2. Recognition of Copyright Laws

In accordance with the Digital Millennium Copyright Act (DMCA), I maintain the copyright to all images I create, unless explicitly transferred through a contractual agreement. It has been made clear in Section 106 of the Copyright Act that copyright owners possess exclusive rights to display and distribute their works. The injunction sought would violate these exclusive rights.

3. Validity of Model Release and US Form 2257

The plaintiff's consent to the creation, use, and distribution of these images is evidenced by her signature on an Adult Model Release Form and US Form 2257. Legal precedence in *Dyer v. Napier* (2007) suggests that such releases are legally binding, and any attempt to rescind this consent retrospectively should be viewed skeptically.

4. Absence of Expectation of Privacy in Public Spaces

The plaintiff's request for a restraining order also covers images taken in public spaces, where privacy expectations do not generally apply. In the landmark case of *Nussenzweig v. diCorcia* (2006), the court ruled in favor of a photographer who had taken a photograph in a public space without obtaining the subject's consent, thus underscoring the lack of privacy expectations in public areas.

For the foregoing reasons, Jane Doe respectfully requests that a TRO be immediately issued as requested, that Jane Doe's motion for a preliminary injunction be set for hearing and that, after such hearing, a preliminary injunction as requested be issued against Mr. Gipson.

Dated: April 24, 2023 Respectfully Submitted,

**UNDER SEAL: DECLARATION OF PLAINTIFF JANE DOE**

I, Plaintiff Jane Doe, declare as follows:

1.
The facts below are personally known to me and are based upon my firsthand knowledge and on information provided to me. If called as a witness, I could and would testify to these facts.

2.
I met Mr. Gipson, a forty-seven (47) year old white male from Austin, Texas, approximately two years ago while getting dinner with a group of friends. At the time, Mr. Gipson

Point of fact, I had already had sexual intercourse, and experienced most sexual acts with the Plaintfiff in Miami Florida, years prior to inviting her to Europe, after originally meeting her on the escort dating website *seeking arragements* seeking.com under the username "Asianal Angel"  EXHIBIT (A) and seeing her escort profiles on the website "*what's your price*" at whatsyourprice.com, a popular escort / sugar baby **EXHIBIT (1.2)** website.

We had previously had sex at at the Verscse Mansion, in Danatellas suite, in Danatella's bed, was the first time (it was memerable) both times the Plaintiff, JANE DOE asked me for $500 cash within minutes after sexual intercourse claiming she was a professional "Sugar Baby" **EXHIBIT (1.2)** , who "only fucked rich guys" and she claimed that the $500 cash payment she demanded was for "her time" and then the Plaitfiff, JANE DOE left within minutes after being paid $500 cash both times for "her time" and insisted we stay in contact. **EXHIBIT (1)** Note that in **EXHIBIT (1.2)** the Plaintiff asks me if I am still looking for a "sugar baby"

In light of these allegations, I believe it is essential for the court to consider the credibility and potential bias of the plaintiff. Credibility is a fundamental aspect of any legal case and is especially important when the allegations at hand are largely based on the plaintiff's word. As such, I wish to bring to the

court's attention that the plaintiff has a history of working as a female escort for over 10 years and thus is an experienced criminal who knows how to avoid prosecution and essentially lies for a living, as it is often a necessity in the sex industry to lie to customers in order to get paid.

While I understand that a person's profession, in and of itself, does not necessarily undermine their credibility, I believe that in this case, it is a relevant fact. It is my understanding that the plaintiff has avoided disclosing this information, likely due to the illegal nature of sex work and the potential for it to impact her credibility.

However, I firmly believe that the complete portrayal of facts is crucial for the court to make a fair and unbiased judgment. This is not an attempt to embarrass or defame or assassinate the character of the plaintiff, but rather to ensure that the court has a comprehensive understanding of the situation.

I am aware that the introduction of such potentially damaging information about the plaintiff must be handled with the utmost care and respect for the dignity of all parties involved. I assure the court that my intention is solely to present an accurate and complete picture of the circumstances surrounding this case.

I respectfully request that the court take this information into consideration when assessing the credibility of the plaintiff's statements and the allegations made against me and reference the true and accurate evidence presented in **EXHIBITS (57-73)**

was dating another woman named Ni Pham (hereafter "Ms. Pham").

Point of fact, Ni Pham refused to collaborate with the Plaintiff regarding the Plaintiff's request for Ms. Pham to LIE and say that I raped her too. Note that in EXHIBIT (189) Ms. Pham states **"I am not going to lie about rape" , "I know you would not hit anyone" , "You are nice" "Defenantly sucks that she [the Plaitfiff] is lying about the situation"**

Over the next two years, Mr. Gipson and I stayed in contact through social media.

On a number of occasions, Mr. Gipson asked me if I would join him on vacation abroad, offering to pay for all expenses and to deal with travel logistics, such as paying for my passport and personal bills so I could afford to miss work.

Because Mr. Gipson had appeared sincere, and because I wanted to celebrate completing my master's degree, I eventually agreed to go on a trip to Europe with him.

On October 18, 2022, Mr. Gipson and I traveled to Amsterdam.

The trip started off normal, but eventually took a turn for the worse.
On October 19, 2022, while at the hotel together, Mr. Gipson obtained "designer" drugs and requested that I take them with him.

This is untrue. I have never obtained or used or given any "designer drugs" to anyone. To be honest I don't know what "designer drugs" means. The only thing I can think is I did buy her an energy drink similar to Red Bull, (Dutch version, no illicit chemicals) as we walked around the red light district before the Plaintiff insisted we go watch a LIVE SEX SHOW TOGETHER.

I refused to participate at first, but ultimately gave in to Mr. Gipson's continuous pressure. I became hazy after taking the drugs and don't recall the rest of the night.

This is untrue. It was probably drinking alcohol along with the effects of JET LAG and MARIJUANA that made her feel "hazy" however the Plaintiff was able to walk home on her own, smiling and laughing. She was very aware and participated actively in the photoshoot. **EXHIBITS (84-97, 186)**

The next morning, Mr. Gipson showed me photographs he had taken of me in a bathtub. Prior to this occurrence, Mr. Gipson had asked to take pictures of me, verbally promising that any photographs taken of me would be for our personal use only.

This is untrue.

However, I had not given Mr. Gipson permission to take any photographs of me that night as I was inebriated.

This is untrue.

<span style="color:red">I immediately voiced my concerns to Mr. Gipson about him taking photographs without my permission and expressed my concerns that he could misuse them.</span>

This is untrue.

<span style="color:red">Mr. Gipson responded, "[i]f I do post them, sue me! I have millions."</span>

This is untrue.

<span style="color:red">On or about October 22, 2022, I traveled from Amsterdam to Ibiza with Mr. Gipson.</span>

<span style="color:red">Mr. Gipson told me that he wanted to help me build an online modeling presence and alleged that he could help with this if I traveled around the world shooting content with him.</span>

True.

<span style="color:red">Because Mr. Gipson had planned all of the accommodations for our trip, I was concerned that Mr. Gipson would retaliate and abandon me in a foreign country if I denied his request.</span>

Point of fact, the Plaintiff was given her return air ticket to the US prior to departure, at any time she could have easily changed the date of her flight and returned home. The Plaintiff never expressed any concern or hesitation about continuing the trip.

<span style="color:red">I told Mr. Gipson that I needed time to consider his proposal because I did not want this to negatively impact my career as an acupuncturist.</span>

This is untrue. This Plaintiff claimed that her true intentions were to produce, publish and promote content that would help her phase out of prostitution and stated the she was only pursuing becoming an "acupuncturist" as a cover job, so that her mother would continue to support her financially and her could not tell her mom she was a prostitute so that was her explanation regarding her desire to be an "acupuncturist".

<span style="color:red">While in Ibiza, I allowed Mr. Gipson to take some pictures of me on his cell phone. I only allowed Mr. Gipson to take the photos because I was under the impression that he would give the images to me and I would retain control over the pictures.</span>

This statement is untrue. Note the Plaintiff iPhone was working the entire trip that I know of EXHIBIT (109) shows the plaintiff taking selfies, while topless, smoking marijuana, **with her cell phone.**

<span style="color:red">On October 24, 2022, Mr. Gipson continued to make unwanted sexual advances towards me, including placing his hand on my butt while we were in our hotel room.</span>

This statement is untrue.

<span style="color:red">When I immediately moved his hand away, Mr. Gipson became visibly upset, yelled at me, and moved to sleep in the other room.</span>

This statement is untrue. I moved to the master suite of the Villa (not a hotel) to get time and space away from the Plaintiff because her drug addictions and mental health issues were bothering me.

<span style="color:red">Mr. Gipson apologized the next morning. I felt forced to accept his apology knowing that Mr. Gipson had scheduled and paid for my travel and lodging, but remained extremely uncomfortable with Mr. Gipson's behavior.</span>

This statement is untrue.

<span style="color:red">On October 25, 2022, I traveled from Ibiza to Mykonos with Mr. Gipson.</span>

**True.**

<span style="color:red">Mr. Gipson had more of the "designer" drugs and pressured me into taking the drugs with him.</span>

This statement is untrue.

<span style="color:red">While under the influence of drugs and alcohol, I had sex with Mr. Gipson for the first time that I can physically remember.</span>

This statement is untrue. We had sex several times before this and in Miami. Also point of contention, request clarification on the meaning of "physically remember"

Mr. Gipson's continued behavior of pressuring me into taking intoxicants made me uncomfortable. Thus, on October 27, 2022, after speaking to my friend, Ricco Moldt (hereafter "Mr. Moldt"), I purchased a plane ticket for him to meet me in Amsterdam.

On October 28, 2022, Mr. Gipson and I went to a local bar for dinner and drinks.

We left the bar extremely inebriated and began walking on the beach together. Mr. Gipson filmed multiple videos of me intoxicated on the beach.

I filmed the Plaintiff assaulting me, punching me in the penis, face and stomach. The Plaintiff then bites my finger as I'm trying to put my jacket on her, she then kicks me in the back of the head, rendering me unconscious.

At some point on the beach that night, Mr. Gipson could not find his bag containing his wallet, passport, and phone.

This statement is untrue. After assaulting me violently as I lay in a beach chair enjoying the Aegean Sea, the Plaintiff walked up behind me and again kicked me in the face and nose with combat boots until I was again rendered unconscious, she then continued to assault me by kicking my in the ribs with her combat boots under she severely fractured my number 6 rib, the Plaintiff then stole my $5,000 LV bag, containing my wallet, passport and phone and then ran off down the beach away from me with my bag into the darkness.

I left the beach to go search for his bag, but could not find Mr. Gipson when I returned. Without a working phone, my passport, or the address of our Airbnb,

I began to panic and started shouting Mr. Gipson's name. After shouting for fifteen minutes, I eventually found Mr. Gipson curled up in the sand. Frustrated and confused as to why Mr. Gipson had not responded, I kicked Mr. Gipson once in his buttocks area and then left so that I could continue searching for his bag.

I eventually found another man holding Mr. Gipson's bag and managed to get it back.

Point of fact, the Plaintiff claimed later that this local man who "had my bag" had sexually assaulted her on the beach. This statement was denied by our host who witnessed the Plaintiff assaulting me.

<span style="color:red">Unable to find Mr. Gipson for a second time, I went to the local police station to ask for help. There I discovered that Mr. Gipson had already gone to the same police station, given them the address of our Airbnb, and was taken home by the police officers.</span>

This statement is untrue. I was never taken to the Police station. The police gave me a ride because the Plaintiff had stolen my bag with the rental car keys inside.

<span style="color:red">The police took me to the Airbnb and, when I got back there, Mr. Gipson was already waiting in bed.</span>

This statement is true. I was asleep in bed, recovering from very serious injuries including a fractured nose and broken rib.

<span style="color:red">I became upset that Mr. Gipson had left me alone and threatened to throw his phone out the window.</span>

The Plaintiff yelled that other men had abandoned her before on trips for "being crazy." For the record I never abandoned the Plaintiff, I was rescued by local police who drove me back to the villa.

<span style="color:red">After I threatened to throw Mr. Gipson's phone out the window, Mr. Gipson became enraged and began to physically assault me.</span>

This statement is untrue. The Plaintiff grabbed my iPhone and ran outside of the Villa and threatened to throw it off a cliff into the ocean if I did not give her additional money to continue the trip. Point of fact, she also stated that she would not have sex with me if I did not give her an additional $3,000. At this point I had no interest in continuing to have sex with the Plaintiff, so I asked her to leave my Villa.

<span style="color:red">Mr. Gipson got up from the bed and punched me in the face.</span>

This statement is untrue and defamatory. I NEVER punched the Plaintiff in the face, photos from the following days show this never happened.

Mr. Gipson had a crazed look in his eyes and continued to attack me, despite my best efforts to resist.

This statement is untrue and defamatory, this never happened.

Mr. Gipson grabbed me by my hair, slammed my face into the ground, and sat on my back.

This statement is untrue and defamatory, this never happened.

Mr. Gipson then placed his hands around my neck and began to choke me from behind.

This statement is untrue and defamatory, this never happened.

Fearing for my life and believing that Mr. Gipson was going to kill me, I begged him to stop, shouting, "Mark you're going to kill me!"

This statement is untrue and defamatory, this never happened.

Mr. Gipson released his grip on my neck just before I ran out of air, but did not get off of my back.

This statement is untrue and defamatory, this never happened.

I began shouting for help and Mr. Gipson told me, "I'll give you three seconds to get the fuck out of here before I kill you."

This statement is untrue and defamatory, this never happened.

I pushed Mr. Gipson off of me and ran out the door crying for help.

This statement is untrue and defamatory, this never happened. I did wrap my arms around the Plaitfiff to defend myself and protect the multi million dollar Villa we were staying at because the Plaintiff had started destroying property, art, furniture and heirloom antiques that had been with the host family for years, causing well over $1,000 in property damage that I had to pay via Airbnb.

As I was crying for help, someone from the Airbnb came outside and gave me water to wash the blood off my face.

This statement is untrue and defamatory, this never happened. I had placed the Plaintiff outside the Villa and told the Plaintiff she was not welcome. The host called the Police and the same local police came back and arrested her for assault, she was taken into custody and spent the night in the Mykonos jail. In the morning the police returned and asked me to please allow her to fly back to Amsterdam with me and told me that the Plaintiff had expressed that she did not remember any of the events from the previous night.

The local police arrived and took my statement, but dismissed my claims, saying something to the effect of "this happens a lot in Mykonos" and "this is something you'll be laughing about later down the road."

This statement is untrue and defamatory, this never happened. I had placed the Plaintiff outside the Villa and told the Plaintiff she was not welcome. The host called the Police and the same local police came back and arrested her for assault, she was taken into custody and spent the night in the Mykonos jail. In the morning the police returned and asked me to please allow her to fly back to Amsterdam with me and told me that the Plaintiff had expressed that she did not remember any of the events from the previous night.

I told the police that I just wanted to retrieve my passport from the Airbnb and return home.

They helped me pack my belongings at the Airbnb and took me back to the police station, where I stayed until my flight back to Amsterdam the next day.

The local police informed me that I would have to return to Mykonos for the resulting court hearings.

Knowing I would not be able to return, I decided not to press any charges at the time.

While at the police station, I called my friend Mr. Moldt to explain what had happened.

Later on October 29, 2022, Mr. Gipson emailed me with the subject line "Cat are you safe?"

He stated that he was "tempt[ed] to cancel [my] flights home," but would not do so because I found his bag that evening on the beach in Mykonos.

This statement was made in an effort to keep the peace because I truly believe the Plaintiff does not remember taking my bag and running away with it and later claimed that she had found it on the beach.

I told him that his attack had seriously injured me, leaving me with a swollen tongue, bumps, and bruises on my forehead, hands, elbows, knees, and pain on my scalp.

I told Mr. Gipson that he had hit me in the face, slammed my face on the floor, and choked me to the point where I almost suffocated and believed I would die.

Mr. Gipson did not deny these acts and instead excused his behavior by stating, "I'm sorry but not sure how else I could have handled that. Your temper and violence had to be stopped and I'm sorry I hurt you."

I did wrap my arms around the Plaintiff to defend myself and protect the multi million dollar Villa we were staying at because the Plaintiff had started destroying property, art, furniture and heirloom antiques that had been with the host family for years, causing well over $1,000 in property damage that I had to pay via Airbnb.

Attached hereto as Exhibit 1 is a true and correct copy of the email message

Mr. Gipson sent me on October 29, 2022.

On October 29, 2022, I traveled back to Amsterdam without Mr. Gipson to meet Mr. Moldt. However, during my layover in Munich, Germany, Mr. Gipson found and approached me at the airport.

Mr. Gipson apologized to me and tried to, again, convince me that I had attacked him, claiming that I had kicked his face and ribs while on the beach.  At the time I did not know what to believe and thought that he may be telling the truth.

Note that the Plaitiff admitted to kicking me in the face and ribs but claimed that because it was dark and she was drunk she thought she was kicking me in the "butt" , I found this statement very difficult to believe.

Regardless, knowing that I had no place to stay in Amsterdam, Mr. Gipson offered to "forgive me" and let me stay at the hotel he had originally booked for us. Mr. Gipson also offered to let Mr. Moldt stay in the room so that I would feel safe.

This statement is not true, the Plaintiff utilized the LCD defense, lie, cry, deny and cried for 15-20 mins begging me to forgive her. It is true that I offered to let her stay in the room with me, so that I could guarantee her safety.

I had not secured my own accommodations in Amsterdam and knew that I would be left without a place to stay in a foreign country if I did not accept Mr. Gipson's offer and ultimately agreed.

This statement is not true, the plan was always for her to stay with me.

This fear led me to believe that I had no option but to share a hotel room with Mr. Gipson.

This statement is not true, the plan was always for her to stay with me.

For the remainder of the Amsterdam trip, I felt the need to keep Mr. Gipson content, constantly fearing additional repercussions.

The Plaintiff had her flight ticket, confirmation number and was free to leave at any time. She stayed on her own free will.

At this point, Mr. Gipson had taken numerous nude photos of me and, after the physical assault, I was scared to think about what Mr. Gipson would do with those photos if I terminated our relationship.

I did exactly what I said I would do with the photos, I published them as part of my STOP ASIAN HATE COLLECTION as fine art photography.

I was also scared that Mr. Gipson would physically attack me again or abandon me in a foreign country.

This statement is not true, I never attacked the Plaintiff at any time.

On October 30, 2022, while in the hotel room, Mr. Gipson asked me to join him in the shower and I refused.

I asked the Plaintiff to join me in the shower, as she had, every night prior, specifically help me use her make-up remover to remove the make-up the Plaintiff had applied to my face because she said she was embarrassed to see face black eyes, cuts and deep purple bruises on my face.

While Mr. Gipson was in the shower, I told Mr. Moldt that I thought Mr. Gipson had poor personal hygiene.

I admit I did wear a dirty shirt, blue jeans and smelly dirty socks to bed that night in hopes of preventing the Plaintiff from initiating make up sex because I was not interested in having sex with her at that time.

I woke up the next morning to Mr. Gipson sexually assaulting me by touching my vagina with his hand. I told him, "NO!," pushed him off of me, and wrapped myself tightly in the blankets to try and shut him out.

This statement is untrue. The Hilton Hotel Amsterdam only offers small twin beds, as do most hotels in Europe. We were sleeping together on a bed approximately 4ft wide and because my rib was broken I was forced to sleep on my side and "spoon" the Plaintiff. I never placed my hand on the Plaintiff's vagina that morning.

Mr. Gipson packed his things and left the room.

True. I had no interest in being around the Plaintiff so I went downstairs to the lobby to call a friend and have breakfast.

Later that day, I saw Mr. Gipson downstairs in the hotel lobby as I was leaving for the airport to catch my return flight to Philadelphia, Pennsylvania.

 I asked Mr. Gipson why he left the hotel room and he said he overheard me complaining about his personal hygiene to Mr. Moldt.

I found this humorous because I had in fact tried to smell as bad as possible on purpose.

Mr. Gipson accused Mr. Moldt of telling me that "[I] wasn't getting paid enough for this." He also claimed that when "[he] woke up and tried to cuddle [me]" earlier that morning I had called him disgusting.

Point of fact the Plaitfiff said I smelled disgusting, she did not call me disgusting.

Although angry with me, Mr. Gipson asked me to share a car with him to the airport, and, reluctantly, I agreed.

This is true, although I was very angry because of the assault, I still invited the Plaintiff to ride in my Uber to the Airport so that I could continue to protect the Plaintiff until she returned to the United States, because I had given her my word that I would keep her safe and I keep my promises.

Fearing what Mr. Gipson would do with the nude photographs, I agreed to complete the return trip peacefully and hoped to let my relationship with Mr. Gipson naturally grow apart.

This statement is not true. Upon returning the Plaintiff agreed to continue traveling to Tulum Mexico after we take a one month break that I insisted on. She requested and was paid $1,500 for "Model Fees for Mexico" on November 7, 2022 and agreed to continue working with me to make explicit content. EXHIBIT (75)

Upon landing in Philadelphia, Mr. Gipson asked if he could come stay with me at my home in Miami, Florida.

This statement is not true.

I said no and told Mr. Gipson that we should have time apart. Mr. Gipson then asked me to stay with him at a 5-star hotel in Miami so he could take more photographs of me.

This statement is not true.

I refused and again asked Mr. Gipson for the photographs he had already taken of me. Mr. Gipson refused to give me my photographs because he had "offered me another chance" to "make it up to [him]" by allowing him to stay with me in Miami, and I said no.

This statement is not true.

I told Mr. Gipson that, at the least, I wanted the nude photographs of me, but he responded saying that my nude photographs belonged to him.

True.

I had no contact with Mr. Gipson until November 7, 2022, when Mr. Gipson sent me a text message.

True.

He told me that he hoped we could "overlook our past and focus on what's next." I told him that I was upset he continued to take nude pictures of me and refused to give me any of them.

This statement is not true.

I explicitly directed him not to post the nude photos anywhere, "not on [his] Instagram or even sending my pictures to someone."

True.

Exhibit 2 is a true and correct copy of text message Mr. Gipson sent me on November 7, 2022.

Later on November 10, 2022, Mr. Gipson sent me multiple text messages asking me to "answer [his calls] and talk."

Mr. Gipson told me that he would delete my nude photographs only if I sent him $5,000.

This statement is not true. I offered the Plaintiff an opportunity to REFUND me the $5,000 she had already been paid in MODEL FEES.

Attached hereto as Exhibit 3 is a true and correct copy of text message

Mr. Gipson sent me on November 10, 2022.

Mr. Gipson became very angry when I refused to answer his text messages.

Between November 10, 2022 and November 11, 2022, Mr. Gipson sent me over fifteen (15) abusive text messages, emails, and voicemails. He repeatedly threatened to make public nude photographs of me and post harmful, false, and

misleading information about me online. Mr. Gipson told me that I should Google my name in order to read a fake escort review he posted about me and bragged that he was enjoying "warning" people about me because I am an "awful ugly cunt of a person." Mr. Gipson repeatedly called me a thief, prostitute, sex industry worker, "dumb bitch," and told me to "rot in hell whore." Attached hereto as Exhibit 4 is a true and correct copy of text messages Mr. Gipson sent me on November 10, 2022.

Note that this was after the Plaintiff had refused to refund me the $1,500 she had been paid in advance for our next trip to Tulum Mexico

On November 10, 2022, I received a voicemail in which Mr. Gipson told me that he would not delete the sexually explicit photos of me and threatened that I should "think about [my] safety."

This statement is not true.

Attached hereto as Exhibit 5 is a true and correct audio file and transcript of the

voicemail from Mr. Gipson on November 10, 2022.

On November 10, 2022, Mr. Gipson told me that my mom would be "so proud" about the information he would post online. Mr. Gipson also repeatedly told me that he would not delete the nude photographs of me and that he would post and distribute them without my consent.

In addition to other specific threats, Mr. Gipson repeatedly threatened me to "act accordingly" or that he would make me regret disrespecting him.

This statement is not true and is a gross misrepresentation of the facts and evidence.

Attached hereto as Exhibits 6–8 are true and correct copies of the emails Mr. Gipson sent me on November 10, 2022.

On November 11, 2022, Mr. Gipson called me a "thief" and told me that I "gave [him] no other options." He told me that even if I was successful in suing him, I would get nothing because his crypto assets are untouchable.

True.

Attached hereto as Exhibit 9 is a true and correct copy of the email Mr. Gipson sent me on November 11, 2022.

On November 12, 2022, Mr. Gipson made a false copyright report against my personal Instagram account resulting in its permanent deletion. I appealed this decision directly to Instagram, and informed them that Mr. Gipson was wrongfully in possession of my sexually explicit images and had been stalking me.

This statement is not true and is a gross misrepresentation of the facts and evidence.

Instagram did not reactivate my account, and instead told me that I would need to contact Mr. Gipson directly to resolve the issue.

Point of fact, the Plaintiff's Instagram account was deleted by Instagram for SOLICITATION OF PROSTITUTION not for violating my copyright ownership.

Attached hereto as Exhibits 10–11 are true and correct copies of my email chain with Instagram.

On November 12, 2022, Mr. Moldt informed me that Mr. Gipson had sent him threatening text messages. Mr. Moldt forwarded me screenshots of their conversation and informed me that Mr. Gipson admitted to accessing my iCloud account without my consent.

This statement is not true and is a gross misrepresentation of the facts and evidence. The Plaintiff openly shared her iCloud photos, bragging that she had a "Sugar Daddy in every city in the US" and proceeded to show me hundreds of prostitution profiles, where she had removed her tattoos and used alias names on both seeking.com and whatsyourprice.com, these are popular escort / prostitution / sugar baby dating websites that replace *Backpage.com* after the US federal government shut it down.

Mr. Gipson also admitted to using that information to track my phone location. I have never given 90%

See: Explanation for Actions Taken to Initiate Legal Proceedings

**6) Counter Motion for a Temporary Restraining Order and Protective Injunctive Order Against the Plaintiff JANE DOE**

**Honorable Judge Pitman,**

**I, Mark Alan Gipson, the Defendant in this case, present this counter motion for a temporary restraining order and protective injunctive order against the Plaintiff based on the considerations outlined below. I respectfully bring forth my case, grounded on the foundations of truth, jurisdiction, and explicit consent, and request your honor to consider the following assertions:**

1. TRUTH AND CONSENT: The Plaintiff has willingly engaged in employment as an adult entertainer and online content creator in the adult industry, seeking my assistance in transitioning from in-person encounters to digital content creation. I categorically deny allegations of non-consensual photography or sexual misconduct, as all content was created with the explicit consent of the Plaintiff, with clear understanding and agreement on the nature of the content. This consent not only serves as a legal safeguard but also highlights a crucial aspect of professional conduct in the adult industry. References to consensual content creation can be found in cases such as Doe v. Moe, 63 Mass. App. Ct. 516 (2005), where the court ruled that consensual sexual activity does not automatically convert into non-consensual activity upon the presence of a camera.

2.  JURISDICTION: Events that form the basis of this lawsuit occurred outside the United States, thus raising pertinent questions about jurisdiction and applicable law. The U.S. Supreme Court, in the case of Kiobel v. Royal Dutch Petroleum, 569 U.S. 108 (2013), underscored the principle that laws do not extend beyond our national borders unless explicitly stated. Given the circumstances of this case, it would be prudent to consider the jurisdictional implications.

3.  COUNTER EVIDENCE: I assert that all sexual activities between myself and the Plaintiff were entirely consensual. No explicit sex acts were ever filmed, recorded, or published. The audio and visual content we created was non-explicit, further strengthening my stance against any allegations of sexual misconduct. Furthermore, evidence including flight tickets, emergency funds, and substantial modeling fees provided to the Plaintiff highlight her voluntary participation and ability to cease involvement at any point.

4.  DEFAMATION AND RETALIATION: Following the Plaintiff's account suspension from Instagram for solicitation of prostitution and her subsequent legal confrontations, the allegations of sexual misconduct were made, raising concerns of retaliation and an attempt to deflect attention. In the landmark case of New York Times Co. v. Sullivan, 376 U.S. 254 (1964), the Supreme Court established the 'actual malice' standard, asserting that false accusations with harmful intent fall outside the protection of the First Amendment. In light of this, the allegations leveled against me appear to be intended to harm my reputation, reflecting an instance of defamation.

5. PERSONAL SAFETY AND MENTAL HEALTH: Finally, I would like to highlight the instances of physical harm and emotional distress I experienced due to the Plaintiff's extreme, non-consensual dominance, documented in non-consensual photographs taken by the Plaintiff herself. The U.S. Constitution and state laws have consistently affirmed the right to personal safety and the pursuit of happiness (see DeShaney v. Winnebago County, 489 U.S. 189 (1989)), indicating that these actions infringe upon my constitutional rights. It is critical to ensure that I am not further victimized.

Given the aforementioned points, it is my plea to this court that the injunction be placed against the Plaintiff, rather than myself, and that my rights to safety, freedom of expression, and Constitutional rights be upheld.

As a pro se defendant, I am writing to address the allegations made against me by the plaintiff, ███████████, in the case at hand. It is my intent to present a full and accurate account of the circumstances that I believe are crucial to understand the nature of these allegations.

The plaintiff, ███████████, works in the sex industry, and is known for her roles as a "FINDOM" a.k.a. "Financial Dominance" and a "dominatrix." While I acknowledge that her profession does not inherently discredit her allegations, it is important to consider the implications it has on our interactions. During our shared intimate moments, there have been instances where her actions have resulted in physical harm to me, this was due to her extreme and non-consensual dominance, even after my explicit protests and pleas for her to stop.

Furthermore, the plaintiff ███████████, has demonstrated a particular interest in the humiliation and abuse of men by women in adult content. It is my belief that these preferences have influenced her actions towards me and have served as a motivation behind the fabrication of the allegations she now brings forth. I further assert that the Plaintiff has misused the

United States legal system in an attempt to cause law enforcement to violently arrest me to satisfy her on deeply disturbing sexual fetishes involving public humiliation of men. The Plaintiff referenced "Daddy Issues" as her excuse for her lack of integrity and criminal behavior on several occasions and proudly pointed to her "DANGEROUSLY DESTRUCTIVE" tattoo under her left breast as a "warning label" of her "destructive powers."

Regarding explicit photographs taken during our trip to Mykonos, Greece, by the Plaintiff, I wish to clarify that these were taken without my explicit consent and have caused me significant emotional distress. The plaintiff ▮▮▮▮▮▮▮▮▮▮▮▮, took advantage of our shared intimate moments to photograph non-consensual sex acts, which I believe were done solely for the purpose of future extortion and humiliation in an attempt to satisfy the Plaintiff's disturbing sexual fetishes related to the public humiliation of men.

I am presenting these facts not to defame the plaintiff or to detract from the seriousness of the allegations made against me, but to provide the court with the necessary context to evaluate the credibility and motivation of the plaintiff, ▮▮▮▮▮▮▮▮▮▮.

Continuing from my previous letter, I would like to bring your attention to another concerning incident involving explicit photographs taken without my consent.

Among the intimate photos taken during our time in Mykonos, Greece, are images that depict non-consensual actions involving the plaintiff forcing her foot into my mouth. These photographs were taken without my knowledge or permission, (note that my eyes were closed during the moment of penetration) further demonstrating the plaintiff's disregard for my boundaries and consent.

In the photograph(s) **EXHIBIT (1) NON CONSENSUAL SEXUALY EXPLCIT PHOTOS TAKEN BY THE PLAINTIFF SHOWING NON CONSENSUAL SEXUAL PENETRATION** you can clearly see the Plaintiff ▮▮▮▮▮▮▮▮▮▮,

place her foot on my chin and force my mouth open, she then violently shoved all her toes, and half of her foot into my mouth.

This non consensual sex act was done with such force and aggressiveness that I was not able to vocalize my non consent, rather the noise just sounded like "Naaaaaaaawww" and "Stuuuuuuuppp" because she was sticking her foot down my throat so hard that is was difficult to breath or talk.

**It was a humiliating and traumatizing experience and something I will never be able to forget, especially the sound of the Plaintiff laughing at my obvious discomfort.**

Had I been the one to enact such an act and capture it in a photograph without consent, it would be rightly viewed as an infringement upon the plaintiff's ████████████, rights.

As such, I believe it is only fair that the same standards apply in this situation, where I was the one subjected to non-consensual sexual actions and intimate photography.

The act itself was not only deeply uncomfortable and humiliating, but it also resulted in emotional distress upon discovering the existence of such photographs. These actions further demonstrate the plaintiff's ████████ ████, pattern of dominance and control, extending beyond the physical realm into the manipulation of our shared experiences for her own purposes.

I was deeply disturbed by the plaintiff's ████████████, actions and am sharing these details not to cause defamation, but to provide the court with a clearer understanding of the circumstances surrounding our relationship and the allegations made against me.

The allegations made against me have had a profound impact on my mental and emotional well-being, causing severe stress and anxiety. It is

my hope that the court takes into account the dynamics of our past relationship and the plaintiff's possible motivations in evaluating the validity of her claims.

I, Mark Alan Gipson, deny any and all allegations of sexual misconduct, non-consensual photography, or illegal drug use. I further deny any association with certain Instagram accounts that are allegedly linked to the plaintiff's image distribution.

I present affirmative defenses, including truth, jurisdiction, and consent, arguing that the plaintiff was aware of the nature of the photography, had given her consent in writing, and that the events that are the basis for this lawsuit did not occur within the United States.

The Plaintiff ████████████, was very upfront and honest with me about working as both an "all nude stripper in Miami" and as a "Sugar Baby" or paid escort on seeking .com and what's your price .com and asked me to help her make adult content to help her phase away from prostitution and into making money online with adult content, in addition to the collection I was working on at the time.

**I had prior permission and consent to produce, publish and promote all content that was created.**

To clarify the photography and videos I produced, published and promoted showed no sex acts or pornography of any kind. As to the Plaintiff's ████████████, claims that she was stuck or somehow being forced to travel with me, I strongly disagree and find this difficult to believe.  I would also like to point out the fact that the Plaintiff ████████████, was given both her flight from Miami to Amsterdam and she was given her RETURN flight from Amsterdam to Miami PRIOR to departing Miami. So she could have taken her flight home at anytime, and at no time did the Plaintiff ████████████, ever vocalize, text or in any way communicate that she wanted to leave early or was being "forced" to do anything so I deny the

untrue statement provided by the Plaintiff regarding being stuck or forced to travel with me.

Furthermore I would be remiss if I did not add that I had given the Plaintiff ████████████, 300 Euro for Emergencies, like, medical, and transportation, that she could have used at anytime to get a flight back to Amsterdam from anywhere within Europe for less than $100USD.

I would also like to point out that the Plaintiff ██████████████, was paid $4,200 upfront in MODEL FEES so she had funds to travel home at any time. It is my understanding that the Plaintiff ██████████████, used the emergency money I had given her to buy cocaine from "a girl she met in the bathroom from Columbia" at a nightclub in Ibiza.

Admittedly we did have sex and in general, I would describe the sexual part of our relationship as mutually pleasant, shared sexual experiences, in world class locations, in world class accommodations, with beautiful world class views and at no time during the trip did the Plaintiff ██████████████, ever voice any concerns or questions regarding ANY KIND of non consensual sexual activity or sexual misconduct.  I admit, I did have sex, with the Plaintiff, ██████████████, including consensual sexual intercourse many times, mutual oral sex many times, and mutual orgasim many times, including giving the Plaintiff ██████████████, what she referred to as multiple "squirting orgasims" with my hands, at her request, in addition to kissing and other normal intimacy such as hugging, cuddling in bed after sex and holding hands and kissing in public and private throughout the trip.

**It is my belief and understanding that all sexual activity was mutually consensual and at no time were any explicit sex acts filmed or recorded or published.**

As a matter of fact, it was often the Plaintiff ██████████████, who offered to have sex and the Plaintiff who requested and initiated sex throughout the entirety of the trip. Note the Plaintiff stated that she was especially turned on by having sex outdoors, so that also happened on many occasions.

Any allegations of sexual misconduct were only mentioned months later, after the Plaintiff's ▒▒▒▒▒▒▒▒▒▒, realized her Instagram account had been permanently deleted for SOLICITATION OF PROSTITUTION, and she had been reported to the Florida Dept of Health and New York State Health Dept for knowingly impersonating a certified medical physician online (3rd degree felony) , and reported to the Miami / Dade County and FBI for ONLINE PROSTITUTION, theft and wire fraud.

Any allegations of sexual misconduct are untrue and not consistent with the reality of the events as evidenced by numerous photographs, videos and text as well as a transcribed voice recording of the Plaintiff ▒▒▒▒▒ ▒▒▒▒, describing The Defendant, MARK ALAN GIPSON as **"he's so nice, he's super nice" … "yes he is a really nice guy",** Oct 29, (last day of the trip) to Mr Modlt. 0:47 Plaintiff ▒▒▒▒▒▒▒▒, referring to the Defendant MARK ALAN GIPSON **"he's so nice, he's super nice"** … **"yes he is a really nice guy." EXHIBIT (48) TRANSCRIBED DIGITAL VOICE RECORDINGS**

I became extremely upset and concerned about wanting to continue working with the Plaintiff ▒▒▒▒▒▒▒▒, after listening to a digital voice recording of the Plaintiff and Mr. Moldt making anti-semantic statements about "**Nazis Germans cooking Jews in gas ovens to make Jew cakes**" the same day they both knew I had visited the *Anne Frank House in Amsterdam* and the Plaintiff was aware that my step Father is Jewish and was the head ER Doctor at Houston Methodist Hospital for many years, so these anti-semantic comments about **"cooking Jews into Jew-Cakes in Gas Chambers"** was particularly disturbing. **EXHIBIT (49) TRANSCRIBED DIGITAL VOICE RECORDINGS**

Additionally, I became extremely upset and concerned about wanting to continue working with the Plaintiff ▒▒▒▒▒▒▒▒, after listening to a digital voice recording of the Plaintiff discuss prostitution and sex work in

vivid detail, stating "Give them head, get the bread, then leave." **EXHIBIT (49) TRANSCRIBED DIGITAL VOICE RECORDINGS**

This combined with a long history of criminal sex work, violent bi polar mental health issues, extreme alcoholism and hard drug addictions, made me question if I wanted to continue working with the Plaintiff ████████ ██████.

I thank you for your consideration and trust in the fair and unbiased examination of the presented facts.