# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

**JANE DOE**

       **Plaintiff,**

     **vs.**

**MARK A. GIPSON**

       **Defendant.**

Civil Action No. 1:23-cv-00463-RP

█████████████

**PLAINTIFF'S OPPOSED MOTION UNDER RULE 59(e)**
**TO AMEND THE JUDGMENT REGARDING PLAINTIFF'S MOTION FOR A**
**PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO SET ASIDE THE**
**DEFAULT (D.I.  83)**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................1

II.      RELEVANT FACTUAL BACKGROUND.....................................................2

     A.      Plaintiff Filed This Litigation Seeking Protection From The Court ......................2
     B.      Mr. Gipson Refused To Participate In This Litigation, Resulting In Default..........3
     C.      While Hiding From The U.S. Marshalls, Mr. Gipson Created At Least
            Fifteen New Websites To Publish And Sell Plaintiff's Nude Photos .....................3
     D.      Mr. Gipson Admitted to Willfully Evading This Lawsuit ....................................4
     E.      Mr. Gipson Introduces A Forged Model Release Form .........................................4
     F.      The Court's August 23, 2023 Order ....................................................5
     G.      Additional Victims Have Come Forward Warranting Reconsideration .................6

III.      LEGAL STANDARD ...........................................................10

IV.      ARGUMENT ..................................................................10

     A.      Amendment of the Court's Order Denying Plaintiff's Request For A
            Preliminary Injunction is Appropriate ....................................................10

            1.      Newly Discovered And Previously Unavailable Evidence Supports
                  Amending The Court's Order To Grant Plaintiff's Request For A
                  Preliminary Injunction ..............................................................10
            2.      Even Without The New Evidence, The Finding That Plaintiff Was
                  Unlikely To Succeed On The Merits Was Based On A Manifest
                  Error Of Law Or Fact, And Results In A Manifest Injustice....................14

     B.      Amendment of the Court's Order Granting Defendant's Request To Set
            Aside The Default Is Appropriate .......................................................16

            1.      Newly Discovered And Previously Unavailable Evidence Supports
                  Amending The Court's Order To Deny Mr. Gipson's Motion To
                  Set Aside The Default ...............................................................16
            2.      Even Without The New Evidence, The Finding That Mr. Gipson's
                  Default Was Not Willful Was Based On A Manifest Error Of Law
                  Or Fact, And Results In A Manifest Injustice.............................18

V.      CONCLUSION................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Allied Home Mortg. Corp. v. Donovan*,
    830 F. Supp. 2d 223 (S.D. Tex. 2011) ....................................................................14

*Alvarado v. Texas Rangers*,
    No. EP-03-CV-305-FM, 2005 WL 1420846 (W.D. Tex. June 14, 2005) ..............................16

*In re Benjamin Moore & Co.*,
    318 F.3d 626 (5th Cir. 2002) .........................................................................10, 14, 18

*Canal Auth. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ...............................................................................14

*Matter of Dierschke*,
    975 F.2d 181 (5th Cir. 1992) ...........................................................................17, 20

*Espinoza v. Humphries*,
    2020 WL 5350489 (N.D. Tex. Aug. 19, 2020), *report and recommendation adopted*,
    2020 WL 5332853 (N.D. Tex. Sept. 4, 2020)...........................................................20

*Gen. Tel. Corp. v. Gen Tel. Answering Serv.*,
    277 F.2d 919 (5th Cir. 1960) ...............................................................................18

*Generation Trade, Inc. v. Ohio Sec. Ins. Co.*,
    No. 3:18-CV-0434-K, 2019 WL 3716427 (N.D. Tex. Aug. 6, 2019) ..............................13, 14

*ING Global v. United Parcel Serv. Oasis Supply Corp.*,
    757 F.3d 92 (2d Cir. 2014)...................................................................................18

*Ex parte Jones*,
    No. PD-0552-18, 2021 WL 2126172 (Tex. Crim. App. May 26, 2021), *reh'g denied*
    (July 28, 2021) ...............................................................................................11

*Joseph v. Hood*,
    2020 WL 10045967 (E.D. Tex. Aug. 12, 2020) ........................................................13

*Lacy v. Sitel Corp.*,
    227 F.3d 290 (5th Cir. 2000) ...........................................................................17, 20

*In re Louisiana Crawfish Producers*,
    852 F.3d 456 (5th Cir. 2017) .........................................................................11, 13, 14

*Luig v. N. Bay Enterprises, Inc.*,
    817 F.3d 901 (5th Cir. 2016) ...............................................................................14

*People's United Equip. Fin. Corp. v. Hartmann*,
  447 F. App'x 522 (5th Cir. 2011) ..................................................................18, 19

*Perry v. Mendoza*,
  No. H-19-4364, 2022 WL 3573141 (S.D. Tex. Apr. 14, 2022) ..............................................16

*Pollard v. Church of God in Christ, Inc.*,
  2017 WL 5127108 (N.D. Tex. Aug. 3, 2017) ...........................................................19

*Roper v. Abbott*,
  2013 WL 12290262 (N.D. Tex. May 8, 2013) ..........................................................17

*Sec. & Exch. Comm'n v. McDuff*,
  2016 WL 6106490 (N.D. Tex. Sept. 20, 2016), *report and recommendation adopted*,
  2016 WL 6093368 (N.D. Tex. Oct. 17, 2016) ..........................................................19

*Shi Chang Xing v. Holder*,
  311 F. App'x 720 (5th Cir. 2009) ..............................................................15, 17, 20

*Templet v. Hydrochem, Inc.*,
  367 F.3d 473 (5th Cir. 2004) .......................................................................10

*Travelhost, Inc. v. Modglin*,
  No. 3:11-CV-0456-G, 2012 WL 2049321 (N.D. Tex. June 6, 2012) ........................................14

*Wilkens v. Toyotetsu America Inc.*,
  No. 09-CV-515-XR, 2010 WL 986049 (W.D. Tex. Mar. 15, 2010) ..........................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................11

**STATUTES**

15 U.S.C. § 6851 .....................................................................................5

## I.      INTRODUCTION

Plaintiff Jane Doe files this Motion, respectfully asking that the Court amend its prior judgement (D.I. 83) to grant Plaintiff's request for a preliminary injunction in full and deny Defendant Mark A. Gipson's request to set aside the Default.

Plaintiff filed the present lawsuit nearly five months ago seeking protection from the Court from the tortious and criminal conduct of Mr. Gipson, who had engaged in a months-long campaign of harassment, which included the dissemination of her nude photographs to her friends, coworkers, and to the general public.  Plaintiff's lawsuit failed to deter Mr. Gipson's harassment however, as Mr. Gipson ignored the properly served Complaint, as well as the Court's initial TROs, choosing instead to ramp up his harassment of Plaintiff and publish even more of her nude photographs online.  As a result, the clerk entered a Default against Mr. Gipson, and the Court entered a warrant for Mr. Gipson's arrest.

Once arrested and finally forced to appear, Mr. Gipson falsely represented that he had never been served with any of the prior documents, and that he had consent to share Plaintiff's nude images.  And despite Plaintiff's sworn affidavits of service and evidence demonstrating Mr. Gipson did not have consent to share her nude photographs, the Court granted Mr. Gipson's request to set aside the default, and denied Plaintiff's motion to enter the requested preliminary injunction in full.  However, newly discovered and previously unavailable evidence significantly undermines the credibility of Mr. Gipson's testimony that he had consent to disseminate Plaintiff's nude images, and that he was not properly served.  Specifically, additional victims have come forward demonstrating that Mr. Gipson's tortious and criminal behavior against Plaintiff is part of a larger pattern of exploitation and predatory behavior against Asian women.  Plaintiff respectfully submits that reconsideration of the Court's prior order is necessary in view of this new evidence, and is further necessary to correct certain manifest errors of law and fact, and to avoid manifest injustice.

1

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Plaintiff Filed This Litigation Seeking Protection From The Court

On April 24, 2023, Plaintiff filed her Complaint and request for a Temporary Restraining Order ("TRO").  D.I. 3, 3-3.  As explained in Plaintiff's sworn declaration accompanying the first request for TRO (D.I. 3-4), Mr. Gipson befriended Plaintiff and offered to take her on a trip to Europe as a graduation present.  *Id*. at ¶ 3.  On the trip, Mr. Gipson continuously pressured Plaintiff to take drugs and alcohol, and photographed her while nude.  *Id*. at ¶¶ 4-8.  Mr. Gipson then became increasingly aggressive, ultimately resulting in Mr. Gipson physically and sexually assaulting Plaintiff during the trip.  *Id*. at ¶¶ 11-16.  When Plaintiff tried to break things off with Mr. Gipson after returning to the United States, he initiated a months-long harassment campaign which included: (1) sending Plaintiff harassing and threatening messages; (2) creating fake social media profiles claiming that Plaintiff was a prostitute and a thief; (3) submitting false copyright infringement reports against Plaintiff's real social media profiles to get them banned; (4) sending Plaintiff "cease and desist" letters from fake law firms claiming Plaintiff owed him hundreds of thousands of dollars; and (5) publishing her nude photographs on social media and on his personal websites without her consent.  *Id*. at ¶¶ 18-56.

Subsequently, on April 26, 2023, the Court granted-in-part Plaintiff's request for a TRO against Mr. Gipson, and set a hearing on the TRO request for May 4, 2023.  D.I. 16.  That same day, Mr. Gipson was duly served with the Complaint and the Court's TRO order.  *See* D.I. 17 (Summons Returned).  As discussed in the sworn affidavit of service, Mr. Gipson identified himself when the service agent stated she had two boxes for him.  *See id.* at 2.  Mr. Gipson asked her to leave the boxes at his door, and the service agent observed Mr. Gipson open the door and collect the boxes with the pleadings and orders inside.  *See id*.

**B.      Mr. Gipson Refused To Participate In This Litigation, Resulting In Default**

Despite having received the Complaint and associated pleadings, as well as the Court's orders, Mr. Gipson failed to show for the May 4, 2023 TRO hearing.  D.I. 19.  Thus, on May 4, 2023, the Court entered an Order to Show Cause against Mr. Gipson, requiring him to explain his non-compliance and failure to appear and further requiring Mr. Gipson to appear for a hearing set for May 5, 2023.  *Id.*  The same day, Mr. Gipson was duly served with this order.  *See* D.I. 20 (Proof of Service).  In the affidavit of service, the service agent noted that Mr. Gipson identified himself, and was "aggressive."  *Id.* at 1.  The affidavit of service also included photographs of Mr. Gipson being served with the order.  *Id*.  Despite being photographed as receiving the Court's order, Mr. Gipson failed to attend the May 5, 2023 hearing, and the Court subsequently issued a warrant for Mr. Gipson's arrest.  D.I. 24.  For more than a month however, Mr. Gipson evaded arrest by simply refusing to answer the door when U.S. Marshals would knock.  *See* D.I. 32.  On May 26, 2023, in view of Mr. Gipson's refusal to participate in the civil process, the Clerk entered a default against him.  *See* D.I. 26.

**C.      While Hiding From The U.S. Marshalls, Mr. Gipson Created At Least Fifteen New Websites To Publish And Sell Plaintiff's Nude Photos**

During his time evading the U.S. Marshals, Mr. Gipson did not simply ignore the civil process, but instead used this time to dramatically ramp up his attacks on Plaintiff and further violate the Court's TROs, creating ***at least fifteen*** websites dedicated to distributing and selling over four hundred of Plaintiff's sexually explicit photographs.  *See* D.I. 29-1.  Thus, on June 1, 2023, Plaintiff filed a second emergency request for a TRO.  *Id.*  That same day the Court granted Plaintiff's Second Emergency TRO application, and on June 5, 2023, the Court issued an order "that the United States Marshals is authorized to use any lawful and reasonable means to effectuate the warrant for Gipson's arrest."  *See* D.I. 32.

3

### D.     Mr. Gipson Admitted to Willfully Evading This Lawsuit

Mr. Gipson was subsequently arrested and the Court set a contempt hearing for June 7, 2023. *See* D.I. 33.  At the contempt hearing, Mr. Gipson asserted: (1) that he had not been served with the Complaint, associated pleadings, or any of the Court's orders; (2) that he did not "know what [he is] representing [himself] against or what the charges are;" and (3) that he had "not been aware that the U.S. Marshals [were] trying to execute a warrant."  June 7, 2023 Hr. Tr. 2:23-25, 6:1-5.  However, as indicated by the testimony of Deputy David Zamora and the sworn affidavits documenting his service with photographic evidence, Mr. Gipson's representations to the Court were false.  Deputy Zamora testified that the United States Marshals tried to arrest Mr. Gipson "at least five" times after the May 5, 2023 bench warrant, each time announcing themselves as police and advising Mr. Gipson that there was a warrant for his arrest. *See, e.g., id*. 15:19–16:5.  Mr. Gipson himself admitted that prior to his arrest, he heard the U.S. Marshals knocking on his door and "yelling police" on at least two occasions, but did not answer because "they weren't allowed to knock the door down." *Id.* at 11:14-17.  Regardless, after the contempt hearing Mr. Gipson was subsequently released from custody and another hearing was set for June 14, 2023. *See* D.I. 35.

### E.     Mr. Gipson Introduces A Forged Model Release Form

At the subsequent June 14, 2023 preliminary injunction hearing, Mr. Gipson admitted to engaging in the harassing behavior against Plaintiff, but incredibly asserted that he did this to "provoke" Plaintiff into filing the present lawsuit so that he could tactically file a counter-suit against her. *See* June 14, 2023 Hr. Tr. at 32:5-9.  With respect to the unauthorized dissemination of Plaintiff's nude images, Mr. Gipson attempted to offer into evidence two purported "model release forms," which he claimed shows that he had Plaintiff's consent to share her nude images. *Id*. at 44:7-46:21.  While Plaintiff's counsel objected to the authenticity of these forms, the Court allowed Mr. Gipson additional time "to try to address any authentication or predicate issues" with

4

the exhibits he wished to admit, ultimately giving the parties until June 20, 2023 to supplement the record with any additional evidence to be considered at the hearing.  *Id*. at 70:1-14.

Subsequently, on June 20, 2023, Mr. Gipson filed an updated motion to contest Plaintiff's emergency request for a TRO and preliminary injunction, once again arguing that he had consent to share Plaintiff's nude photographs and attaching the purported "model release forms."  D.I. 46. The same day, Plaintiff filed a motion to strike Mr. Gipson's "model release forms" from evidence, and to enter the requested preliminary injunction in full.  D.I. 45-2.  In support of her motion, Plaintiff attached sworn affidavits from herself, as well as Mr. Ricco Moldt, attesting that they had never seen, nor signed the purported "model release forms."  D.I. 45-3, 45-4.  Plaintiff also included photographs of her and Mr. Moldt's actual handwriting and signatures.  *Id*.

### F.    The Court's August 23, 2023 Order

On August 23, 2023, the Court entered an omnibus order addressing, among other things, Plaintiff's motion to enter her requested preliminary injunction in full, as well as Mr. Gipson's motion to vacate the default.  D.I. 83.  With respect to the preliminary injunction, the Court found that "[a]t this early juncture, Plaintiff has failed to show that she is likely to succeed on the merits of her claims, either under 15 U.S.C. § 6851 or Texas Civil Practice & Remedies Code § 98B." D.I. 83 at 9.  As the Court explained, "both statutes require a defendant to have disclosed images without the consent of the aggrieved individual," "Defendant has introduced two model releases appearing to reflect Plaintiff's consent to the dissemination of the pictures at issue," and "Defendant also testified as to the authenticity of these documents."  *Id*.  While the Court recognized that "Plaintiff disputes the authenticity of her signature on the documents and provided writing and signature samples for the Court to analyze," the Court nevertheless held that "Plaintiff's evidence does not sufficiently undermine the credibility of Defendant's testimony at this stage."  *Id*.  With respect to Mr. Gipson's motion to set aside the default, the Court held that

Mr. Gipson's default was not willful, finding that "Defendant has raised sufficient doubts to justify setting aside the entry of default." *Id*. at 3.

### G.   Additional Victims Have Come Forward Warranting Reconsideration

While the Court relied on Mr. Gipson's testimony that he had consent to disseminate Plaintiff's nude images in denying Plaintiff's request to enter the preliminary injunction in full, and further relied on Mr. Gipson's testimony that he had not been served with the Complaint in granting Mr. Gipson's motion to set aside the default, new evidence has been uncovered further undermining Mr. Gipson's credibility and necessitating reconsideration of the Court's prior orders. Specifically, additional victims have recently come forward, each providing declarations and supporting documentary evidence confirming similar tortious and criminal conduct by Mr. Gipson.

For example, as discussed in the declaration of ████████, after meeting Mr. Gipson, he began pressuring her to take a trip to Europe with him, just as he did with Plaintiff. ████ ██. at ¶ 6-11. On the trip, Mr. Gipson incessantly offered ████████ alcohol and drugs in an attempt to get her intoxicated, just as he did with Plaintiff. *Id*. at ¶ 11. During the trip, Mr. Gipson became more violent and aggressive towards ████████, with Mr. Gipson publicly urinating on ████████ and verbally calling her a "dirty f*cking hooker" after he became intoxicated. *Id*. at ¶ 14. While ████████ realized she was no longer safe with Mr. Gipson, she was forced to complete the trip with him because Mr. Gipson maintained control over her travel documents, and ████ did not have the money to fly back home on her own. *Id*. After the trip, when ████████ tried to break things off with Mr. Gipson, he became extremely aggressive and threatened to stalk her online and further threatened to tell her parents that she was a sex worker. *Id*. at ¶ 17.

After ████████ broke off the relationship, Mr. Gipson made good on his threats, engaging in a months-long harassment campaign, which included: i) sending her threatening messages; ii) showing up at her home and work; and iii) claiming that he had bugged her apartment. *Id*. at ¶¶

17-32.  As he did with Plaintiff, Mr. Gipson also sent ███████ a fake "cease and desist" letter from a non-existent law firm claiming that she owed him $250,000 in damages for purported copyright violations.  *Id*. at ¶¶ 33-34.  And like Plaintiff, ███████ later discovered that Mr. Gipson had published nude photographs of her on his personal Flikr account, as well as on at least fifteen websites that he had created to disseminate nude images of his victims.  *Id*. at ¶¶ 39-40. Like Plaintiff, ███████ explicitly told Mr. Gipson that he did not have permission to publish or share her nude photographs and did not sign any model release form giving Mr. Gipson consent. ███████. at ¶¶ 38-41.[1]

As another example, as discussed in the declaration of ███████, after meeting on a dating application, ███████ informed Mr. Gipson that she was not romantically interested in him.  ███████. at ¶¶ 7-8.  Mr. Gipson was undeterred however, and stated that he would pay her $500 to go to lunch to discuss a potential photography deal, where he would pay for a trip to Mexico and take photographs of her, and that the two could split the profits.  *Id*. at ¶ 8.  During the trip to Mexico however, Mr. Gipson became more aggressive and ███████ began to fear for her safety.  *Id*. at ¶ 9.  Mr. Gipson began making sexual advances, and attempted to initiate physical contact with ███████, despite her objections.  *Id*.  When ███████ rejected Mr. Gipson's advances, he became verbally abusive, calling her a "b*tch and a c*nt."  *Id*.  During the trip, Mr. Gipson also bragged to ███████ about targeting young 18-19 year old Asian female freshman at the college near his home, calling the young women "whores and prostitutes."  *Id*. at ¶ 12.  After

---

[1] These are the same websites identified in Plaintiff's Second Emergency Application For Temporary Restraining Order (D.I. 29-1), which Mr. Gipson created in retaliation for Plaintiff's filing of this lawsuit.  As discussed in Plaintiff's Second Emergency TRO Application, in addition to publishing his victims' nude photographs, Mr. Gipson calls each of the photographed women "sex workers" and claims that all of the proceeds from the sales of any of the photographs would go to the "ASIAN SEX WORKERS FUND."  *Id*. at 7.   The websites thus serve the dual purpose of defaming each of the victims as well as disseminating their nude photographs without consent.

the trip, Mr. Gipson refused to delete or hand over the photographs.  *Id*. at ¶ 10.  ████████ later discovered that Mr. Gipson had posted her nude photographs on his personal Flickr page, as well as on at least fifteen websites that he had created to disseminate nude images of his victims.  *Id*. at ¶¶ 11, 16.  As with Plaintiff and ████████, ████████ did not consent to the distribution of her nude images, and did not sign any model release form giving Mr. Gipson consent.  *Id*. at ¶¶ 10, 17.

As another example, as discussed in the declaration of ████████, Mr. Gipson began reaching out to ████ over Instagram, repeatedly offering to take her on a trip to Europe.  ████. at ¶ 5.  While ████ eventually agreed to travel with Mr. Gipson, she became increasingly uncomfortable with Mr. Gipson's behavior during the trip, as he repeatedly spoke in a derogatory way about Asian women he had dated, and repeatedly tried to pressure ████ into allowing him to take photographs of her nude.  *Id*. at ¶ 6.  After the trip to Europe, Mr. Gipson apologized for his behavior and convinced ████ to travel to Tulum, Mexico with him.  *Id*. at ¶ 7.  During the trip to Mexico, Mr. Gipson attempted to control ████ travel documents, and became increasingly aggressive.  *Id*.  When ████ attempted to leave, Mr. Gipson began begging her to stay, pressuring her to take drugs, and offering her money.  *Id*.  Fearing for her life, ████ declined, stating that she had received a call that her mother was sick in the hospital.  *Id*.

After the trip, Mr. Gipson engaged in a months-long harassment campaign, sending her harassing messages and texts.  *Id*. at ¶ 8.  As with Plaintiff, Mr. Gipson also threatened to sell ████ ████ nude photographs on the "dark web."  *Id*.  And as with Plaintiff, Mr. Gipson also created a fake social-media account purporting to be ████, claiming that she was a prostitute and a thief, and claiming that there was a "$250,000" reward for her arrest.  *Id*. at ¶ 9.  And as with Plaintiff, Mr. Gipson made false copyright reports against ████ real social media accounts to get them

blocked, ensuring that his fake account would be the only account ███████ family and friends would see. *Id.* at ¶ 10. And as with Plaintiff, ██████████, and ██████████, Mr. Gipson also posted photographs of ██████ on his personal websites, without her consent. *Id.* at ¶ 11.

As another example, as discussed in the declaration of ████████████████, Mr. Gipson has a history of pressuring women into taking alcohol and drugs, and then attempting to have sex with them and/or photograph them nude once they are inebriated or incapacitated. For example, on at least two occasions, Mr. Gipson attempted to have sex with ██████ when he thought she was passed out. ██████. at ¶ 4. Mr. Gipson also repeatedly pressured ██████ to allow him to take nude photographs of her. *Id.* After discovering that Mr. Gipson had been charged with online impersonation of other young Asian women, ██████ demanded to see what photographs Mr. Gipson had of her on his computer. *Id.* at ¶ 5. ██████ then discovered that Mr. Gipson had hundreds of her nude photographs saved on his computer, along with nude photographs of dozens of other young Asian women, some of whom appeared underage. *Id.* In total there were thousands of pictures of nude young Asian women on Mr. Gipson's computer, causing ██████ to fear for her safety. *Id.* ██████ then tried to create a copy of the evidence on Mr. Gipson's computer, but was interrupted by Mr. Gipson, who became extremely angry and violent. *Id.* at ¶ 6. Mr. Gipson threw ██████ to the ground with sufficient force to break her iPOD, and then sat on top of her with a look in his eyes like he wanted to kill her. *Id.* ██████ was eventually able to escape and fled the house, running to a local gas station to call the police, however the police never came. *Id.* After this incident, ██████ began talking to other Asian women that had been around Mr. Gipson, with these women telling ██████ that they had similar experiences with him, including repeated attempts to pressure them into drinking and/or taking drugs, followed by attempts to have sex with

them after they were too intoxicated to resist, as well as taking photographs of them while nude and incapacitated.  *Id*. at ¶ 8.

## III.  LEGAL STANDARD

"A rule 59(e) motion calls into question the correctness of a judgment." *Templet v. Hydrochem Inc*., 367 F.3d 473, 478 (5th Cir. 2004) (internal quotations omitted).  Under Rule 59(e), amending a judgment is appropriate where: (1) there has been an intervening change in controlling law; (2) the movant presents newly discovered evidence that was previously unavailable; or (3) there is a need to correct a clear error of law or prevent manifest injustice.  *In re Benjamin Moore & Co*., 318 F.3d 626, 629 (5th Cir. 2002).

## IV.  ARGUMENT

### A.  Amendment of the Court's Order Denying Plaintiff's Request For A Preliminary Injunction is Appropriate

#### 1.  Newly Discovered And Previously Unavailable Evidence Supports Amending The Court's Order To Grant Plaintiff's Request For A Preliminary Injunction

The Court should amend its order denying Plaintiff's motion to enter her requested preliminary injunction in full because newly discovered and previously unavailable evidence establishes that Plaintiff is likely to succeed on the merits.  While the Court previously held that Plaintiff had not shown a likelihood that she will succeed on the merits of her claim based on the current evidentiary record (D.I. 83 at 9), as discussed above, *supra* at Section II.G, additional victims have recently come forward, each providing declarations and supporting documentary evidence which significantly undermines the credibility of Mr. Gipson's testimony that he had consent to share Plaintiff's nude images.  The Fifth Circuit has identified four factors a court should consider when determining whether to grant a motion to amend judgment pursuant to Rule 59(e) in light of new evidence: (1) the probative value of the evidence; (2) the reason for Plaintiff's

default; (3) whether the evidence was available to Plaintiff at the time of the prior motion; and (4) potential prejudice to the non-moving party. *In re Louisiana Crawfish Producers*, 852 F.3d 456, 466 (5th Cir. 2017). Each of these factors weighs in favor of amending the Court's prior judgment.

First, the probative value of the new evidence is substantial. "A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As an initial matter, the Court has already found that there is "a substantial risk of irreparable harm to Plaintiff if Defendant Mark A. Gipson were allowed to continue disclosing Plaintiff's intimate visual materials, impersonate her on social media, and contact her or her family," and that "[a]ny potential harm to Defendant Mark A. Gipson in ceasing such conduct is minimal…." D.I. 16 at 1. Additionally, because the "interest in sexual privacy is substantial" and "[v]iolations of sexual privacy are intrinsically harmful because sex is inherently private," a preliminary injunction serves the public interest. *Ex parte Jones*, No. PD-0552-18, 2021 WL 2126172, at \*7 (Tex. Crim. App. May 26, 2021), *reh'g denied* (July 28, 2021).

With respect to Plaintiff's likelihood to succeed on the merits, as discussed above, *supra* at Section II.E, Mr. Gipson previously submitted two forged model release forms purporting to show Plaintiff's consent. And despite Plaintiff submitting sworn declarations from herself and Mr. Moldt attesting under penalty of perjury that they did not sign the model release forms, and further providing samples of their handwriting and signatures, the Court found that "Plaintiff's evidence does not sufficiently undermine the credibility of Defendant's testimony at this stage." D.I. 83 at 9. However, new evidence removes any doubt that Mr. Gipson did ***not*** have consent to disseminate Plaintiff's nude photographs.

As discussed above, *supra* at Section II, Mr. Gipson has systematically targeted young Asian women, befriending them and offering to take them on trips to Europe or Mexico, and then pressuring the women to take drugs and alcohol and to allow him to photograph them nude. *Id*. Mr. Gipson then engages in a months-long campaign of harassment and intimidation when the women attempt to break contact. *Id.* This campaign of harassment includes eerily similar behavior to what Plaintiff recounts in her Complaint, including: (1) sending the women harassing and threatening messages; (2) creating fake social media profiles for the women claiming that they are prostitutes and thieves; (3) submitting false copyright infringement reports against the women's real social media profiles to get them banned to ensure that their friends and family only see the fake profiles; (4) sending the women fake "cease and desist" letters from fake law firms claiming the women owe him hundreds of thousands of dollars; and (5) publishing their nude photographs on his personal websites without the women's consent. *Id*. This new evidence significantly undermines Mr. Gipson's credibility that he had consent to disseminate Plaintiff's nude photographs, and thus is highly probative in demonstrating that Plaintiff is likely to succeed on the merits of her claims. This factor thus weighs strongly in favor of reconsideration.[2]

Second, with respect to Plaintiff's reason for not submitting this evidence sooner, and whether the evidence was available to Plaintiff at the time of the prior motion, none of these additional victims had been identified prior to the preliminary injunction hearing, and indeed new victims have been identified even within the past two weeks. Hyde Decl. at ¶ 4. Specifically, after Mr. Gipson retaliated against Plaintiff's filing of this lawsuit by creating at least fifteen websites

---

[2] Moreover, while the Court has already found irreparable harm, this new evidence significantly raises the irreparable harm that will occur if Mr. Gipson is allowed to maintain his websites publishing Plaintiff's nude photographs. Specifically, it is apparent now that **none** of the women featured on Mr. Gipson's websites gave Mr. Gipson consent to distribute their nude photographs, and that each of these women are additional victims of Mr. Gipson's predatory behavior.

to distribute her nude photographs, Plaintiff's counsel began attempting to identify other potential victims on Mr. Gipson's website through reverse google image search. Hyde Decl. at ¶ 2. Over the next two months, Plaintiff's counsel was able to identify and contact several additional victims, and those victims notified other women who had been harmed by Mr. Gipson, who in turn reached out to Plaintiff's counsel to assist with the case. Hyde Decl. at ¶ 3. However, as discussed above, none of these additional victims had been identified prior to the preliminary injunction hearing, and at least two of the victims that have contacted Plaintiff's counsel did so after the Court issued its order denying Plaintiff's request for a full preliminary injunction. Hyde Decl. at ¶ 4. Thus, Plaintiff could not have submitted this new evidence sooner, as this evidence was not available to Plaintiff previously.

Additionally, given Mr. Gipson's retaliation against Plaintiff after filing this lawsuit, there is good reason to delay in disclosing the additional victims, to protect their identity and limit potential retribution. Thus, even had the victims been identified earlier, there was good reason to not disclose them sooner. These factors also weigh in favor of amending the Court's prior judgment and granting Plaintiff's request for a preliminary Injunction *See Crawfish Producers*, 852 F.3d at 468-69 (finding plaintiffs had good reason for not presenting evidence earlier); *Joseph v. Hood*, No. 6:19-CV-105-JCB-KNM 2020 WL 10045967 (E.D. Tex. Aug. 12, 2020) (granting Rule 59(e) motion where deposition could not have bene taken earlier).[3]

---

[3] Moreover, even if the Court were to find that Plaintiff should have raised each new victim with the Court as they were identified (for those identified before the Court issued its order), the probative value of this new evidence still weighs strongly in favor of considering this evidence and amending the Court's prior order. *See, e.g., Generation Trade, Inc. v. Ohio Sec. Ins. Co.,* No. 3:18-CV-0434-K, 2019 WL 3716427, at *5 (N.D. Tex. Aug. 6, 2019) (finding that Plaintiff's delay in submitting evidence weighed slightly in favor of denying Plaintiff's motion, but still granting the motion because the probative value of the evidence was significant); *see also Crawfish Producers*, 852 F.3d at 466-67 (finding that the probative value of the evidence weighed in favor of reconsideration).

Finally, the potential prejudice to Mr. Gipson in granting the preliminary injunction is minimal, as the Court has already held that "[a]ny potential harm to Defendant Mark A. Gipson in ceasing such conduct is minimal…." D.I. 16 at 1. Thus, the Court should amend its prior judgment to grant Plaintiff's requested preliminary injunction in full. *See Travelhost, Inc. v. Modglin*, No. 3:11-CV-0456-G, 2012 WL 2049321, at *3 (N.D. Tex. June 6, 2012) (amending judgment denying preliminary injunction because new evidence established Plaintiff was likely to succeed on the merits); *Crawfish Producers*, 852 F.3d at 468-69 (finding new evidence warranted reconsideration); *Luig v. N. Bay Enters., Inc.*, 817 F.3d 901, 907 (5th Cir. 2016) (same); *Generation Trade, Inc.,* 2019 WL 3716427, at *5 (same).

2.  <u>Even Without The New Evidence, The Finding That Plaintiff Was Unlikely To Succeed On The Merits Was Based On A Manifest Error Of Law Or Fact, And Results In A Manifest Injustice</u>

Even without the additional victim declarations undermining Mr. Gipson's credibility, the Court should amend its order and grant Plaintiff's requested preliminary injunction in full because the denial is based on a manifest error of law or fact, and is manifestly unjust. *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002) (reconsideration is appropriate "to correct a clear error of law or prevent manifest injustice"). In order to demonstrate likelihood of success on the merits, "the plaintiff's evidence need not prove that plaintiff is entitled to a summary judgment; plaintiff needs only to present a *prima faci*e case, but not demonstrate that he is certain to win." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) (citing *Janvey v. Alguire,* 647 F.3d 585, 595-96 (5th Cir. 2011)). Here, in weighing the credibility of Mr. Gipson's testimony and model release forms, the Court recognized that Plaintiff "disputes the authenticity of her signature on the documents and provided writing and signature samples for the Court to analyze." D.I. 83 at 9. However, this understates the evidence Plaintiff submitted demonstrating Mr. Gipson's testimony is not credible. In addition to providing a declaration from

14

herself attesting under penalty of perjury that she never signed the model release forms and providing copies of her signature and handwriting for the Court to review (D.I. 45-3 (Doe Decl.)), Plaintiff *also* submitted a declaration from Mr. Ricco Moldt similarly attesting under penalty of perjury that he never signed the model release forms and similarly providing copies of his signature for the Court to review (D.I. 45-4 (Moldt Decl.)).  Thus, this was not a case of comparing two competing witnesses' testimony, but rather *both* individuals who Mr. Gipson claimed signed the purported model release forms attesting under penalty of perjury that *neither* had ever seen, let alone signed, the documents.  Additionally, Plaintiff did more than just submit samples of her handwriting and signature, she submitted photographs of her government issued driver's license, issued March 24, 2016 (seven years before this law suit), removing any doubt as to whether the submitted samples were legitimate representations of her signature.  D.I. 45-3 (Doe Decl.), Ex. 2.

Moreover, credibility is not viewed in a vacuum.  *See, e.g., Shi Chang Xing v. Holder*, 311 F. App'x 720, 721 (5th Cir. 2009) (holding that "multiple misrepresentations" warranted a finding that a witness lacked credibility).  Thus, Mr. Gipson's credibility regarding having consent to disseminate Plaintiff's nude photographs must be evaluated in view of his other incredible allegations and contentions, including his allegations that Plaintiff's pro bono counsel purportedly "exploit[ed] minority female sex workers," "intentionally and knowingly fabricated evidence," and further "paid a homeless woman to impersonate a Texas Ranger Law Enforcement officer." D.I. 65 at 3-5; D.I. 84 at 4-5.  Taken altogether, and even without considering the new evidence from the additional victims who have come forward, Mr. Gipson's testimony that he had consent to disseminate Plaintiff's nude photographs is simply not credible.  Thus, the Court's order should be amended because Plaintiff has demonstrated that she is likely to succeed on the merits of her claims.  *See Wilkens v. Toyotetsu America Inc*., No. 09-CV-515-XR, 2010 WL 986049, at *2-3

(W.D. Tex. Mar. 15, 2010) (reconsideration appropriate based on clear error of fact); *see also Perry v. Mendoza*, No. H-19-4364, 2022 WL 3573141 (S.D. Tex. Apr. 14, 2022) (reconsideration granted in view of Court's further review of the record).

Additionally, denial of Plaintiff's request to enter the preliminary injunction in full is manifestly unjust. A showing of manifest injustice requires that, without correction, the Court's decision would "lead to a result that is both inequitable and not in line with applicable policy." *Alvarado v. The Texas Rangers*, No. EP-03-CA-0305-FM, 2005 WL 1420846, at *3 (W.D. Tex. June 14, 2005) (internal citations omitted). It has been nearly five months since Plaintiff filed this case and first sought a TRO seeking to take down the nude images and defamatory content Mr. Gipson published about her. And despite granting-in-part Plaintiff's first requested TRO (D.I. 16), granting-in-full Plaintiff's second emergency TRO (D.I. 31), and granting-in-part Plaintiff's request for a preliminary injunction (D.I. 44), there are now ***hundreds*** more nude photographs of Plaintiff on Mr. Gipson's websites than were published prior to this case's filing. *See* D.I. 29-1; 45-2. Moreover, in addition to continuing to publish Plaintiff's nude photos in violation of the Court's prior orders, Mr. Gipson failed to remove the fake social media pages he created impersonating and defaming Plaintiff, and failed to identify to the Court any other websites where he had disseminated her nude photographs (as required by D.I.s 16, 31, and 44). Allowing Mr. Gipson to continue harming Plaintiff, along with his other victims, is manifestly unjust.

**B.     Amendment of the Court's Order Granting Defendant's Request To Set Aside The Default Is Appropriate**

1.     Newly Discovered And Previously Unavailable Evidence Supports Amending The Court's Order To Deny Mr. Gipson's Motion To Set Aside The Default

Likewise, the Court should amend its order granting Mr. Gipson's motion to set aside the Default, and instead deny Mr. Gipson's motion, because the newly discovered and previously

unavailable evidence significantly undermines Mr. Gipson's credibility that his default was not willful.  In determining whether good cause exists to set aside a default, courts must consider several equitable factors, including: (1) whether the default was willful, (2) the extent of prejudice to plaintiff, (3) the merits of a defendant's asserted defense, and (4) additional factors, including whether the public interest is implicated.  *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000); *Roper v. Abbott*, No. 7:11-cv-00031-O, 2013 WL 12290262, at *3 (N.D. Tex. May 8, 2013).  However, "***[a] finding of willful default ends the inquiry***, for 'when the court finds an intentional failure of responsive pleadings there need be no other finding.'"  *Lacy*, 227 F.3d at 292 (quoting *Matter of Dierschke*, 975 F.2d 181, 184 (5th Cir. 1992)) (emphasis added).

As discussed above, additional victims have recently come forward, each providing declarations and supporting documentary evidence confirming similar conduct by Mr. Gipson.  With respect to the probative value of this new evidence, the Court previously found that Mr. Gipson's default was not willful in view of his testimony that he had not been properly served.  D.I. 83 at 3.  But the new evidence from Mr. Gipson's other victims significantly undermines Mr. Gipson's already questionable credibility, and is thus probative to the ultimate question of whether Mr. Gipson was indeed aware of this lawsuit, and thus whether his default was willful.  *Shi Chang Xing,* 311 F. App'x at 721 ("multiple misrepresentations" sufficient to deem testimony lacks credibility).  Moreover, as discussed above, Plaintiff could not have submitted this new evidence sooner, as this evidence was not available to Plaintiff previously.  Finally, any prejudice to Mr. Gipson from the Court amending its order is entirely Mr. Gipson's own doing.  Mr. Gipson sought to game the system, ignoring the present lawsuit and each of the Court's prior orders until U.S. Marshals were authorized to use any reasonable means to secure his arrest.  Mr. Gipson would thus suffer only the prejudice of the consequences of his own actions.

2.     Even Without The New Evidence, The Finding That Mr. Gipson's Default Was Not Willful Was Based On A Manifest Error Of Law Or Fact, And Results In A Manifest Injustice

Even without the additional victim declarations further undermining Mr. Gipson's credibility, the Court should amend its order granting Mr. Gipson's motion to set aside the Default, and instead deny Mr. Gipson's motion, because the prior order is based on a manifest error of law or fact, and is manifestly unjust.  *In re Benjamin Moore & Co*., 318 F.3d at 629; *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96-97 (2d Cir. 2014).   As the Court recognized, while Mr. Gipson testified that he was not properly served until June 7, 2023, Plaintiff submitted a sworn affidavit of service, confirming that Mr. Gipson was served on April 24, 2023. D.I. 83 at 3 (citing D.I. 82 at 11-14).   The Court further recognized, "[a] signed return of service constitutes *prima facie* evidence of valid service."  *Id*. (citing *People's United Equip. Fin. Corp. v. Hartmann*, 447 F. App'x 522, 524 (5th Cir. 2011) (internal quotation marks omitted)). Regardless, the Court held that a signed return of service "is not, however, *prima facie* evidence of willfulness" (*id*.) and "doubts should 'be resolved in favor of the movant to the end of securing a trial'" (*id*. (*citing Gen. Tel. Corp. v. Gen Tel. Answering Serv*., 277 F.2d 919, 921 (5th Cir. 1960))).   But in this case *prima facie* evidence of service *is* equivalent to *prima facie* evidence of willfulness, because Mr. Gipson's *only* argument that his default was not willful is that he was not properly served.  *See* D.I. 79 (Gipson Motion to Vacate Default).

Specifically, in support of his motion to vacate the default, Mr. Gipson argued that the default should be set aside because he "was not served on [April 26, 2023]," and only "discovered two empty boxes on his porch late at night on or about April 26, 2023, neither of which contained any papers or pleadings from this case."   D.I.s 75 at 2, 76 at 2-3, 79 at 3.   Mr. Gipson further provided an "unsworn declaration" stating that "service of process was defective" and that the process server "may be high on methamphetamine."   D.I. 79-2.   But as a matter of law, Mr.

Gipson's unsupported (and plainly incredible) allegations that he was not served falls far short of the "strong and convincing evidence" required to defeat Plaintiff's *prima facie* evidence of valid personal service.  *See Hartmann*, 447 F. App'x at 524 (denying *pro se* defendant's motion to dismiss for improper service because defendant's "un-notarized affidavit claiming that no service was made on him" was insufficient to overcome plaintiff's *prima facie* evidence of valid service).[4]

Indeed, Courts have repeatedly declined to vacate an entry of default—even against *pro se* defendants—based on a defaulting party's implausible claim that a process server falsely represented facts in the return of service.  *See, e.g., Pollard v. Church of God in Christ, Inc.*,  No. 2:16-CV-238-J, 2017 WL 5127108, at *1 (N.D. Tex. Aug. 3, 2017) (declining to vacate Clerk's entry of default judgment against a *pro se* defendant because "[Defendant's] claim that a mistake has been made, that is, that the summons was also not delivered to him by either the process server *or* by the service by mail effectuated upon him by Plaintiffs' counsel, is not credible").[5]

Nor were the affidavits of service the only evidence demonstrating that Mr. Gipson's default was willful.  For example, at the contempt hearing, Deputy David Zamora testified that the U.S. Marshals had spoken to one of Mr. Gipson's neighbors after one of the initial attempts to execute his arrest, and the neighbor stated that she had heard Mr. Gipson talking loudly on the phone about being "in trouble" due to a lawsuit relating to "taking pictures."  June 7, 2023 Hr. Tr.

---

[4] While the Court stated that "Defendant's testimony revealed apparent inconsistencies with service that Plaintiff was unable to clarify" (D.I. 83 at 3), Plaintiff's counsel explicitly confirmed at the hearing that affidavits of service were filed for both the Complaint, as well as the Court's order to show cause.  *See* June 7, 2023 Hr. Tr. at 12:14-13:1; *see also* D.I. 17 (summons returned executed), D.I. 20 (certificate of service).  And Mr. Gipson offered no credible evidence to support his alleged "inconsistencies with service."

[5] *See also Sec. & Exch. Comm'n v. McDuff*, No. 3:08-CV-0526_L-BK, 2016 WL 6106490, at *3 (N.D. Tex. Sept. 20, 2016), *report and recommendation adopted*, 2016 WL 6093368 (N.D. Tex. Oct. 17, 2016) (denying defendant's motion to set aside void judgment where defendant claimed "he was not personally served" and the person who attempted to serve him "was not an authorized process server.")

at 19:19-20:2.  This testimony directly undermines Mr. Gipson's testimony that he was unaware of the lawsuit prior to June 7, 2023.  Additionally, Mr. Gipson's own admissions and statements to the process server demonstrate that his failure to respond, and resulting default, was willful.  Specifically, videos of Mr. Gipson's interaction with the process server reveal Mr. Gipson saying "you never served me," "you lied about serving me," "you improperly served me," "we'll talk to the judge about it," "I have it on video though, not properly serving me."  D.I.s 80-2, 80-3, 80-4.  But Mr. Gipson's statements "amount[] to an admission to the process server that it would be difficult to serve him, which suggest that Defendant's conduct and resulting default were willful."  *Espinoza v. Humphries,* No. 19-CV-1805-E-BK, 2020 WL 5350489, at *2 (N.D. Tex. Aug. 19, 2020), *report and recommendation adopted*, 2020 WL 5332853 (N.D. Tex. Sept. 4, 2020) (citing *Matter of Dierschke*, 975 F.2d at 183.[6]

In short, while the Court is correct that "doubts should 'be resolved in favor of the movant to the end of securing a trial'" (D.I. 83 at 3), here there can be no doubt that Mr. Gipson was timely and properly served, and that his default in this case was willful.  And because Mr. Gipson's default was willful, under Fifth Circuit law, his motion to set aside the default should be denied.  *See Lacy*, 227 F.3d at 292 ("A finding of willful default ends the inquiry . . .").

## V.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court amend its Judgement (D.I. 83) to grant Plaintiff's requested preliminary injunction in full and deny Mr. Gipson's request to set aside the default.

---

[6] And once again, credibility is not viewed in a vacuum.  *Shi Chang Xing,* 311 F. App'x at 721.  Thus, Mr. Gipson's credibility regarding having not been served and being unaware of this lawsuit must be evaluated in view of his other incredible allegations and contentions.

Dated: September 20, 2023

Respectfully Submitted,

/s/  *S. Giri Pathmanaban*

S. Giri Pathmanaban (TSB#: 24074865)
Benjamin J. Behrendt (TSB#: 24130704)
LATHAM & WATKINS LLP
300 Colorado Street
Suite 2400
Austin, TX  78701
Telephone:  (737) 910-7300
Facsimile:  (737) 910-7301
giri.pathmanaban@lw.com
benjamin.behrendt@lw.com

Bradley A. Hyde (*pro hac vice*)
Kevin M. Hamilton (*pro hac vice*)
Caitlyn L. Brock (*pro hac vice*)
LATHAM & WATKINS LLP
650 Town Center Drive
Suite 2000
Costa Mesa, CA  92626-1925
Telephone:  (714) 540-1235
Facsimile:  (714) 755-8290
bradley.hyde@lw.com
kevin.hamilton@lw.com
caitlyn.brock@lw.com

ATTORNEYS FOR Plaintiff
JANE DOE

## CERTIFICATE OF CONFERENCE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify on September 19, 2023, counsel for Plaintiff emailed Defendant seeking his position on this motion, and that Defendant failed to respond.  Counsel for Plaintiff thus files the present motion as opposed.

Dated: September 20, 2023                          /s/  *S. Giri Pathmanaban*
                                                                    S. Giri Pathmanaban


## CERTIFICATE OF SERVICE

I hereby affirm that on this 20th day of September, 2023, a true and correct copy of the foregoing document was served by electronic service pursuant to the Federal Rules of Civil Procedure with the Court's CM/ECF electronic filing system.  Additionally, a copy of the respective pleading was served to Mr. Gipson's email address.

Dated: September 20, 2023                          /s/  *S. Giri Pathmanaban*
                                                                    S. Giri Pathmanaban